# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE CELLULAR TELEPHONE PARTNERSHP LITIGATION | ) ) ) | COORDINATED. C.A. No. 6885-VCL |

THIS FILING APPLIES TO COODINATED CIVIL ACTIONS 6886 AND 6908

## MEMORANDUM OPINION ADDRESSING CLAIMS FOR BREACH OF THE PARTNERSHIP AGREEMENT GOVERNING SALEM CELLULAR TELEPHONE COMPANY

Date Submitted: July 28, 2021
Date Decided: September 28, 2021

Carmella P. Keener, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Thomas R. Ajamie, David S. Siegel, Ryan van Steenis, AJAMIE LLP, Houston, Texas; Michael A. Pullara, Houston, Texas; Marcus E. Montejo, Kevin H. Davenport, John G. Day, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Attorneys for Plaintiffs.*

Maurice L. Brimmage, Jr., AKIN GUMP STRAUSS HAUER & FELD LLP, Dallas, Texas; Todd C. Schiltz, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; William M. Connolly, FAEGRE DRINKER BIDDLE & REATH LLP, Philadelphia, Pennsylvania; Zoë K. Wilhelm, FAEGRE DRINKER BIDDLE & REATH LLP, Los Angeles, California; *Attorneys for Defendants.*

**LASTER, V.C.**

Salem Cellular Telephone Company (the "Partnership") was a Delaware general partnership that held a license to provide cellular telephone services in a geographic area centered around Salem, Oregon. Defendant AT&T Mobility Wireless Operations Holdings LLC ("Holdings") owned 98.119% of the partner interest in the Partnership. Holdings is an indirect, wholly owned subsidiary of non-party AT&T Inc. Through Holdings and other affiliates, AT&T controlled the Partnership, directed its business and affairs, and managed its day-to-day operations.[1]

In October 2010, AT&T caused the Partnership to transfer all of its assets and liabilities to defendant New Salem Cellular Telephone Company LLC, another affiliate of AT&T. As consideration, AT&T paid the Partnership $219 million in cash, reflecting the value of the Partnership as determined by a valuation firm retained by AT&T. The Partnership dissolved after selling all of its assets, and each partner received its pro rata share of the liquidating distribution. After the transaction, AT&T continued to operate the business of the former Partnership. The transaction thus functioned as a freeze-out of the minority partners (the "Freeze-Out").[2]

---

[1] AT&T came to control the Partnership through a complex series of corporate transactions spanning years. The evolution of AT&T as an entity is not directly relevant to this proceeding. For simplicity, this decision refers to AT&T, unless the context requires a more specific referent. In footnotes, this decision provides context regarding the stage of AT&T's evolution.

[2] Between October 2010 and June 2011, AT&T engaged in similar freeze-out transactions involving twelve other partnerships. The thirteen transactions resulted in the filing of fifteen civil actions in this court. The cases were coordinated for purposes of pre-trial discovery under the caption *In re Cellular Telephone Partnership Litigation*, C.A. No.

The plaintiffs were minority partners who owned the 1.881% minority interest in the Partnership. At the price AT&T paid in the Freeze-Out, they received approximately $4.1 million for their interest.

The plaintiffs assert that AT&T breached its fiduciary duties by effectuating the Freeze-Out. They also assert that AT&T breached the terms of the partnership agreement during the years leading up to the Freeze-Out. This post-trial decision addresses the claims for breach of the partnership agreement. It does not address the claim for breach of fiduciary duty.

The plaintiffs advanced three principal claims for breach of the partnership agreement, but they prevailed on only one. The plaintiffs proved that AT&T failed to comply with a provision requiring that Partnership assets be titled in the name of the

---

6885-VCL (the "Coordinated Action"). By agreement, the parties subsequently conducted a coordinated trial. The court therefore is issuing decisions in the Coordinated Action.

Five of the other partnerships have histories and governance structures that are substantially similar to the Partnership's. Those five are (1) Bremerton Cellular Telephone Company, (2) Melbourne Cellular Telephone Company, (3) Provo Cellular Telephone Company, (4) Visalia Cellular Telephone Company, and (5) Sarasota Cellular Telephone Company.

Seven of the other partnerships have histories and governance structures that differ to varying degrees from the Partnership. Those seven are (1) Alton CellTelCo, (2) Bellingham Cellular Partnership, (3) Bradenton Cellular Partnership, (4) Reno Cellular Telephone Company, (5) Bloomington Cellular Telephone Company, (6) Galveston Cellular Partnership, and (7) Las Cruces Cellular Telephone Company.

At times, this decision refers to the other partnerships. When referring to a specific partnership, this decision uses the name of its market. For example, a reference to "Melbourne" refers to the Melbourne Cellular Telephone Company.

2

Partnership. Under an exception to that requirement, any assets titled jointly with or in the name of another owner had to be held for the benefit of the Partnership. The plaintiffs proved that AT&T breached this provision by using AT&T affiliates to hold title to the contract rights with the Partnership's subscribers and to information generated by the Partnership's subscribers. AT&T monetized those Partnership assets for its own benefit without allocating a share of the income to the Partnership. AT&T thus held Partnership assets for its own benefit, rather than for the Partnership's benefit.

The plaintiffs pursued their claims for breach of the partnership agreement to obtain a damages award based on a contractual dissociation remedy. The partnership agreement called for any partner who breached a material provision of the agreement to be dissociated from the partnership. The agreement called for the dissociated partner to receive the value of its capital account and for the non-breaching partners to receive a pro rata allocation of the breaching partner's interest. In substance, the dissociation remedy resulted in the non-breaching partners receiving the full value of the Partnership, minus the value of the dissociated partner's capital account.

The plaintiffs recognize that in 2021, eleven years after the Freeze-Out, it is impractical to implement the dissociation remedy as written. They accordingly seek the monetary equivalent. They ask the court to determine the fair value of the Partnership, subtract the amount of AT&T's capital account on the date of the Freeze-Out, and award them the resulting value as damages. They accept that the amount they received in the Freeze-Out will operate as a credit against the award. As a practical matter, therefore, the

3

plaintiffs would receive as damages the entire amount by which the judicially determined fair value of the Partnership exceeds the price AT&T paid in the Freeze-Out.

This decision declines to award dissociation damages, because such an award easily could become so large as to be unconscionable. Under a compensatory damages remedy, if the court were to determine that the fair value of the Partnership was 10% higher than the Freeze-Out price, then the plaintiffs would receive a damages award reflecting a 10% increase in their share of the Freeze-Out price. The plaintiffs received $4,119,390 in the Freeze-Out, so an award of compensatory damages reflecting a 10% increase would result in damages of $411,939. Under the dissociation remedy, however, the plaintiffs would receive 100% of the value of the Partnership, minus the value of AT&T's capital account and minus a credit for what the plaintiffs already received. For a 10% increase, that translates into a damages award of $21.9 million, or roughly a 432% increase over the plaintiffs' share of the Freeze-Out. If the court were to determine that the fair value of the Partnership was 50% higher than the Freeze-Out price, then an award of compensatory damages would yield $2.06 million to the plaintiffs, while an award of dissociation damages would yield $109.5 million. As the degree of underpricing increases, the results diverge exponentially.

The plaintiffs insist that dissociation damages are warranted under Delaware's contractarian approach. They point out that AT&T sought to enforce a dissociation remedy against minority partners in a prior litigation, that AT&T had the power to eliminate the dissociation remedy but never did, and that AT&T should have to live with its agreement.

4

If the plaintiffs had shown that AT&T had committed a breach that deprived the minority partners of meaningful value, and particularly if AT&T's breach was willful or persistent, then dissociation damages could be warranted. But the plaintiffs only proved that AT&T deprived the minority partners of a negligible amount of value. The record also reflects that AT&T engaged in significant administrative efforts to allocate revenue and expense to the Partnership in accordance with the same principles that AT&T used to allocate revenue and expense to AT&T's other market-level entities.

There is a strong argument that AT&T deprived the minority partners of meaningful value by failing persistently and pervasively to follow certain contractually specified methodologies for allocating revenue to the Partnership that appear in a management agreement between the Partnership and an AT&T affiliate. The plaintiffs attempted to pursue this claim under the guise of a breach of the partnership agreement, but this decision rejects that approach. And although the record establishes clearly that AT&T ignored the agreed-upon methodologies, the plaintiffs failed to develop the factual record necessary to estimate how compliance with the agreed-upon methodologies would have affected the value of the Partnership. One of the provisions mandated that AT&T add a premium of 25% when allocating revenue to the Partnership, so that increase would need to be taken into account. Beyond that step, however, the impact is unclear. It seems likely that the other contractual methodologies would have benefited the partnership, but the court cannot say more than that.

On these facts, the court will not award dissociation damages as a remedy. The plaintiffs are awarded compensatory damages in the amount of $39,847, plus pre- and post-judgment interest on that amount.

## I. FACTUAL BACKGROUND

Trial took place over five days. The parties introduced 3,187 exhibits, including thirty-nine deposition transcripts. Four fact witnesses—all present or former AT&T executives—and three experts testified live. The following factual findings represent the court's effort to distill this record.[3]

### A. The Formation Of The Partnership

In the 1980s, during the early days of the cellular telephone industry, the Federal Communications Commission (the "FCC") conducted lotteries to award the rights to construct cellular telephone networks in particular geographic areas. If the lottery winner built out the network and complied with other regulatory requirements, then the FCC granted the lottery winner a license to provide cellular telephone service in that area. The

---

[3] Trial was held in the Coordinated Action and addressed all of the partnerships and all of the coordinated lawsuits. Unless otherwise noted, citations to docket entries refer to items filed in the Coordinated Action. Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 600. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. The parties deposed some witnesses multiple times. For those witnesses, the citation includes the year of the pertinent deposition. Citations in the form "JX —— at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number or, if the document lacked a control or JX number, by the internal page number. If a trial exhibit used paragraph numbers, then references are by paragraph.

6

legacy wireline carrier received its own permit and was not allowed to participate in the lottery, ensuring that a new entrant would receive a license. PTO ¶¶ 4, 20.

No one expected a lottery winner to build and operate an isolated wireless business limited to a particular geographic area. The value of the rights lay in the ability of the local system to become part of a larger wireless network.

At the time, pioneering cellular telephone companies were trying to build ever-larger networks. One method of expanding involved partnering with a lottery winner. For the cellular provider, the lottery winner's license added a geographic area to its network. For the lottery winner, the cellular provider took over the task of building, maintaining, and operating the local system as part of its larger network.

Many investors participated in the FCC-sponsored lotteries. To increase their odds of winning, participants often formed groups, called settlement associations. In an arrangement similar to an office pool, the members of a settlement association agreed that if one of them won the lottery, then the winning member would contribute the rights to a partnership comprising all of the members of the association. The winning member would receive a 50.01% interest in the partnership. Subject to potential adjustments, the other members would receive equal shares of the remaining 49.99% interest in the partnership. With the FCC conducting lotteries in regions across the country, standardized agreements emerged with typical terms. *See, e.g.*, JX 4 at 1, 12–15.

One of the geographic areas where the FCC conducted a lottery was the metropolitan statistical area centered around Salem, Oregon. A group of lottery participants formed a settlement association using a standard settlement agreement. One of the

7

members of the association won the lottery and received the rights to build, maintain, and operate a wireless network in that market. The winning member sold her rights to a predecessor of AT&T.[4]

In 1988, the members of the settlement association formed the Partnership. They entered into a partnership agreement to govern their rights and obligations as partners. JX 15 (the "Partnership Agreement" or "PA"). As the party contributing the rights to build, maintain, and operate the network, AT&T received a 50.01% interest in the Partnership. Over 110 members of the settlement association shared the minority interest, with each member initially receiving a 0.3424% interest in the Partnership. *See id.* at '432–33.

The Partnership Agreement recited that the purpose of the Partnership was "to engage in the business of constructing, owning, investing in and operating, directly or indirectly, nonwireline cellular telephone systems, including the system for the Market and for other areas and MSA's [sic] and to engage in related activities in the communications business in such form as the Partnership shall determine." *Id.* § 1.3. The Partnership Agreement defined the "Market" by referring to the area centered around Salem, Oregon. The Partnership's business, however, was not limited to that area, and it encompassed "related activities in the communications business." *Id.* That aspect of the Partnership's

---

[4] The predecessor of AT&T was McCaw Cellular Communications, Inc. *See* JX 42 at '021 (describing McCaw's acquisition of majority of Salem); JX 2634 (diagram of partnerships' ownership over time); *see also* JX 59 at 4 (brief in support of petition for consolidation of actions against the "McCaw Empire").

8

purpose becomes pertinent later, because AT&T adopted a narrower interpretation of the Partnership's business.

As the owner of a majority interest in the Partnership, AT&T controlled the Partnership from the outset. First, AT&T controlled the Partnership at the partner level. The Partnership Agreement generally authorized the partners to take action by majority vote. *Id.* § 4.1. As the holder of a majority interest in the Partnership, AT&T controlled the outcome of any partner-level vote.[5]

Second, in a provision central to the case, the Partnership Agreement stated that "[e]xcept as otherwise provided in this Partnership Agreement, complete and exclusive power to conduct the business affairs of the Partnership is delegated to the Executive Committee." *Id.* § 4.3 (the "Governance Provision"). The Partnership Agreement provided for a three-member Executive Committee, with two representatives appointed by the majority partner and one by the minority partners. PTO ¶ 24.

---

[5] The Partnership Agreement contemplated a two-thirds supermajority vote to amend (i) the sections describing the Partnership's purpose and the nature of its business and (ii) the sections governing the admission of persons as partners who did not acquire an interest in compliance with the Partnership Agreement. *Id.* The Partnership Agreement was later amended to require a unanimous vote to convert the Partnership into a different form of entity. *Id.* None of these limitations are relevant to this proceeding. Moreover, AT&T soon gained a sufficient partner-level interest to dictate the outcome of any supermajority vote. The Partnership Agreement contemplated that the Partnership could make capital calls, and if a partner did not meet a capital call, then the Executive Committee could permit another partner to fulfill the call and increase its ownership interest in the Partnership to reflect its additional contribution. *See id.* §§ 2.3, 2.5. Building and maintaining a network required lots of capital, and AT&T funded the capital calls. By doing so, AT&T increased its percentage interest in the Partnership. From time to time, AT&T also purchased interests from minority partners.

As the majority partner, AT&T appointed two representatives to the Executive Committee. The Governance Provision authorized the Executive Committee to act by majority vote, meaning that AT&T's representatives could dictate the outcome.

During the period relevant to this case, Eric Wages served as one of AT&T's representatives. Wages was an AT&T executive who oversaw AT&T's Partnership Accounting Group.[6] The other representative was the director of the regional business unit that included Salem, Oregon. *See* Wages Tr. 129.

In practice, AT&T only held Executive Committee meetings to the extent required in the Partnership Agreement. *Id.* at 131. The Partnership Agreement initially required two meetings of the Executive Committee per year, but AT&T amended that provision to eliminate the requirement for a minimum number of meetings. *See* PA at '436. In practice, AT&T only acted through the Executive Committee on formal matters, such as authorizing a distribution to the partners. Wages Tr. 131–32, 276. AT&T generally ran the business of

---

[6] Wages served as AT&T's principal witness. In addition to appearing at trial, AT&T proffered him for deposition on five different occasions, each time as a Rule 30(b)(6) witness on the topics that the plaintiffs had identified. Wages Tr. 213. During trial, Wages gave unsatisfying testimony. His counsel conducted the bulk of his direct examination with leading questions, resulting in counsel testifying and Wages assenting to counsel's statements. On cross examination, Wages initially lost his ability to answer questions directly. He became less evasive after an admonishment from the court, but he had convenient failures of memory. He often deflected questions by claiming not to be a lawyer, even though it was clear that he was the point person responsible for overseeing AT&T's compliance with its contractual obligations. On redirect, his counsel again conducted the examination using leading questions. It is not possible to decide the case without taking Wages' testimony into account, but his performance caused the court to approach his statements with care.

10

the Partnership as an integrated part of AT&T's wireless network, without seeking or obtaining Executive Committee approval for particular decisions.

Third, AT&T controlled the day-to-day management and operations of the Partnership. The Partnership Agreement authorized the Executive Committee to enter into agreements with partners or their affiliates to provide management services to the Partnership. PTO ¶ 24. The key language stated:

> All Partners recognize that the Partnership may enter into agreements from time to time with Partners and/or Partner Affiliates for management services in connection with design, development, construction and operation of the Partnership's nonwireline cellular systems, and with other persons, firms or corporations which are Affiliates of Partners for goods and services related to the Partnership Business.

PA § 4.8 (respectively, the "Affiliate Provision" and an "Affiliate Agreement").[7]

---

[7] The Affiliate Provision contained requirements for Affiliate Agreements that the plaintiffs have not placed at issue. For example, the Partnership Agreement mandated that any Affiliate Agreement "shall be on terms no less favorable to the Partnership than could be obtained if it was made with a person who is not a Partner." PA § 4.8(a). It also required that any Affiliate Agreement "provide for fees to be paid by the Partnership, representing reasonable profit and overhead allowances to the contracting parties." *Id.* And the Partnership Agreement required that when negotiating, administering, executing, amending, or terminating any Affiliate Agreement, the Executive Committee and any delegee of the Executive Committee owed a duty "to the Partnership and to the Partners . . . to act in good faith." PA § 4.8(c) (the "Good Faith Obligation"). The plaintiffs did not assert claims under these aspects of the Affiliate Provision. *See* Dkt. 640 at 94–96.

The Affiliate Provision initially required that the Executive Committee approve any Affiliate Agreement. That provision was amended in 1997 to require the approval "of the Executive Committee or its delegee." *Id.*; *see* JX 150. After this amendment, the Executive Committee could delegate to AT&T the power to approve Affiliate Agreements.

11

From the earliest days of the Partnership, there was a settled understanding that AT&T operated the day-to-day business of the Partnership and had authority to build, maintain, and operate its cellular network as part of its wider network.[8] In effect, there was an unwritten Affiliate Agreement in place from the formation of the Partnership that authorized AT&T to manage the Partnership.

Consistent with this reality, the Partnership did not have its own officers or employees. The Partnership did not have a CEO or a Director of Sales and Marketing. The Partnership did not have personnel who sold phones or maintained its network. The Partnership did not even have its own bank accounts. *See* Wages Tr. 134. AT&T employees performed all of those tasks. *See id.* at 125. AT&T then billed the Partnership for those expenses by either assigning specific items of expense to the Partnership, such as the cost of an employee's salary, or by allocating to the Partnership a portion of a broader expense, such as a share of corporate overhead. AT&T effectively treated the Partnership as an accounting exercise supported by periodic legal documentation.

## B. The Title Provision And The Protected Information Provision

In addition to the Governance Provision, two other provisions in the Partnership Agreement play significant roles in the case. Both provisions reflected an understanding

---

[8] The minority partners testified to that understanding. *See, e.g.*, Dutta Dep. 49; Stone Dep. 39–41. AT&T's representatives held a similar understanding. *See* Wages Tr. 225, 239–42, 245–47, 286–87.

that the Partnership would be managed for the benefit of all of the partners, and not just for the benefit of the majority partner.

The first provision generally required that the Partnership hold title to all of its assets. In full, it stated:

> The Partnership shall hold title to the capital of the Partnership and to all applications, authorizations, equipment and other property and assets, whether real, personal or intangible, acquired by the Partnership.
>
> The Partnership may, however, acquire, own and utilize assets jointly with other entities, including entities affiliated with a Partner, and may commingle assets to the extent the Executive Committee reasonably considers, in its sole discretion, such activities appropriate and in the best interests of the Partnership, and title may be held in the name of persons designated by the Executive Committee so long as the Partnership's interest in such title is held for the benefit of the Partnership.

PA § 3.1 (the "Title Provision") (formatting added). The Title Provision thus permitted another entity—such as AT&T—to hold title to a Partnership asset if (i) the Executive Committee concluded that doing so was in the best interests of the Partnership, and (ii) the assets were held for the benefit of the Partnership.

The second provision generally mandated that partners use certain categories of protected information only for the benefit of the Partnership. It stated:

> Without the prior written consent of the Executive Committee, no Partner or Partner's Affiliate shall assign, transfer, license, disclose, make available, use for personal gain, or otherwise dispose of any patents, patent rights, trade secrets, customer lists, proprietary information, or other confidential information of the Partnership, whether or not the information is explicitly designated as confidential.

*Id.* § 10.2 (the "Protected Information Provision"). By its terms, the Protected Information Provision extended to four familiar types of information: "patents, patent rights, trade

13

secrets, [and] customer lists." The provision then added catchall references to "proprietary information" and "other confidential information." It also stated that information need not be designated as confidential to qualify for protection. This decision refers to these categories collectively as "Protected Information."

The Protected Information Provision established a general rule against any partner taking action to "assign, transfer, license, disclose, make available, use for personal gain, or otherwise dispose" of Protected Information. A partner could not do any of these things without the permission of the Executive Committee.

## C. The Use Of NPA-NXX In The Early Years Of The Cellular Industry

From the beginning of the cellular telephone industry until the early 2000s, carriers billed their subscribers for the number of minutes that the subscriber used the wireless network during the previous billing period. Across the industry, it became standard for wireless companies to track subscribers and usage using a system known as "NPA-NXX," a shorthand term for the area code and next three digits of the subscriber's phone number.[9] For example, in the phone number (999)-555-1234, the NPA-NXX is 999-555. The last

---

[9] Wages Tr. 350–51; Taylor Tr. 710. The "NPA" referred to the fact that wireless carriers received blocks of 10,000 telephone numbers from the North American Number Plan Administration, a publicly funded entity run by an FCC contractor. The FCC used NPA-NXX "to approximate the number of subscribers that each provider has in each of the approximately 18,000 rate centers in the country." JX 1142 ¶ 169 n.518; *see* Taylor Tr. 710; Taylor Rebuttal Report at 24.

four digits produce a block of 10,000 phone numbers, ranging from 0000 to 9999, associated with a particular NPA-NXX.[10]

Wireless carriers assigned particular NPA-NXX blocks to their market-level entities based on geography. Within its accounting system, AT&T assigned company codes to its blocks of NPA-NXX numbers. AT&T then used the codes to attribute revenue and expense to particular market-level entities, such as the Partnership. Wages Tr. 176–77.

To assign the proper NPA-NXX number to a new subscriber, AT&T asked the subscriber to identify the phone's primary place of use. An AT&T employee then assigned the subscriber an NPA-NXX number based on the primary place of use. If the subscriber identified a primary place of use that corresponded to the geographic area covered by the Partnership, then the customer received an NPA-NXX number assigned to the Partnership and was treated thereafter as a subscriber of the Partnership. *Id.* at 352; Wages 2019 Dep. 167.

By assigning NPA-NXX numbers based on primary place of use and allocating revenue and expense to the market unit corresponding to the NPA-NXX number, AT&T sought to connect portions of its network with the revenue and expense that those portions generated. The system broke down if a customer moved to a new market, because AT&T had no mechanism for assigning the existing NPA-NXX number to a new market. Instead, the customer's usage continued to be attributed to the original market associated with the

---

[10] Wages Tr. 348–51; Wages 2019 Dep. 160; JX 3596 at 4; *see* JX 643 at 7; JX 2681 at '359, '361; Taylor Rebuttal Report at 24.

15

customer's NPA-NXX number. Taylor Report at 67; Wages Tr. 176–77. In other words, if a customer with a number assigned to the Partnership moved from Salem, Oregon, to Salem, Massachusetts, then the customer's revenue and expense would continue to be assigned to the Partnership.

Until the mid-aughts, that major defect was not a significant problem, because other aspects of the wireless industry's business model resulted in an NPA-NXX number acting as a strong proxy for primary place of use. During that era, wireless carriers provided postpaid plans, under which a subscriber entered into a long-term contract (typically one or two years) that provided for a particular number of minutes of usage per month. The postpaid plans during this era only covered usage in the subscriber's local market. If a subscriber used her cellular phone outside of her local market, then the carrier charged the subscriber a higher rate for "roaming." *See* Wages Tr. 173; Taylor Tr. 709–10; Taylor Report at 46.

Competing carriers entered into agreements that permitted their subscribers to roam on their competitors' networks. As a result, there were two types of roaming. Intra-company or intra-carrier roaming referred to a customer who used her phone outside of her home area, but still used her provider's network. Inter-company or inter-carrier roaming referred to a customer who used her phone outside her home area, but used a different carrier's network.[11]

_____

[11] For example, if a subscriber assigned to Salem used her phone in Bremerton, Washington, then the Salem subscriber's use of the Bremerton network would constitute

16

Regardless of type, roaming was expensive. Due to the high cost of roaming, a customer who relocated outside of her home area had a strong financial incentive to obtain a new NPA-NXX number. Wages Tr. 354; Taylor Tr. 709–11. Moreover, until the advent of number portability in 2004, any subscriber who changed carriers was treated as a new subscriber and received a new NPA-NXX number. Generally speaking, therefore, during this period in the history of the cellular telephone industry, a customer's NPA-NXX number correlated strongly with the customer's primary place of use. As a result, customers holding NPA-NXX numbers associated with the Partnership were highly likely to be primarily using the Partnership's portion of AT&T's network.[12]

## D.    The Cellular Agreement And The Switch Agreement

In 1995, seven years after the Partnership was formed, the Executive Committee formally delegated managerial authority over the Partnership to AT&T. The Executive Committee also caused the Partnership to enter into two agreements with an AT&T

---

intra-carrier roaming. If the Salem subscriber used her phone in a region of Oregon where AT&T did not offer wireless coverage, and if the customer obtained coverage from a competitor like T-Mobile, then the customer's use would constitute inter-carrier roaming.

[12] That said, the system was not foolproof. For example, a college student with an NPA-NXX number associated with the geographic area where her family lived might use her phone in a different geographic area while attending college. Or a "snowbird" with an NPA-NXX number associated with New York might use her phone in Florida during the winter. Wages Tr. 178–79. But while imperfect, the NPA-NXX system operated as a reliable proxy for use. *See* Taylor Rebuttal Report at 24–26.

17

affiliate.[13] One agreement was a Cellular System Operating Agreement. JX 110 (the "Cellular Agreement"). The other agreement was a Switch Sharing Agreement. JX 112 (the "Switch Agreement").

During the meeting of the Executive Committee held to discuss these changes, an AT&T representative explained that minority partners in other markets had questioned the absence of any written agreement governing how AT&T managed their partnerships. *See* JX 91 at '466. AT&T drafted the Cellular Agreement and the Switch Agreement to address that concern. *Id.* The representative stated that "[t]he net effect will be positive for the Salem market." *Id.*

In the resolutions adopting the agreements, the Executive Committee recognized that the Partnership had not previously had any written agreement with AT&T regarding management services or switch sharing services. The Executive Committee then formally resolved that "the Majority General Partner is hereby delegated full, complete and exclusive authority to manage and control the business of the Partnership." *Id.* at '469 (the "1995 Resolution"). The Executive Committee also formally approved the Cellular

---

[13] PTO ¶ 45. The relevant predecessor of AT&T at the time was AT&T Corporation ("Old AT&T"), which acquired McCaw in September 1994. JX 70. Old AT&T was then a separate corporation from the entity now known as AT&T, which was then known as Southwestern Bell Corporation. The latter was one of the Regional Bell Operating Companies, or "Baby Bells" spawned from the breakup of Old AT&T in 1982. In 1995, Southwestern Bell Corporation changed its name to SBC Communications, Inc., and in 2005, SBC acquired Old AT&T and changed its name to AT&T, Inc.

Agreement and the Switch Agreement and resolved that "[they] may be executed by the Majority General Partner." *Id.*

The agreements contemplated identifying subscribers by NPA-NXX and allocating revenue and expense on that basis. *See* JX 112 §§ 4.1(a)–(b). The Cellular Agreement provided that "common costs" would be attributed to the Partnership based on its number of subscribers. JX 110 § 5.1(b). The Switch Agreement provided that (i) all roaming revenue generated in the Partnership's market by non-Partnership subscribers would be allocated to the Partnership and (ii) all roaming charges incurred by the Partnership's subscribers in non-Partnership markets would be allocated to an affiliate of AT&T. JX 112 § 4.2(b).

## E.     The Business Model Changes.

The basic business model in the cellular telephone industry remained relatively stable until late 2003. Throughout the pre-2003 period, postpaid plans remained the dominant source of revenue, and NPA-NXX served as an effective proxy for primary place of use. *See generally* JX 1994 ¶¶ 94–95. The period of relative stability came to an end as a result of two developments: nationwide rate plans and number portability.

During the pre-2003 period, competition among carriers increased steadily. *See* JX 166 at '538; *see also* JX 148 at 2. One consequence of increased competition was a shift to nationwide plans that eliminated roaming fees. Those plans in turn removed the financial incentive for a customer to obtain a new NPA-NXX number after relocating to a new geographic area. Instead, there was a natural disincentive for a customer to go through that personally burdensome process. Wages Tr. 355–56.

19

As fewer subscribers changed their NPA-NXX numbers, tracking subscribers' usage by NPA-NXX became less reliable. *See id.* at 357; Wages 2019 Dep. 259–60, 273–75. AT&T was aware of these limitations and explored alternative methods, such as tracking subscribers by billing address. But AT&T concluded that the existing technology made it "difficult . . . if not impossible" to identify subscribers' home markets at the individual subscriber level. Wages Tr. 178. AT&T permitted subscribers to change their billing address or designate a new primary place of use, but even if a subscriber did both of those things, the subscriber and her NPA-NXX number still remained associated with her original billing market. *See* Wages 2019 Dep. 243–55, 259–60.

The other major industry development was number portability. That concept refers to the ability of a subscriber to keep the same phone number if the subscriber switches carriers. Before the advent of number portability, a subscriber who switched wireless carriers had to obtain a new NPA-NXX number. The new number was associated with the subscriber's primary place of use at the time, so the need to change numbers when changing carriers helped maintain the correlation between a customer's NPA-NXX number and their geographic area.

In the Telecommunications Act of 1996, Congress mandated that cellular carriers take steps to enable number portability. But Congress gave the companies until 2004 to make the change. *See* 47 U.S.C. §§ 251(b)(2), 153(37); Wages Tr. 355; JX 300 at 4; JX 1142 ¶ 242 & n.682. The implementation of number portability in 2004 meant that going

20

forward, a subscriber did not have to receive a new NPA-NXX number when changing carriers.[14]

The combination of nationwide plans and number portability fatally undermined the association between a subscriber's NPA-NXX number and primary place of use. Over time, as more subscribers relocated, tracking subscribers using NPA-NXX became less reliable. By the time of the events giving rise to this litigation, the NPA-NXX system had become so unreliable that AT&T could not provide basic information about its subscribers or the Partnership's:

- AT&T did not know the number of AT&T subscribers who resided in the Partnership's service area but used a non-Partnership NPA-NXX number. *See* Wages Tr. 364.

- AT&T did not know the number of AT&T subscribers who resided in a non-Partnership service area and used an NPA-NXX number assigned to the Partnership. *See id*.

- AT&T did not know the number of AT&T subscribers who moved to the Partnership's service area, changed their billing address and primary place of use to an address in the Partnership's service area, yet continued to use a non-Partnership NPA-NXX number. *See id.* at 365.

---

[14] *See* JX 2122 at 2–3 & n.14. For purposes of regulatory reporting, the FCC mandated that the ported number remain associated with its original rate center, which was the FCC-designated "geographic area used to determine distances and prices for local and long distance calls." *Id.* at 6 n.20; JX 2160 at 3; JX 1296 at 1. To comply with the FCC requirement, wireless carriers established "Location Routing Numbers" that identified the carrier that previously served the ported number. *See* JX 2160 at 5; JX 2431 at 4; Wages 2019 Dep. 253. The carriers thus created a system that could distinguish between the original rate center, which was used for regulatory reporting, and the customer's primary place of use, which was used for other purposes.

- AT&T did not know the percentage of AT&T subscribers nationwide who resided in AT&T service areas different from the one that issued their NPA-NXX number. *See id.* at 364.

## F. The Management Agreement

In 2005, in response to the changing business model in the cellular industry, AT&T caused the Partnership to enter into a Management and Network Sharing Agreement. JX 217 (the "Management Agreement" or "MNSA").[15] The Management Agreement was backdated so that it became effective as of January 1, 2003. PTO ¶ 48.

AT&T informed the minority partners that it would be adopting the Management Agreement during the Partnership's annual meeting on April 7, 2004. JX 191. According to the minutes, the AT&T representative explained that the Management Agreement was replacing the Cellular Agreement and Switch Agreement "because the business has changed dramatically over the past nine years." *Id.* at 2. The AT&T representative also explained that "[t]he new agreement more closely reflects how the business is currently managed." *Id.* AT&T represented that it "made sure that the agreement will have either a neutral or positive financial impact on the Partnership." *Id.* The Management Agreement reflects those points, reciting that it was adopted "to adapt to changing market and

---

[15] At this point, the AT&T predecessor that ultimately controlled the Partnership was Cingular Wireless, LLC, which had acquired Old AT&T's wireless business in October 2004. JX 263 at 28; *see* JX 188; JX 3563 at 10. Cingular was a joint venture owned 60% by SBC and 40% by BellSouth Corporation. JX 359 at 3; *see* JX 526 at '016. In 1995, shortly after causing the Partnership to enter into the Management Agreement, SBC acquired Old AT&T and changed its name to AT&T Inc.

technological conditions." MNSA at '748. Those changes included the rollout of nationwide plans and the advent of number portability.

AT&T personnel drafted the Management Agreement. Wages Tr. 373. The Executive Committee authorized the Partnership to enter into the Management Agreement during a meeting on August 10, 2005. JX 229. The Management Agreement was executed in October 2005. MNSA at '748. The same AT&T executive, Sean Foley, executed the Management Agreement for both the Partnership and the AT&T affiliate. *Id.* at '759.

The Management Agreement figures prominently in this case. The plaintiffs have contended that AT&T breached the Governance Provision in the Partnership Agreement by managing the Partnership unilaterally, rather than through the Executive Committee. AT&T has relied on its delegated authority to manage the Partnership, regularly invoking the Management Agreement as a source of that authority. AT&T's reliance on the Management Agreement was evident during trial, when AT&T's counsel used leading questions on direct examination to elicit testimony from AT&T's principal witness, Wages, about the Management Agreement and the authority that it conferred on AT&T.[16] The record shows, however, that when overseeing the Partnership Accounting Group in real

_____

[16] *See* Wages Tr. 126–29, 142–43, 145–147. Wages returned to the Management Agreement on cross-examination when confronted with provisions in the Partnership Agreement, like the Governance Provision, which limited AT&T's ability to manage the Partnership, or when questioned about AT&T's authority to take particular actions. *See id.* at 221–23, 233, 274, 276, 278, 280–81, 285, 320, 325, 443, 447. AT&T's counsel then revisited the Management Agreement on redirect and used leading questions to walk Wages through various provisions conferring authority on AT&T. *Id.* at 495–502.

23

time, Wages did not pay meaningful attention to the Management Agreement. He simply thought that AT&T had the ability to run its business, and he believed that any agreements or other understandings necessarily allowed AT&T to do that. Wages Tr. 274, 285. But as Wages recognized, neither the Partnership Agreement nor the Management Agreement enabled AT&T to do anything it wanted with the Partnership.[17]

### 1. Provisions Empowering AT&T

The first substantive section in the Management Agreement, titled "Obligations and Operational Responsibilities," required AT&T as "Manager" to provide the services to the Partnership as "Owner." That section both empowered AT&T to operate the Partnership and required AT&T to perform specific functions. The operative language stated:

> Manager shall provide strategic direction and guidance, management and operation of the Owner's Business and shall provide all services as are necessary to assure the commercially reasonable development and operation of the Owner's Business, including, without limitation:
>
> (A) Construction and procurement of tangible and intangible assets, goods and services acquired for, or associated with the operation and utilization of, the Owner's System and Shared Network;
>
> (B) General and Administrative Services;
>
> (C) Technical Operating Services for the Owner's System and the Shared Network;
>
> (D) Sales and Marketing Services; and

---

[17] Wages Tr. 126 ("Q: Did you believe that as the manager, AT&T and its affiliates could do anything they wanted? A: No."); *see id.* at 147 (Wages expressing view that AT&T had to share revenue with the partnerships if it used their information in its business).

24

(E)     Maintenance of Owner's Licenses.

MNSA art. I (the "Services Provision").

The second substantive section in the Management Agreement, titled "Authority," gave AT&T broad authority to manage the Partnership. It stated:

> Manager shall have the authority to undertake, and may undertake, any and all other commercially reasonable actions necessary or advisable to develop, manage, and operate the Owner's Business, which are not prohibited by law or regulation, including, without limitation, the authority to act as agent for and on behalf of Owner (a) in entering into contractual arrangements, and (b) before federal, state, and local governmental authorities.

*Id.* art. II (the "Authority Provision").

The same provision in the Management Agreement authorized AT&T-as-Manager to enter into additional agreements with its affiliates to provide services to the Partnership:

> The foregoing authority includes the authority of Manager, on behalf of Owner, to enter into agreements, contracts, or arrangements with Manager and its Affiliates, pursuant to which Manager and its Affiliates provide tangible or intangible assets, goods, or services to the Owner, in connection with the Manager's activities hereunder.

*Id.* AT&T-as-Manager also had the power to "select the Persons who shall perform all services necessary to the development, management, and operation of the Owner's Business." *Id.* art. III. The Management Agreement explicitly provided that AT&T-as-Manager "may, in its sole discretion, elect to rely upon its own employees or employees of its Affiliates for the performance of services hereunder." *Id.*

Notably, the Management Agreement defined "Owner's Business" and "Manager's Business" in parallel terms. The "Owner's Business" was "the business of providing wireless communications services in Owner's Area and all the activities associated

25

therewith, including, without limitation, the development, construction, management, and operation of a wireless communications system and the acquisition and maintenance of Subscribers." *Id.* at '750.[18] Except for a distinction as to area, that definition tracked word for word the definition of "Manager's Business," defined as "the business of providing wireless communications services in Manager's Area and all the activities associated therewith, including, without limitation, the development, construction, management, and operation of a wireless communications system and the acquisition and maintenance of Subscribers." MNSA at '750. The same parallelism appears in the definitions of "Owner's System" and "Manager's System." *See id.*

The parallel definitions recognized that the Partnership and AT&T were in the same business. To that end, the Management Agreement contemplated that AT&T-as-Manager would manage and operate the Partnership's business as part of the "Shared Network," defined as

> all wireless communications system equipment that is owned, leased or used by Manager and its Affiliates and that allows the cell sites of Manager and its Affiliates (including Owner) to operate as a single nationwide network, including, without limitation, switches, base station controllers, data centers, certain circuits, SS7 network, and all related hardware and software required for such equipment to operate in accordance with its specifications.

---

[18] The Management Agreement defined "Subscriber" as "a user of wireless communications services, acquired and maintained by Owner or Manager and its affiliates pursuant to an ongoing agreement for wireless communications services." *Id.* at '751. AT&T recognizes that the Partnership was an affiliate of AT&T doing business as AT&T. Wages Tr. 151.

*Id.* at '751. The obvious purpose of the Management Agreement was to enable AT&T-as-Manager to operate the Partnership as part of "a single nationwide network."

## 2. Provisions Constraining AT&T

As noted, the Management Agreement obligated AT&T to provide services to the Partnership, including "General and Administrative Services." The Management Agreement defined those services to include "administrative, legal and regulatory, accounting and tax, billing, credit and collection, Subscriber retention and care, insurance, information systems, purchasing, human resources, clerical and other general and administrative services." *Id.* at '749.

The Management Agreement thus authorized AT&T-as-Manager to provide accounting services to the Partnership. The Management Agreement did not, however, empower AT&T to proceed however it wanted. It contained specific procedures for AT&T to follow. Those procedures reflected the changed business model of the wireless industry.

### a. Identifiable Versus Non-Identifiable Items

The Management Agreement began by recognizing that AT&T's nationwide cellular network generated some categories of revenue and expense that could be identified with reasonable effort as attributable to the Partnership or another AT&T business unit and assigned to the Partnership or other business unit. Other categories of revenue and expense, however, could not be identified and attributed in that manner. For the latter, the Management Agreement contemplated that AT&T would use an appropriate metric to allocate a proportionate share of the revenue and expense to the Partnership.

27

The Management Agreement did not give AT&T-as-Manager unbridled discretion to determine which items fell into which bucket. Nor did it give AT&T-as-Manager unconstrained discretion over what allocation methodologies to use. The Management Agreement specified that the categories of identifiable items of revenue and expense were "as described herein." *Id.* § VI(A). The Management Agreement then stated that for categories without identifiable items, AT&T "will assign such revenues and expenses to Owner through the allocation methodologies described in paragraph B below and Exhibit A." In its entirety, the pertinent section states:

> Owner and Manager acknowledge that (a) it is reasonable and practical to specifically identify certain revenues and expenses to Owner, as described herein, (b) it is not reasonable or practical to specifically identify certain other revenues and expenses to Owner, and Manager will assign such revenues and expenses to Owner through the allocation methodologies described in paragraph B below and Exhibit A.

*Id.* (the "Allocation Requirement").

Properly understood, the only prescriptive language in the Allocation Requirement is "Manager will assign such revenues and expenses to Owner through the allocation methodologies described in paragraph B below and Exhibit A." The rest of the section is a contractual stipulation about the state of the world that gives rise to the prescriptive language. It is analogous to a recital, but with binding effect.

As contemplated by the Allocation Requirement, Section IV(B) specified six methodologies that Manager "will use . . . to determine revenues and expenses related to the Owner's business in each period." *Id.* They included methodologies for (i) "Shared Revenues," (ii) "Outcollect Roaming Revenues," (iii) "Out-of-Pocket Expenses," (iv)

28

"Shared Expenses," (v) "Shared Network Costs," and (vi) "Other" types of expense. As described in greater detail below, the Management Agreement called for AT&T to allocate Shared Revenues, Shared Expenses, and Shared Network expenses to the Partnership based on a formula. The Management Agreement called for AT&T to identify Outcollect Roaming Revenues, Out-of-Pocket Expenses, and Other expenses individually and assign them to the Partnership.

For Shared Revenues and Shared Expenses, the Management Agreement required AT&T to use a formula to allocate those expenses to the Partnership. The definitions of Shared Revenues and Shared Expenses are important, and this decision discusses them below. For present purposes, what matters is that the Management Agreement directed AT&T-as-Manager to follow a procedure set forth on Exhibit A. That exhibit stated: "Each period, Manager shall determine Owner's share of Shared Revenues and Shared Expenses, as listed in the table below." *Id.* Ex. A. The exhibit then called for AT&T-as-Manager to determine the Owner's share of Shared Revenues or Shared Expenses using the following equation.

| Shared Revenue or Shared Expense of Manager's Business plus Owner's Business / Statistic for Calculating Percentage Sharing for Manager's Business plus Owner's Business | Multiplied by | Owner's Statistic for Calculating Percentage Sharing |
|---|---|---|

*Id.* (the "Sharing Equation"). Below the Sharing Equation, the exhibit identified a single statistic for allocating Shared Revenues: System Traffic Less Outcollect Roaming Traffic. It identified a series of statistics for allocating different types of Shared Expenses. In each

case, however, the basic principle was the same—AT&T was obligated to use the Sharing Equation.

Notably, the exhibit that specified the Sharing Equation also called for AT&T to apply a premium to benefit the Partnership. The operative language stated:

> Manager may apply a premium to certain revenues and/or a discount to certain expenses to ensure that the allocation method set forth below is no less favorable to the Owner than the allocation method used in prior periods. Initially, Manager will apply a premium of 25% to Owner's share of Shared Revenues and a discount of 10% to Owner's share of Sales and Marketing Expenses.

*Id.* (the "Premium Provision"). The Management Agreement defined the Sales and Marketing Expenses where the discount applied as "expenses associated with Sales and Marketing Services," which the agreement defined as "marketing, sales, advertising, and other promotional and subscriber acquisition and retention services." *Id.* at '751. Through the Premium Provision, AT&T committed to treat the Partnership better than its own business units and indisputably better than an arm's-length third party.

### i. Shared Revenues

The first allocation methodology in the Management Agreement called for AT&T-as-Manager to allocate "Shared Revenues" by using the Sharing Equation and applying the Premium Provision. *Id.* § VI(B)(1). The operative language stated: "Manager shall determine Owner's share of Shared Revenues in the manner described in Exhibit A." *Id.*

The Management Agreement defined "Shared Revenues" as "the aggregate revenue generated by Subscribers of Owner's Business and Manager's Business utilizing Owner's System and Manager's System, and any other applicable revenues generated by utilization

30

of the Entire Network, but excluding Outcollect Roaming Revenues." *Id.* at '751 (the "Shared Revenues Definition"). The Management Agreement defined "Entire Network" as "collectively, the Owner's System, the Manager's System, and the Shared Network." *Id.* at '748. In other words, Shared Revenues meant all revenue of any kind generated from the utilization of the Entire Network, other than Outcollect Roaming Revenues, which the Management Agreement addressed separately.

After AT&T-as-Manager had totaled up all revenue generated by any and all subscribers using the Entire Network, the Management Agreement mandated that AT&T allocate a portion of the aggregate revenue to the Partnership using a specified statistic. For Shared Revenues, the exhibit stated that the sharing percentage would be calculated using the ratio of "System Traffic less Outcollect Roaming Traffic." *Id.* Ex. A. Once again, the omission of Outcollect Roaming Traffic recognized that the Management Agreement provided a separate allocation methodology for that source of revenue.

The Management Agreement defined System Traffic as the total minutes of usage "generated on a wireless communications system." *Id.* at '752. At the time, network traffic predominantly involved voice calls, which were measured in minutes of use ("MOUs"). The definition of System Traffic noted that "[i]n the future, other Units of Traffic may be included in the definition of System Traffic as that type of Traffic becomes material and as it becomes technologically feasible to track that Unit of Traffic." *Id.*

The resulting allocation methodology for Shared Revenues obligated AT&T to aggregate all revenue generated by the Entire Network. The allocation methodology then required that AT&T allocate to the Partnership a proportionate share of AT&T's aggregate

31

revenue based on the share of voice traffic carried by the Partnership's system *and* add the premium required by the Premium Provision. As an unrealistic example, if the Entire Network generated a total of $1 million in revenue, and if the Entire Network carried 1,000,000 MOUs while the Partnership's network carried 1,000 of the MOUs, then the Partnership's share of the revenue before the addition of the premium would be $1,000. After the addition of the premium, AT&T would allocate $1,250 in Shared Revenues to the Partnership.

This decision refers to this allocation methodology as the "Shared Revenues Formula."

### ii.    Outcollect Roaming Traffic

The second allocation methodology in the Management Agreement addressed Outcollect Roaming Traffic. *Id.* § VI(B)(2). The Management Agreement defined "Outcollect Roaming Revenues" to mean "revenues generated when Third Party Subscribers use the Owner's System or Manager's System, based on provisions of the Roaming Agreements." *Id.* at '750. The Management Agreement defined "Third Party Subscriber" as "a user of wireless communications services acquired and maintained by a Third Party Carrier." *Id.* at '752. The Management Agreement defined "Third Party Carrier" as "a domestic and/or international wireless communication carrier that is not affiliated with either Owner or Manager." *Id.*

The allocation methodology directed AT&T to "identify Owner's Outcollect Roaming Revenues by multiplying the Outcollect Roaming Traffic each Third Party Carrier generates on Owner's System times the applicable rate per Unit of Traffic set forth

32

in the Roaming Agreement with such Third Party Carrier." *Id.* § VI(B)(2). That methodology required that AT&T identify the extent to which a Third Party Subscriber used the Partnership's network, then multiply that usage by the contract rate that AT&T received from the Third Party Carrier. AT&T then was required to assign that revenue to the Partnership.

AT&T rendered this allocation methodology irrelevant by entering into reciprocal bill-and-keep agreements with third-party carriers. Under the bill-and-keep arrangements, the subscriber's home carrier retained the incremental roaming revenue generated when the subscriber roamed on another carrier's network. In other words, if an AT&T subscriber roamed on T-Mobile's network, then AT&T (and not T-Mobile) received the incremental roaming fees. AT&T did not pay anything to T-Mobile. The same was true for a T-Mobile subscriber roaming on AT&T's network.

Under the bill-and-keep method, "the applicable rate per Unit of Traffic set forth in the Roaming Agreement with such Third Party Carrier" became zero, so there was no revenue to allocate to the Partnership. The plaintiffs do not advance any arguments regarding Outcollect Roaming Revenues from third-party subscribers to the Partnership. The Outcollect Roaming methodology therefore does not figure in this decision. The principal significance of this allocation methodology lies in its exclusion from the scope of Shared Revenues. By specifically excluding Outcollect Roaming Revenues, the Management Agreement implicitly confirmed an intent to include all other sources of revenue within the definition of Shared Revenues.

### iii. Out-Of-Pocket Expenses

33

The third allocation methodology addressed "Out-of-Pocket Expenses." This methodology called for the identification of specific expenses. It stated simply: "Manager shall identify Owner's Out-of-Pocket Expenses." *Id.* § VI(B)(3). The Management Agreement defined "Out-of-Pocket Expenses" as "those expenses which can be specifically associated with the construction and operation of Owner's System, including the expense of any tangible or intangible assets, goods, or services performed by personnel of Manager . . . or by a third party," and including "the cost of wireless communications equipment, network/subscriber toll charges, system leases, rents, and utilities, interconnect expenses, and other expenses related to cell sites in Owner's System." *Id.* at '750. The Management Agreement thus contemplated the direct identification of out-of-pocket expenses and their assignment to the Partnership.

The plaintiffs do not contend that AT&T failed to assign Out-of-Pocket Expenses to the Partnership. The methodology for Out-of-Pocket Expenses therefore does not figure prominently in this decision. The principal significance of this allocation methodology lies in the fact that the Management Agreement specifically called for identification of those items, but demonstrated an intent to use the Sharing Equation for other sources of revenue and expense.

### iv. Shared Expenses

The fourth allocation methodology addressed "Shared Expenses." *Id.* § VI(B)(4). This lengthy provision explained the concept of Shared Expenses as follows:

> To the extent that expenses incurred by Manager and its Affiliates in performing their duties under this Sharing Agreement are incurred to support both Owner's System and Manager's System and are of a type such that a

34

direct charge as an Out-of-Pocket Expense is not reasonably practical, such expenses shall be considered "Shared Expenses."

*Id.* (formatting added). The concept of Shared Expenses thus encompassed (i) any expense incurred to support both Owner's System and Manager's System that was (ii) of a type such that a direct charge as an Out-of-Pocket Expense was not reasonably practical. Stated conversely, AT&T could identify expenses and assign them to a particular Partnership if the expenses were incurred *only* to support the Owner's System *or* the expenses were of a type where a direct charge was reasonably practical.

If an expense category qualified as Shared Expenses, then the Management Agreement required that AT&T allocate the expenses using the Sharing Equation. The operative language stated:

> Manager shall allocate a portion of each Shared Expenses to Owner in proportion to the benefit Owner's Business receives from the Shared Expenses relative to the benefit Manager's Business receives.

> Manager shall identify the total Shared Expenses for both Owner's Business and Manager's Business; in addition, Manager shall determine Owner's share of Shared Expenses, as described in Exhibit A.

*Id.* This decision refers to this allocation methodology as the "Shared Expenses Formula."

As with the allocation methodologies generally, the Management Agreement did not leave it to AT&T to determine on the fly what constituted Shared Expenses. The Management Agreement stated:

> Shared Expenses shall initially be divided into the following categories: Technical Operating Expenses, Sales & Marketing Expenses, General & Administrative Expenses, Subscriber Bad Debt Expenses, Pass-Through Tax Expenses, Incollect Roaming Charges, Handset Equipment Margin for new Subscribers and Handset Equipment Margin for existing subscribers.

*Id.* The Management Agreement thus required that AT&T use the Sharing Equation for these identified categories. The Management Agreement identified the following sharing statistics for each category:

| Type Of Shared Expenses | Statistic For Calculating Percentage Sharing |
|---|---|
| Technical Operating Expenses | System Traffic |
| Sales & Marketing Expenses | Gross Subscriber Additions[19] |
| General & Administrative Expenses | Ending Subscribers |
| Subscriber Bad Debt Expenses | System Traffic Less Outcollect Roaming Traffic |
| Pass-Through Tax Expenses | System Traffic Less Outcollect Roaming Traffic |
| Incollect Roaming Charges[20] | System Traffic Less Outcollect Roaming Traffic |
| Handset Equipment Margin[21] for new Subscribers | Gross Subscriber Additions |
| Handset Equipment Margin for Existing Subscribers | Ending Subscribers |

---

[19] The Management Agreement defined "Gross Subscriber Addition" as "a Person who becomes a new Subscriber during a given period." *Id.* at '749.

[20] The Management Agreement defined "Incollect Roaming Charges" as "charges generated when the Subscribers of Owner's Business or Manager's Business use the wireless communications systems of Third Party Carriers, based on provisions of the Roaming Agreements." *Id.* That allocation methodology thus only addressed third-party roaming, not intra-carrier roaming. As discussed below, the Management Agreement eliminated any revenue or expense associated with intra-carrier roaming.

[21] The Management Agreement defined "Handset Equipment Margin" as "the net of handset equipment revenues less the expense of handset equipment sales, such expense including, without limitation, the cost of the handset and expenses associated with storage, distribution, fulfillment, obsolescence, and incentives expense (i.e., rebates or other promotional expenses), as they each relate to wireless handsets, devices, and related accessories." *Id.*

Although five of the eight categories called for AT&T to allocate Shared Expenses using a statistic related to System Traffic, three of the eight categories called for AT&T to make an allocation based on subscribers. To administer those methodologies, AT&T needed a means of tracking the subscribers that were assigned to the Partnership.

There is ample evidence that AT&T did not adhere to the Shared Expenses Formula. Nevertheless, the plaintiffs have not sought to establish that point. The Shared Expenses Formula therefore does not figure prominently in this decision.[22] The principal significance of the allocation methodology lies in the fact that (i) the Shared Expenses Formula called upon AT&T to allocate certain categories of Shared Expenses based on a subscriber count, which required that AT&T have a method for assigning subscribers to the Partnership; and (ii) the use of subscriber-based allocation methodologies for the Shared Expenses Formula contrasted with the traffic-based methodology used for the Shared Revenues Formula.

### v.    Shared Network Costs

The fifth allocation methodology addressed "Shared Network Costs." *Id.* § VI(B)(5). The Management Agreement defined those costs as defined as "the capital costs incurred by the Manager to develop and construct the Shared Network." *Id.* at '751. The

---

[22] The allocation methodology for Shared Expenses contained language authorizing AT&T to "add to, eliminate, or modify these categories of Shared Expenses, as necessary, to adapt to changing market and technological conditions, so long as any such new or modified categories are within the scope of Shared Expenses, as defined above." *Id.* § VI(B)(4). AT&T thus could depart from Shared Expenses Formula if necessary "to adapt to changing market and technological conditions" and as long as AT&T adhered to the principles of what constituted Shared Expenses. This provision is not at issue in the case. In substance, it closely resembles the Modification Right, discussed below.

lengthy provision for allocating Shared Network Costs ultimately required that AT&T allocate those costs based on the extent of the Units of Traffic "originating or terminating on Owner's System" relative to the total System Traffic during that period. *Id.* § VI(B)(5). It thus was another traffic-based allocation methodology, comparable to the Shared Revenues Formula and some of the expense categories governed by the Shared Expenses Formula.[23]

The plaintiffs do not contend that AT&T failed to follow the methodology for allocating Shared Network Costs. That methodology therefore does not figure prominently in this decision. The allocation methodology is significant only because it represents another traffic-based allocation method.

### vi.     Other Expenses

The last methodology was a catchall for "Other." It stated that "Manager may charge Owner for other expenses not specifically identified herein to the extent the expenses benefit Owner and provided that such expenses are charged at Manager's actual cost." *Id.*

---

[23] Like the Shared Expenses Formula, the allocation methodology for Shared Network Expenses authorized AT&T to

> change the way it calculates the specified rate from time to time in order to adapt to changing market and technological conditions, provided that the rate is always calculated in a way that the cost Owner pays is in proportion to the benefit Owner's Business receives from the Shared Network relative to the benefit Manager's Business receives.

*Id.* This provision is not at issue in the case. In substance, it too closely resembles the Modification Right, discussed below.

38

§ VI(B)(6). The Management Agreement thus contemplated direct identification of "Other" expenses and the assignment of those expenses to the Partnership.

This methodology does not play a role in the case. Its principal significance lies in the fact that the Management Agreement did not contain a similar catchall category for revenue. The absence of such a category emphasizes that the Management Agreement envisioned AT&T using the Shared Revenues Formula for revenue other than Outcollect Roaming Revenues.

### b. The Modification Right

As discussed previously, the Management Agreement framed the allocation methodologies as mandatory obligations for AT&T to follow. Reinforcing that requirement, after listing the methodologies, the Management Agreement stated that "Manager shall charge or allocate revenue and expenses to Owner for each given period using the above methodologies." *Id.* § VI(B). The Management Agreement then explained that the Manager was required to maintain a running intra-company balance between the Partnership and the Manager based on the positive or negative cash flows from each period, and the Manager would be charged or earn interest on the net amounts due to or from the Manager "at the Prime Rate, compounded quarterly." *Id.*

Although the Management Agreement plainly contemplated mandatory methodologies, it also granted AT&T some flexibility. The Management Agreement provided that

> Manager may from time to time amend these allocation methodologies, including, without limitation, the types of Shared Revenues and Shared Expenses, statistics for calculating percentage sharing, and the applications

39

of premiums and discounts, to adapt to changing market and technological conditions, provided that any new methodology fairly accounts for the revenues and expenses of Owner's Business.

*Id.* § VI(A) (the "Modification Right").

Under this provision, AT&T could exercise the Modification Right if two conditions were met. First, the change had to respond "to changing market and technological conditions." *Id.* (the "New Conditions Requirement"). Second, the new methodology had to "fairly account" for the revenue and expense of Owner's Business. *Id.* (the "Fair Accounting Requirement").

In addition to the two requirements built into the Modification Right, the Management Agreement imposed a third requirement. Any new allocation method that AT&T used be "no less favorable to the Owner than the allocation method used in prior periods." *Id.* Ex. A (the "No-Less-Favorable Requirement").

The Modification Right figures prominently in the case. As will become apparent, AT&T did not follow the Shared Revenues Formula. To defend its actions, AT&T relied on the Modification Right.

### c. The Intra-Company Roaming Provision

As discussed previously, the Management Agreement contained provisions specifying how AT&T would allocate revenue associated with third-party roaming, defined as a situation when a subscriber from another cellular carrier roamed on AT&T's network or an AT&T subscriber roamed on another cellular carrier's network. The Management Agreement also addressed intra-company roaming, which involved an AT&T subscriber using the network outside of the subscriber's home area.

40

The Switch Agreement had called for AT&T to assign intra-company revenue and expense generated by roaming. JX 112 § 4.2(b). In a significant change, the Management Agreement eliminated any direct charges associated with intra-company roaming. The operative language stated:

> Affiliate Roaming Activity. Owner acknowledges and agrees that Subscribers of Owner's Business shall be entitled to Roam in Manager's Area, and Subscribers of Manager's Business shall have the right to Roam on Owner's System, without any direct charges.

MNSA § V(F) (the "Intra-Company Roaming Provision"). Any revenue generated by intra-company roaming instead fell within the Shared Revenues Formula as revenue generated by subscribers using the Entire Network. AT&T therefore was obligated to allocate a proportionate share of the revenue to the Partnership based on the Traffic Ratio, then add a premium to comply with the Premium Requirement.

## G. AT&T Disregards The Management Agreement.

Despite implementing the Management Agreement, AT&T did not follow the specified allocation methodologies. AT&T did not rescind or amend the Management Agreement. AT&T did not specifically invoke the Modification Right. AT&T simply developed its own internal allocation methodologies without considering the Management Agreement. Those methodologies generally involved identifying items of revenue and expense and assigning them to the Partnership whenever possible, even if the Management Agreement specified a different allocation methodology.

By doing so, AT&T adopted an internally inconsistent system. For purposes of running its own business, AT&T managed the Partnership's assets with its own assets as

41

an integrated part of a single nationwide network. From an operational standpoint, AT&T's senior executives and regional managers treated the Partnership's assets like any other part of AT&T's national footprint.[24] And that is what the Management Agreement envisioned, namely that AT&T-as-Manager would operate the Partnership as part of "a single nationwide network." MNSA at '751.

For purposes of allocating revenue and expense to the Partnership, however, AT&T treated the Partnership as an independent, stand-alone entity whose business had not progressed beyond providing voice and basic data services to a limited group of subscribers in a specific geographic area.[25] To that end, AT&T's Partnership Accounting Group sought whenever possible to identify specific items of revenue and expense and assign them to the Partnership, regardless of whether the Management Agreement specified a different methodology.

---

[24] Stephens Tr. 15; *see* Hall Dep. 51 ("Q: Were the partnership networks operated separately and apart from AT&T's Wireless networks? A: No."); *id.* at 59–60 ("Q: So no distinct[ion] between a partnership's day-to-day activities as a business entity and AT&T Mobility Wireless? A: Not to the customers. . . . Or the public, no. There was no difference."); Wages 2019 Dep. 146 ("Q: Do you agree that Mobility fully integrated the partnership's assets into its business and operated those partnership assets as a fully integrated part of Mobility's business? A: My general understanding, yes, I believe it was fully integrated.").

[25] Stephens Tr. 22; *see* Teske Tr. 526–27 ("I think of an AT&T partnership as a mini wireless business within the larger AT&T Mobility business."); Hall Dep. 60 ("In the back office, we had to make sure we did the accounting correctly for the separate legal entities throughout the entire company.").

During the relevant period, AT&T was a partner in scores of partnerships, including the thirteen partnerships that are the subject of the Coordinated Action. Between ten and fifteen accountants comprised the Partnership Accounting Group. They determined how to assign or allocate revenue and expense and how to administer the methodologies that they decided upon. They also interacted with AT&T's outside auditors. Wages Tr. 117–18. Wages oversaw the Partnership Accounting Group throughout the relevant period. *Id.* In 2004, he took over the group as Director of Financial Reporting and Technical Accounting. In 2009, he was promoted to the position of Director of Finance for AT&T Mobility LLC, the entity that managed AT&T's wireless business, and Bradley Gifford took over as the head of the Partnership Accounting Group. *Id.* at 191, 193. After his promotion, Wages continued to play a supervisory role in the allocation of revenue and expense to AT&T's partnerships. *Id.* at 193. Throughout his tenure, Wages reported to Philip Teske, who was an Executive Director of AT&T Mobility. *Id.* at 197; Teske Tr. 524. Teske reported to Gregory Hall, the controller of AT&T Mobility. Hall Tr. 1083; Teske Tr. 526; Hall Dep. 50.

Wages could not recall anyone at AT&T ever reading the Partnership Agreement. *See* Wages Tr. 216. He thought he might have read portions of the agreement from time to time. *See id.* at 272–73. He struggled to answer questions about whether AT&T had agreed to specific provisions in the Partnership Agreement, and he claimed at times that AT&T had not agreed to specific provisions in the Partnership Agreement. *See id.* at 216–21.

Wages exhibited a similar lack of recollection about the Management Agreement. During Wages' direct examination at trial, AT&T's counsel subjected him to a series of

43

leading questions about the Management Agreement, with Wages dutifully giving the answers that counsel's questions suggested. On cross-examination, it became clear that Wages and the Partnership Accounting Group had not paid attention to the Management Agreement when determining how to assign or allocate revenue and expense to the Partnership. Wages admitted that he could not recall what the Management Agreement said.[26] He simply believed that the Management Agreement gave AT&T the ability to manage and operate the Partnership. *Id.* at 221; *see id.* at 241–42, 274, 276, 278. That understanding conflicted with express language in the Management Agreement, which stated: "Nothing in this Agreement permits, or will be deemed to permit, Manager to exercise de facto or de jure control over Owner or its operations." MNSA § X(E).

Consistent with that loose and general understanding, Wages thought that AT&T had "overarching[,] broad" power to identify and assign items or make allocations "as long as we're within the confines of the general ways that we run the business and it's been apparent that those are the general ways we're running the business." *Id.* at 273–74. As a result, Wages did not seek guidance about whether AT&T could deploy a particular allocation methodology unless AT&T began providing a new product or service and used what Wages viewed to be assets that belonged to the Partnership. *Id.*

---

[26] *See id.* at 242. In one telling example, Wages testified that there was never a writing that defined the term "subscriber" for purposes of AT&T's assignment or allocation of revenue and expense to the Partnership. *Id.* at 349. The Management Agreement contains a definition of "subscriber." MNSA at '751. Wages could not recall ever reading it. Wages Tr. 374. He admitted that it was different than the definition of "subscriber" that AT&T used when allocating revenue to the Partnership. *Id.* at 375, 378.

44

Wages and the Partnership Accounting Group generally believed that the Partnership should receive revenue if AT&T used the Partnership's assets to conduct business. On behalf of AT&T, Wages characterized the Partnership's assets as consisting of either (i) *classical assets*, meaning the types of assets typically listed on a balance sheet, and (ii) *non-classical assets*, meaning the types of assets not typically listed on a balance sheet. *Id.* at 288–89.

From AT&T's standpoint, the Partnership's classical assets included things like antennae, radio equipment, land and buildings, leases, and FCC-issued spectrum licenses *Id.* at 288, 291. From AT&T's standpoint, the Partnership's non-classical assets included its customers, customer service contracts, and information about or generated by the Partnership's customers, such as data concerning their use of the network or their geo-location when using the network. *Id.* at 294, 318–19. AT&T came to its understanding regarding the customer service contracts late in the case. When being deposed as AT&T's Rule 30(b)(6) witness on the subject, Wages did not know if the contracts between the Partnership's subscribers and the Partnership were assets of the Partnership. *See id.* at 327–28 (counsel for plaintiffs cross-examining Wages with deposition testimony, where he testified, "I think of the customers as being assets of the partnership. The contracts, I don't know if they are or not").

Using their concepts and understandings, Wages and the Partnership Accounting Group sought to assign to the Partnership other types of revenue that they believed should be associated with the Partnership's business. In making these determinations, however, Wages and the Partnership Accounting Group took a narrow view of what constituted the

45

Partnership's business. They viewed the business of the Partnership as limited to "wireless activity," meaning activity involving "cellular phones, voice, data, SMS text, those things . . . we do with our phones." *Id.* at 395–97. As a result, they believed that the Partnership was "not entitled to participate in the profits of every AT&T business venture that used partnership assets." *Id.* at 406.

For activities not involving their definition of wireless activity, Wages and the Partnership Accounting Group believed that the Partnership only was entitled to be "made whole" for AT&T's use of its assets. *Id.* They did not think that the Partnership was entitled to an allocation that would enable it to receive a share of the profit from those businesses. *Id.* And they did not think that more limited right to be "made whole" always applied; they thought it applied only "in certain instances." *Id.*

The different approach that Wages and the Partnership Accounting Group used was not written down anywhere. *Id.* at 397. AT&T's Partnership Accounting Group also did not think they had any reason to seek Executive Committee approval for their determinations. Hall Tr. 1096.

That unwritten understanding of the Partnership's business differed significantly from the Partnership Agreement, which defined the Partnership's business as involving "the business of constructing, owning, investing in and operating, directly or indirectly, nonwireline cellular telephone systems, including the system for the Market and for other areas and MSA's [sic] and to engage in related activities in the communications business in such form as the Partnership shall determine." PA § 1.3. It also was contrary to the language of the Management Agreement, which defined the Partnership's business and

46

AT&T's business in parallel terms. The Management Agreement envisioned that AT&T and the Partnership were in the same business—operating and benefiting from the Entire Network.

The Shared Revenues Formula therefore contemplated aggregating all revenue derived from any subscriber's use of the Entire Network, then allocating to the Partnership a portion of that revenue based on its share of network traffic. Instead, Wages and the Partnership Accounting Group continued to use a subscriber-based model to allocate revenue. They treated the Partnership as having a specific number of subscribers based on the NPA-NXX numbers associated with the Partnership. *See* Wages Tr. 176; *see also* Stephens Tr. 64 (testifying that the partnerships had "specific customers tied, for example, to those partnerships"). The Partnership Accounting Group then identified and assigned to the Partnership the revenue that its subscribers generated. Wages and the Partnership Accounting Group did the same for expenses.

## H.    The Reliability Of AT&T's Accounting Records

When Wages, the members of the Partnership Accounting Group, and their superiors assigned or allocated revenue and expense to the Partnership, they used their own, internal, decisional paradigm. Wages Tr. 397. Within the narrow confines of that worldview, Wages, the members of the Partnership Accounting Group, and their superiors attempted to treat the Partnership fairly. They also sought to identify and assign or allocate revenue and expense accurately.

Rather than following the Management Agreement, the Partnership Accounting Group believed it had the discretionary authority to determine how to identify and assign

47

or allocate revenue and expense to the Partnership. When creating, applying, and reviewing the results of its methods, the Partnership Accounting Group attempted to determine "the fair and reasonable way" to assign or allocate revenue and expense to the Partnership. Wages 2020 Dep. 189–90. When making decisions, AT&T's accountants looked for "the most directly causal metric" to use to assign or allocate an item. Hall Tr. 1023. Wages testified that AT&T operated under the principle that a "tie goes to the minority partner if we didn't have a . . . better, clearer, way to differentiate" among available methods. Wages Tr. 513.

The Partnership Accounting Group made significant efforts to identify and assign or allocate revenue and expense consistently and accurately. Beginning in 2008, the Partnership Accounting Group held semiannual sign-off meetings where employees and executives discussed issues and worked on solutions. *Id.* at 128–29, 493–94, 502–03; Teske Tr. 531–32; Hall Tr. 1034; *see* JX 1296; JX 1561; JX 1642; JX 1761; JX 2645. The Partnership Accounting Group kept minutes of the sign-off meetings. When the meeting resulted in a new procedure or the resolution of a disputed issue, a series of individuals, including Hall, Teske, and Wages, had to approve the decision. *See* 1296 at '737.

AT&T's outside auditors reviewed and gave feedback on AT&T's methods. *See* Stephens Tr. 12–13. As the auditors for AT&T's corporate organization, they had insight into the reliability and fairness of AT&T's methodologies from an accounting perspective. *See* Hall Tr. 1019–20. AT&T's outside auditors also audited AT&T's partnerships. *Id.* at 1020–21. The Partnership did not require an outside audit, but AT&T conducted audits for

48

all of its partnerships, and AT&T "used [the] same principles, methodologies, on all the partnerships." Stephens Tr. 23–24.

Other AT&T executives and employees provided input to the Partnership Accounting Group. *Id.* at 25; Teske Tr. 530. AT&T's regional business operations directors oversaw regional AT&T market clusters and were tasked with supporting and monitoring the market-level entities within their territories, including any partnerships. Wages Tr. 130. Each regional business operations director had to explain any variations between the budget projections and the actual results from year to year. *Id.* The compensation of the regional business operations directors varied based on the financial performance of their market clusters. Hall Tr. 1023–24. The regional business operations directors therefore were "very interested" in ensuring that AT&T's methodologies accurately identified and assigned or allocated revenue and expense to the market-level entities, including any partnerships. *Id.* at 1024; *accord* JX 2419 at 61–62.

The finance teams for AT&T's various business units also provided the Partnership Accounting Group with feedback about the "quality and accuracy" of its methods. Hall Tr. 1024–25. The finance teams created budgets and competed for funding based on the results of projects they sponsored, which gave them an incentive to make sure that revenue and expenses were identified and assigned or allocated accurately. *Id.* Employees responsible for regional sales and marketing had similar incentives. *Id.* at 1025.

To memorialize the assignments and allocations of revenue and expense, AT&T maintained a complex general ledger system that relied on both automatic and manual allocations. *See* JX 2145 at 19–23; JX 2610. Automatic or "mass" allocations followed a

49

procedure in which "allocated revenues and expenses were initially booked to certain headquarter-level companies and then allocated to the market-level companies, including [AT&T's partnerships], on a monthly basis." JX 2403 at 2; *see* JX 2610. Mass allocations distributed revenue and expense down to the Partnership using allocation rules created by AT&T's GL Expense Group. Woodall Dep. 104, 127–28. The Partnership Accounting Group then allocated revenue and expense to the Partnership based on the minority ownership percentage of the Partnership, which AT&T tracked continuously. *Id.* at 103–04.

The Partnership Accounting Group also made "manual journal entries," meaning entries in AT&T's accounting system made on a one-off basis by a human accountant. JX 2403 at 5; *see* Hall Tr. 1040. AT&T used a "multi-step approval process" for manual journal entries:

- The preparer of a manual journal entry had to attest that the entry was prepared correctly and appropriate to record in the applicable business month based on the supporting documentation.

- An approver also had to sign the manual journal entry to certify that it was correct, timely, and appropriate for the applicable business month. The approver could not be the same person as the preparer and had to be a second-level manager or higher.

- A manual journal entry could not be recorded in the general ledger of a Mobility entity without the approval of the individual in charge of the general ledger for that entity.

- If a manual journal entry was prepared by a business unit other than the Controller's unit, then it had to be approved by the Finance group of that business unit.

JX 2145 at 22.

Until 2009, the process of making manual journal entries "was a paper process" with documentation "maintained in binders in whichever accounting organization prepared the entry." *Id.* at 21; *see* JX 2403 at 6. Starting in 2009, AT&T began transitioning to a computer-based system. JX 2145 at 21; JX 2403 at 5. The transition was not yet complete when the Freeze-Out took place. *See* JX 2145 at 21–23.

As a result of these careful procedures, AT&T's accounting records accurately reflected the revenue and expense that AT&T believed should be identified and assigned or allocated to the Partnership. AT&T's accounting records also accurately reflected the methodologies that AT&T used to identify and assign or allocate revenue and expense to the Partnership. It is not the case, for example, that AT&T decided that the Partnership should receive a particular type of revenue, and then the Partnership Accounting Group failed to allocate that revenue to the Partnership. Nor is it the case that the Partnership Accounting Group decided to use a particular methodology to allocate revenue to the Partnership, then implemented it errantly or inaccurately.

Because AT&T's accounting records present an accurate picture of how AT&T treated the Partnership, the absence of a particular entry for a type of revenue in the accounting records establishes that AT&T believed that the Partnership was not entitled to receive a share of that type of revenue. The absence of evidence of a particular allocation methodology similarly demonstrates that AT&T did not use that methodology to allocate revenue to the Partnership.

## I. The Data Revolution

By 2007, the market for wireless voice communications was relatively mature, and the double-digit subscriber growth of the early 2000s had leveled off to single digits. JX 526 at '022; *see* JX 279 at 25. Wireless providers began to see stronger growth in data services, driven by demand for applications such as downloadable music, games, ring tones, and text and photo messaging. JX 526 at '022; *see* JX 263 at 20; JX 279 at 4. The growth of data services opened up new revenue streams, including mobile internet advertising. JX 526 at '022.

AT&T planned to capitalize on these changes and expand its wireless business.[27] In June 2007, AT&T announced the appointment of Randall Stephenson as its new CEO. JX 282. The press release quoted Stephenson as saying, "Today's AT&T is a brand-new company, with wireless at the heart of what we do, supported by an unmatched heritage of innovation and service." *Id.* AT&T and other telecommunications companies viewed wireless capabilities as a "key driver" for the industry's future. Lurie Dep. 23.

A cornerstone of AT&T's plan was the introduction of the Apple iPhone, which launched on June 29, 2007. JX 285. AT&T was the exclusive wireless carrier for the iPhone. *See id.* AT&T correctly predicted that the iPhone would "transform the way people think about wireless communications." Dkt. 279 at 4; *see* Lurie Dep. 31. At an analyst

---

[27] By this point, SBC had completed its transformation into AT&T. SBC also had acquired Bellsouth, resulting in Cingular becoming a wholly owned subsidiary of the new AT&T. *See* JX 279 at 19; JX 526 at '016. AT&T caused Cingular to change its name to AT&T Mobility, LLC. PTO ¶ 50; *see* JX 287; JX 526 at '016.

conference at the end of 2007, AT&T touted the "huge potential in wireless data," a business that was quadrupling every year. JX 325 at 11–12. AT&T's customers had used significantly more data after the introduction of the iPhone. *Id.* at 12.

To expand its wireless capabilities, AT&T paid $2.5 billion in October 2007 to purchase additional wireless spectrum covering "an area which is home to around 196 million people . . . including 72 of the 100 biggest US cities." JX 319. In the press release announcing the purchase, an AT&T executive stated that "[c]ustomer demand for mobile services, including voice, data and video, is continually increasing." *Id.*

On January 24, 2008, AT&T reported its earnings for the fourth quarter of 2007. *See* JX 342. AT&T announced "record wireless gains" that included "record gross subscriber additions, reduced subscriber churn, solid mid-teens percentage growth in revenues and robust growth in operating income." *Id.* at 1, 3. Year over year, AT&T reported 57.5% growth in revenue from wireless data services, which was "driven by increased adoption of smart phones and 3G wireless devices." *Id.* at 4. AT&T viewed data services as a promising new source of revenue growth, because growth from wireless voice subscribers continued to mature. *See* JX 359 at 30 (average voice service revenue per user for 2007 declined 4.1% while average data service revenue per user grew 46.9%); *see also* Stephens Tr. 36 (explaining that during the years leading up to the Freeze-Out, "data traffic on our networks was growing dramatically").

J.   **AT&T's Efforts To Monetize Its Network**

With the importance of data and other services blossoming, AT&T took practical steps to monetize its network. Those steps included launching new businesses. The record

on these topics is more abbreviated than it should be due to positions AT&T took in discovery.

As part of its efforts to monetize its network, AT&T realized that a customer's location information and other data that customers generated by using the Entire Network had value and could be monetized. During the period relevant to this litigation, the principal method of identifying a customer's location was by triangulating from multiple cell sites. Wages Tr. 155. During the relevant period, AT&T maintained a privacy policy under which AT&T only provided its customers' location-based data to service providers if they opted into that service. *Id.* at 153. In addition, whenever a subscriber made a call or used AT&T's system with a device, the system would generate information about the use, including the customer name, NPA-NXX number, date, start time of usage, end time of usage, connection type (voice or data) duration or kilobytes consumed, and destination. *Id.* at 136–37.

Wages and the Partnership Accounting Group did not view either location information relating to Partnership subscribers or the other types of information generated on AT&T's system by Partnership subscribers as proprietary information belonging to the Partnership. *See id.* at 146–47, 156–57. They decided that AT&T could use that information in its business, as long as AT&T shared that revenue to some degree with the Partnership. *Id.* at 147, 158.

AT&T did not have any formal process for identifying new revenue sources that could generate revenue that would need to be allocated to AT&T's various partnerships. Wages might hear about a new line of business, read about it, or be contacted by someone

54

else in AT&T. *See id.* at 175. If Wages or one of his colleagues learned about a new line of business and thought it might be something where the partnerships should participate, then they would consider it and make a decision. *See id.* at 175–76. The process was catch-as-catch-can. *See id.* at 312 (Wages testifying that he was responsible "to know about what I could be aware of").

### 1.    The AT&T Navigator Application

During the relevant period, AT&T launched the "AT&T Navigator" application, a location-based navigation service, through a contractual relationship with TeleNav, Inc. *See* JX 3867. AT&T made the AT&T Navigator available to iPhone users in 2009. *See* JX 493. By then, AT&T Navigator had become one of AT&T's "most popular and best-performing apps." JX 493.

Wages could not recall if he knew about the TeleNav contract during the relevant period. *See* Wages Tr. 431. He believed that the Partnership Accounting Group assigned revenue related to TeleNav on a subscriber-by-subscriber basis. If a subscriber with an NPA-NXX number assigned to the Partnership purchased the TeleNav product, then AT&T assigned that revenue to the Partnership. *Id.* at 439–40, 494–45. AT&T did not treat the revenue from the TeleNav contract as Shared Revenues for purposes of the Shared Revenues Definition and Shared Revenues Formula.

### 2.    The Geolocation Aggregators

During the relevant period, AT&T began selling information about its subscribers to "geolocation aggregators" such as LOC-AID Technologies, Inc., and Zumigo Corporation. *See* JX 1435. A geolocation aggregator purchases location data from cellular

carriers that is derived from their subscribers' cellular phone usage. The aggregator then sells the information to companies who provided services using the data. *See* Wages Tr. 442.

During the relevant period, Wages and the Partnership Accounting Group did not know about AT&T's sales of geolocation information to aggregators. Wages did not know about AT&T's contract with LOC-AID until November 2020, when AT&T proffered him as its Rule 30(b)(6) witness on that topic. *Id.* at 445.

As a result, Wages and the Partnership Accounting Group did not determine whether the Partnership was entitled to any revenue from the LOC-AID contract. *Id.* Departing from the view he said he held for purposes of the TeleNav contract, Wages agreed that geolocation information regarding subscribers assigned to the Partnership belonged to the Partnership for purposes of the LOC-AID contract. *Id.* at 443. Wages also agreed that the revenue from the contracts with the location aggregators fell within a strict reading of the Shared Revenues Definition. *Id.* at 449.

The agreement with LOC-AID that is in the record was executed in September 2010, just one month before the Freeze-Out. *See* JX 1435 at 56. AT&T projected revenue of only $100,000 in 2010. *See* JX 3828 at 23. AT&T actually generated only $952 in revenue from the LOC-AID contract in 2010. JX 2971, "2010 Pivot" tab, row 187.

### 3.    The Commercial Network Agreements

During the relevant period, AT&T entered into commercial agreements with companies like Amazon, General Motors, and Garmin (the "Commercial Network Agreements"). Under those agreements, commercial partners contracted with AT&T to use

its network. For example, Amazon entered into a Commercial Network Agreement to use AT&T's network for its Kindle product. General Motors entered into a Commercial Network Agreement to use AT&T's network for its On-Star vehicle security system. And Garmin entered into a Commercial Network Agreement to use AT&T's network for its navigation devices. This decision refers to the various devices—other than phones—that connected to AT&T's network as "Connected Devices."

AT&T pursued other Commercial Network Agreements that potentially covered a wide range of commercial applications, including consumer products, fleet management systems, building automation systems, cargo monitoring systems, medical devices, and other types of "machine-to-machine" communications. *See* JX 2166 at 24; JX 2090 at 29. There is evidence that AT&T entered into Commercial Network Agreements with particular businesses, such as AT&T's announcement in November 2009 that it had entered into "a five-year, $2.6 million contract for wireless services and applications to United Road Services, Inc., a leading U.S. provider of vehicle logistics." JX 620.

Under the Commercial Network Agreements, AT&T received data service revenue from Connected Devices based on "data package rate structures," which involved either "(1) a fee per kilobyte or megabyte; (2) a monthly access fee plus a reduced rate per kilobyte or megabyte; or (3) a monthly fee for a specified amount of data plus a fee for kilobyte or megabyte of data used in excess of that amount." JX 2166 at 33–34; *see* JX 252 at '002–06 (tiered pricing plan for contract with KORE Telematics Inc., a reseller of wireless data services); JX 2090 at 39–40 (tiered pricing plan with monthly recurring charges for contract with Spacenet Inc.). AT&T allocated revenue from Commercial

Network Agreements to the Partnership "based upon a weighted average of kilobytes" for each geographical area. JX 2412 at 13–14, 18. AT&T calculated allocation factors every month and maintained detailed usage statistics for each market, including the Partnership's market. *See* JX 2409; JX 2412 at 18; *see also* Hall Tr. 1023 (commercial Connected Device revenue was allocated based on usage). AT&T then applied the allocation factor to the total revenue generated by each commercial Connected Device subscriber each month. *See* JX 2407; Wages Tr. 189; *see also* JX 2419 at 54–59, 62–63.

The record indicates that AT&T also received other forms of compensation and streams of revenue under the Commercial Network Agreements. AT&T did not allocate a share of those amounts to the Partnership.

### 4. Services To Law Enforcement And Other Governmental Agencies

During the relevant period, AT&T also provided services to law enforcement and other government agencies that involved monetizing Partnership information.[28] AT&T repeatedly refused to provide information about the revenue it generated by providing services to law enforcement and other government agencies, resulting in a series of motions and rulings. The court ultimately ordered AT&T to identify "on a year-by-year basis . . . the gross consideration that AT&T received from monetizing Partnership Information to

---

[28] *See* Wages Tr. 166–67. This decision does not consider whether AT&T sold information to government entities involved in national security activities. The plaintiffs agreed to waive any claims involving that issue. Dkt. 573 Ex. A. The record establishes that AT&T sold information to other government entities that were not involved in national security activities. This decision only considers the latter aspect of AT&T's business.

government entities." Dkt. 283 ¶ 16. In response, AT&T disclosed the "*total* revenues and expenses of one or more business units within AT&T Corp." JX 2416 at 1 (emphasis added); *see* Wages Tr. 477–81. AT&T stated that the figures it disclosed were

> the total revenues and expenses from certain AT&T Corp. sales organization[s] that sell many different types of goods and services to the federal government, including internet services, telecom services, consulting services, engineering and design service, etc. Accordingly, the revenues and expenses identified above also include revenues and gross operating margin for sales of goods and services to the federal government wholly unresponsive to the Plaintiffs' pled and otherwise stated allegations regarding Defendants' monetization of partnership assets or information.

JX 2416 at 2. AT&T represented that "[f]urther isolation and presentation of revenues and operating margins is not practical, however, in light of the risk of disclosure of information the Company is not free to disclose." *Id.* The aggregate revenue figures thus did do not show the extent to which AT&T profited by selling Partnership subscribers' information to government entities. *See id.*; JX 2567, "Para 16 Funnel" tab.

AT&T concedes that it generated revenue by selling Partnership subscriber data to government entities under contractual relationships with those entities. *See* JX 2403; JX 2416. AT&T concedes that it booked the revenue from contracts with government agencies at the corporate level and that the resulting revenue was "not allocated to AT&T Mobility companies, including [AT&T's partnerships]." JX 2416 at 2. The Partnership thus did not receive any benefit from AT&T's contracts with government entities.

### 5. Handset Insurance

In addition to new services, AT&T operated a business between 2002 and 2009 that offered handset insurance to cover customers' phones against loss or damage. *See* Wages

59

Tr. 182–83. Wages admitted that the handset insurance business was "[d]efinitely associated" with providing wireless communications services. *Id.* at 413, 420–21. But Wages did not think it was part of his duties to advocate for AT&T's partnerships to receive a share of the revenue from the handset insurance business. *Id.* at 426.

AT&T offered the insurance through a wholly owned subsidiary named Peachtree Insurance Company, Ltd. Employees in the Partnership's AT&T-branded stores offered the handset insurance to customers. If a customer chose to participate, then the employee in the Partnership's store facilitated the subscriber's enrollment in the program. *See* JX 2591 at 5. Under the program, the customer paid a monthly fee to an AT&T affiliate for insurance to "cover damage to, or loss of, their cell phones." *Id.* The AT&T affiliate received the payments from the customers, paid the administrative costs, satisfied claims, and retained the net profits.[29]

From the beginning of the program until 2005, AT&T did not provide any compensation to the Partnership for using Partnership's assets in the handset insurance business. JX 2403 at 11. After AT&T's outside auditors questioned that decision, AT&T adopted a new system: If an employee whose compensation was identified as an expense for the Partnership sold a handset, and if the employee received a commission for the sale as an incremental component of compensation expense, then AT&T credited the

---

[29] Technically, a third party administered the insurance program for AT&T, with the AT&T affiliate acting as reinsurer. JX 2403 at 9–12. The distinction is not material to the analysis.

Partnership for the commission expense.[30] AT&T did not compensate the Partnership for the use of its other assets, such customer relationships, customer lists, and customer information. *See* JX 3866 at '315; Wages Tr. 418. AT&T did not allocate revenue and expense to the Partnership so that it participated in the benefits of the business. Wages Tr. 415, 419.

## K.      AT&T Considers Eliminating The Minority Partners.

With data usage expected to balloon, AT&T began to explore ways to eliminate the minority partners. In August 2007, Chris Reeves, an executive in AT&T's Corporate Development department, gave a presentation to Teske and Wages in the Partnership Accounting Group.

Reeves' presentation was titled "Partnership Relations - Restructuring Update and Buyout Analysis." JX 310. The presentation identified fifty-one partnerships where AT&T could benefit by eliminating the minority partners. *See id.* at '765–67. The presentation

---

[30] At trial, Wages did not know if the commission was paid "specifically to the employee" who sold the insurance or "if it was a commission to . . . recognize the benefit to the partnership." Wages Tr. 418. The financial statements for Bradenton mention that handset insurance was offered to subscribers as an optional feature, but do not explain how Bradenton earned revenue from handset insurance or break out handset insurance as a separate line item. *See* JX 541 at 3, 8. The financial statements do show commissions to Bradenton employees as an expense, and the logical inference is that AT&T simply reimbursed the partnerships for the sales commissions that the partnerships paid to their employees. *See id.* at 3, 17. Regardless, the record makes clear that AT&T did not compensate the Partnership for the use of its customers. JX 3866 at '315. *But see* JX 2591 at 5 (2005 memorandum from Ernst & Young LLP asserting that commission reflected what AT&T management believed "would be a reasonable approximation of amounts earned by the partnership for use of its subscriber in the handset insurance plan").

explained that "[a] buyout today will be much less expensive than 1 or 2 years down the road given OIBDA growth rates." *Id.* at '765.[31] Among a list of "Ongoing Issues" that AT&T faced, the presentation listed the "[i]nability to capture data roaming revenues within the partnerships." *Id.* at '762.

In early 2008, Reeves gave a presentation to AT&T's CFO, Pete Ritcher, about buying out the minority partners. JX 344; Teske Tr. 535. The presentation stated that "[p]ending asset mergers and accelerating valuations provide an opportune time to buyout certain minority partnerships." JX 344 at 2. The presentation contemplated an acquisition strategy that "would focus on the 18 legacy AT&T wireless partnerships" where AT&T could "execute a purchase without partner consent." *Id.* By acquiring the minority partners' interests, AT&T projected that it could "[e]liminate[] $186M of Distribution and Dividend payments over 10 years" or "$113M on a DCF basis." *Id.* at 2, 4.

The presentation explained that the minority partners' lack of "knowledge of the industry and historically poor relations" had led to "consistent conflict on issues such as CAPEX spending, and allocations." *Id.* at 3. AT&T identified "Internal Systemic Barriers" that affected relations with its partnerships, including AT&T's "[i]nability to track data roaming" and the "[i]nconsistent booking of revenues, expenses and allocations." *Id.* at 4.

---

[31] "OIBDA" means "operating income before depreciation and amortization." *See* Teske Tr. 583. It is "essentially the same" as the more familiar "EBITDA," a profitability metric that measures "earnings before interest, taxes, depreciation, and amortization." *Id.*

Both issues resulted in the "extensive use of accounting and field personnel to resolve ongoing issues." *Id.*

The presentation contemplated buyouts at eighteen partnerships. At a total cost of $100 million, the buyouts would create "total savings of $243M in perpetuity." *Id.* at 7. The presentation observed that for those partnerships, "[v]alue is projected to increase 60% from 2007 to 2010 based on Mobility OIBDA growth rates," equivalent to an OIBDA compound annual growth rate of 18%. JX 344 at 8. The buyouts would enable AT&T to "retain [the] lift in value driven by [the] projected growth of the business." *Id.* The presentation noted that the partnership assets would be "acquired at a discount to future growth." *Id.* at 9.

AT&T ultimately decided not to buy out the minority partners in 2008. AT&T preferred to buy additional spectrum and to invest in its network. Teske Tr. 535–36.

As suggested by its spectrum purchases, AT&T remained bullish on the prospects for growth in data usage. On October 15, 2008, AT&T announced the appointment of Glenn Lurie to be the head of its Emerging Devices Organization. JX 401. Lurie stated that "[h]igh speed wireless broadband service can enhance a huge variety of gadgets." *Id.* Lurie stated that there also were "a host of exciting new applications – from social networking to navigation to location-based solutions – being developed that will rely on wireless connectivity." *Id.*

## L. AT&T Again Considers Eliminating The Minority Partners.

In late summer and fall 2009, AT&T again considered eliminating the minority partners. Teske Tr. 536. The economic rationale remained compelling, and the buyouts

63

would have the additional benefit of simplifying AT&T's internal corporate structure. Over the preceding decade, AT&T had pursued an effort known as Project LESS that sought to reduce the number of entities in the AT&T corporate family. Under the auspices of Project LESS, AT&T had eliminated hundreds of legal entities. Stephens Dep. 153–54.

The Project LESS team was the logical group to spearhead the buyouts of the minority partners. The effort was by Debbie Dial, an executive who handled special projects for John Stephens, AT&T's CFO. Stephens Tr. 34; Teske Tr. 536–37; Wages Tr. 191–92.

Dial directed Teske, Wages, and others to compile information about the partnerships and assess the potential savings achievable under various streamlining options. *See* Teske Tr. 536–38; Wages Tr. 190–91,193–95; JX 587. The team based its analysis on the "Minority Entity Acquisition Summary" that Reeves prepared in January 2008. *See* JX 518; JX 547.

Contemporaneously, AT&T's senior executives were reviewing AT&T's strategy for mobile applications and emerging devices. *See* JX 532. AT&T executives viewed initiatives in those areas as critical to "provid[ing] AT&T a stronger foothold in the value chain" and enabling AT&T to compete with the likes of Apple, Microsoft, and Google. *Id.* at 5. The strategy depended on "[l]everag[ing] and expos[ing] AT&T assets to promote application innovation." *Id.* at 5. AT&T believed that by using its network to play "a meaningful role in the delivery of applications to AT&T subscribers," AT&T would protect its competitive position in the rapidly changing telecommunications sector. *Id.* AT&T

projected that its business plan would "drive a 10% uplift in AT&T data revenue," equal to $8 billion, by 2014. *Id.* at 7.

In November 2009, the Project LESS team presented its findings on the possibility of eliminating the minority partners. JX 616. The team described multiple "Current Challenges," including:

- Multiple audit/operational processes, inconsistent with the manner in which management runs the business

- Cost allocation and operational issues of accounting for distinct partnerships

- Additional processes to account for non-wireless activities in partnerships

*Id.* at '935 (formatting added). The presentation evaluated three alternative structures: a national asset roll-up, regional asset roll-ups, and minority buyouts. *Id.* at '937. The team strongly preferred the minority buyouts, describing it as the "[s]traightfoward/simple alternative" that would (i) "[a]void[] litigation risks associated with business unit integration," (ii) provide a "[c]lear legal path forward," and (iii) "[e]liminate 360 ownership stakes" associated with the entities. *Id.* at '638.

After the presentation, Stephens directed Teske and Greg Hall, Mobility's controller, to engage a valuation firm to estimate the value of the minority partners' interests. Teske Tr. 544–45. In February 2010, AT&T retained PricewaterhouseCoopers LLP ("PwC") to value the partnerships.

In April and May 2010, PwC sent AT&T its final valuation analyses. PWC valued the Partnership at $219 million. JX 1039 at 41. AT&T used PwC's valuation to set the price it paid in the Freeze-Out. PTO ¶ 16.

After receiving the valuations from PWC, Stephens met with Stephenson, AT&T's Chairman and CEO, to obtain his approval for eliminating the minority partners. Stephens Tr. 34–35; Teske Tr. 575. In connection with the meeting, AT&T executives sent Stephenson a memorandum that quantified the administrative, audit, and tax savings that AT&T would achieve. JX 3514. The memorandum also identified a benefit in the form of a "[d]ecreased distribution payment stream." *Id.* at '575. The memorandum conspicuously failed to quantify the decreased payment stream. But AT&T necessarily knew the value of the payment stream, because AT&T observed that eliminating the minority partners "will be slightly accretive to AT&T's earnings and free cash flow per share." *Id.*

On June 3, 2010, Stephenson approved the Freeze-Out. JX 3514. *Id.* at '575–76. After receiving Stevenson's approval, AT&T formed Holdings as a new subsidiary to effectuate the Freeze-Out. *See* PTO ¶¶ 53–54. AT&T transferred its interest in the Partnership to Holdings. JX 1273; JX 1285.

## M.    AT&T Eliminates The Minority Partners.

In July 2010, AT&T offered to purchase the minority partners' interests at a 5% premium above the pro rata value determined by PwC. For the Partnership, PwC's valuation worked out to $2,190,000 for each 1% of the Partnership. AT&T offered to pay $2,299,500 for each 1% interest. *See* JX 1309; JX 1316; JX 1319.

The offer letter informed the minority partners that if they did not accept AT&T's offer, then AT&T would convene a meeting of the partners and vote its interest in favor of selling the Partnership's assets and liabilities at the value determined by PwC. The letter explained that after the sale, the Partnership would be dissolved and each remaining partner

66

would receive its pro rata share of the purchase price. PTO ¶ 59. In other words, minority partners who declined the buyout offer would receive their pro rata share of PwC's valuation, rather than a 5% premium over that valuation.

Some minority partners accepted AT&T's offer and sold their interests to AT&T. *See, e.g.*, JX 1365. Others did not. PTO ¶ 61.

In September 2010, AT&T caused an affiliate named New Salem Cellular Telephone Company LLC ("New Salem") to send an offer to the Partnership to purchase all of its assets and assume all of its liabilities for a cash payment of $219 million. JX 1433; *see* PTO ¶ 63. Next, AT&T called a special meeting to vote on the offer. JX 1452; JX 1453; *see* PTO ¶ 64.

On October 12, 2010, the Partnership held a special meeting to consider the Freeze-Out. At the meeting, AT&T voted its interest in favor of the Freeze-Out. JX 1485; *see* PTO ¶ 65. The minority partners in attendance voted against the Freeze-Out. JX 1485; *see* PTO ¶ 66.

Immediately after the vote, AT&T caused the Partnership to enter into an asset purchase agreement with New Salem. JX 1489. Immediately after that, the Partnership and New Salem entered into a bill of sale and assignment and assumption agreement to effectuate the transfer of the Partnership's assets and liabilities. JX 1526. Having done so, Wages executed a "Statement of Dissolution," also dated October 12, 2010, reciting that the Partnership had dissolved as a result of completing a sale of all of its assets. JX 1493. That same day, AT&T sent checks to the minority partners reflecting their share of a liquidating distribution in the amount of the sale price. JX 1534.

67

Roughly contemporaneous with the Freeze-Out, AT&T engaged in similar transactions at five other partnerships. Over the following months, AT&T engaged in similar transactions involving seven additional partnerships, bringing the total number of freeze-outs to thirteen.

## N.     Litigation Commences.

On August 26, 2011, former minority partners in the Partnership sent AT&T a letter asserting that AT&T had breached the Partnership Agreement when engaging in the Freeze-Out. JX 2030; *see* PTO ¶ 70. The former minority partners demanded that AT&T "cure its material defaults" within thirty days. JX 2030 at 2; *see* PTO ¶ 70.

On September 23, 2011, AT&T filed a lawsuit seeking declaratory relief against the nine former minority partners in the Partnership. C.A. No. 6886-VCL, Dkt. 1. AT&T's complaint sought broad declarations absolving AT&T of any contractual or fiduciary liability for its actions. *Id.* ¶ 59; PTO at 3. On October 4, 2011, five of the minority partners in the Partnership filed suit against AT&T. C.A. No. 6908-VCL, Dkt. 1.

Either AT&T or the minority partners or both filed lawsuits addressing the transactions involving the other partnerships. In total, fifteen lawsuits were filed involving thirteen different partnerships. Because of the manner in which the lawsuits were filed, minority partners appeared as the plaintiffs in some civil actions and as defendants in others. AT&T occupied the converse positions. To achieve a measure of consistency, the court realigned all of the minority partners as plaintiffs and AT&T and its affiliates as defendants.

As a result of the court's orders, the following minority partners are the plaintiffs for purposes of claims relating to the Partnership. The chart identifies their minority interest in the Partnership at the time of the Freeze-Out.

| Salem Minority Partners | Interest |
|---|---|
| Alan R. Bell | 0.3420% |
| Michael T. Bowers | 0.1710% |
| The Ronald J. Gotchall Living Trust (Rosa Lee Gotchall, Trustee) | 0.1710% |
| The Rosa L. Gotchall Living Trust (Ronald J. Gotchall, Trustee) | 0.3420% |
| Om Parkash Kalra | 0.3420% |
| Ellen M. Martin | 0.1710% |
| Roam-Tel Partners | 0.3420% |

PTO ¶ 9. Collectively, the minority partners held a 1.881% interest in the Partnership, with AT&T holding the remaining 98.119% interest. *See* PTO ¶ 10. Based on the consideration that AT&T paid for the assets and liabilities of the Partnership, the plaintiffs received $4,119,390 in the aggregate.

## O.    The Coordination Order

Initially, the actions proceeded separately, albeit with the parties making parallel moves across their multiple lawsuits. In June 2012, AT&T filed motions to dismiss the claims which asserted that AT&T failed to comply with the Partnership Agreements when effectuating the freeze-outs. *E.g.*, C.A. No. 7030-VCL, Dkt. 16. In March 2013, the court issued a series of orders granting the motions. In summary, the court held that AT&T had

the power under the Partnership Agreements to effectuate the freeze-outs. *E.g.*, Dkt. 64 ¶¶ 8–9.

In June 2013, the court entered a stipulated order coordinating the actions for purposes of pre-trial discovery under the caption of the Coordinated Action. The actions were not formally consolidated. The court directed the parties to make all filings in the Coordinated Action and designate them as pertaining to all of the coordinated actions or to specific cases.

## P.   Discovery

Discovery unfolded over the better part of eight years. During the process, AT&T aggressively resisted discovery, even after the court ruled against AT&T on specific issues. As the court noted on several occasions, AT&T was the most obstructive litigant that this judge has ever seen, whether in private practice or on the bench.[32]

---

[32] *See, e.g.*, Dkt. 283 ¶ 1 ("The court has considered in particular the defendants' attempts to portray as excessive and unfounded the discovery that the plaintiffs served in response to the guidance the court provided, the numerous issues raised by the defendants in response to that discovery, and the defendants [sic] repeated efforts to argue the merits of the case in the context of discovery disputes."); Dkt 454 at 35–36 ("[T]his has been an effort by the plaintiffs to hack through the – one of the largest forests of discovery, objections, and delays and problems that I have seen. And that goes for both on being on the bench and in practice. And you guys are No. 1, you know. It's good to be No. 1, I guess. But the number of problems and inability to understand things and need to revisit issues that you-all have raised over the course of these nine years, both before and after me bringing in the Special Master, dwarfs anything I have ever encountered."); *see also* Tr. 481 ("THE COURT: . . . . I read that [objection in AT&T's discovery response]. And what that suggests to me is that it was a contemporaneous admission from you-all that you weren't providing what I ordered you to provide.").

### 1. The Disputes That Led To The Appointment Of The Discovery Master

In late 2015, the plaintiffs pursued a motion to compel that sought to follow up on information that the plaintiffs obtained during depositions taken in 2014. The plaintiffs sought to explore the extent to which AT&T sold information belonging to the partnerships in the Coordinated Action to third parties, including government agencies, without the approval of their Executive Committees. Dkt. 131. The plaintiffs detailed their extensive and unsuccessful efforts to obtain this information from AT&T. *Id.* at 6–12.

AT&T responded to the discovery motion with a fifty-nine page brief, supported by forty-six exhibits, that advanced a barrage of arguments. AT&T claimed that the discovery did not relate to any claim in the case. Dkt. 140 at 27–28. AT&T claimed that the plaintiffs should have sought the discovery earlier. *Id.* at 29–30. In an effort to obtain summary judgment under the guise of a discovery ruling, AT&T argued that the materials sought could not support a breach of the partnership agreements as a matter of law. *Id.* at 31–35. In support of that contention, AT&T relied on the fact that certain of the partnerships had entered into management agreements, which AT&T claimed "explicitly authorized the Defendants' affiliates to 'act as agent for and on behalf of [those partnerships] . . . before federal, state, and local governmental authorities.'" *Id.* at 34 (ellipsis in original) (quoting MNSA art. II). AT&T also claimed that the sharing of subscriber information could not support a breach of the partnership agreements as a matter of law because federal law declared that the information belonged to individual subscribers, not the partnerships. *Id.* at 35–36. And AT&T claimed that even if the plaintiffs were correct about the meaning of

71

the provision in the partnership agreements, then the provisions would be invalid as a matter law. *Id.* at 36.

AT&T also advanced arguments more appropriate to a motion to compel. AT&T argued that it had provided all the information to which the plaintiffs were entitled and that providing any additional information would be unduly burdensome. *Id.* at 36–44. And AT&T claimed that federal law prohibited them from providing much of the information. *Id.* at 44–53.

In their reply, the plaintiffs confirmed that they were seeking information about how much money AT&T made by selling proprietary information belonging to the partnerships to third parties. Dkt. 149 at 2. The plaintiffs noted correctly that AT&T had never denied that it sold the partnerships' information to third parties. *Id.* at 7. The plaintiffs also made clear to AT&T that they were pursuing a claim for breach of the Partnership Agreement based on AT&T's sharing of information with third parties. *Id.* at 16–18.

AT&T then sought leave to file a sur-reply. AT&T claimed that the plaintiffs' responses to AT&T's arguments actually constituted new arguments to which AT&T should have a chance to respond. Dkt. 163. The court denied the request. Dkt. 165.

The court held a hearing on February 11, 2016. Dkt. 203. The court ruled that the information that the plaintiffs sought about revenue that AT&T received and had not allocated to the partnerships was relevant and discoverable. *Id.* at 6, 47. To the extent the information related to non-governmental counterparties, the court directed AT&T to provide it. *Id.* at 9. To the extent the information related to government entities, the court directed AT&T to determine whether any revenue streams existed that were not allocated,

72

then "figure out a way to provide the information at a sufficiently aggregate level so that it doesn't implicate national security concerns, and figure out a way to give the plaintiffs that information." *Id.* at 48. The court instructed the plaintiffs to serve a new set of interrogatories and requests for production that refined their requests. *Id.* at 65. The court also admonished AT&T against relying on overly broad, general objections. *Id.* at 70–71.

AT&T did not comply with those rulings. AT&T instead served responses cabined by a host of overly broad, general objections. Dkt. 222 Ex. B; *see* Dkt. 251; Dkt. 252. AT&T objected to approximately 100 requests for admission, interrogatories, and requests for production. AT&T refused to provide any documents in response to thirty-two requests for production. AT&T effectively disregarded the court's instructions.

The plaintiffs again moved to compel, styling their effort as a supplemental motion. Dkt. 222. The plaintiffs also moved to compel discovery regarding revenue that AT&T generated from contracting with third parties for data-related services. *See* Dkt. 220. Through the latter motion, the plaintiffs sought to ensure that they received information about AT&T's revenues from what this decision has referred to as Connected Devices and Commercial Network Agreements. *See id.* at 8–13. AT&T responded to the supplemental motion with a thirty-eight page answering brief supported by 320 pages of exhibits. Dkt. 251. AT&T responded to the additional motion to compel with a fifty-one page answering brief supported by fifty-four different exhibits. Dkt. 252; Dkt. 253.

The court convened a hearing on both motions on June 3, 2016. Dkt. 272. During the hearing, the court discussed the practical challenges that the motions presented. *Id.* at 5. In summary, the plaintiffs sought to understand how AT&T generated revenue from its

nationwide cellular business, so the scope of discovery was potentially vast. The burden of that discovery also could be disproportionate, because regardless of the metric used, the partnerships at issue in the Coordinated Action made up a small fraction of AT&T's business. An additional problem was that to evaluate the scope of discovery, the court would need to develop a deep understanding of AT&T's business. The court typically would acquire that level of understanding only after a trial on the merits. The court thus faced the prospect of conducting a multi-day evidentiary hearing akin to a trial so that the court could determine what discovery was warranted in preparation for a trial.

Confronted with a seemingly intractable Gordian knot, the court hazarded the possibility of a special discovery master. If the parties could agree on an independent, subject-matter expert, then that person could investigate AT&T's business and make a recommendation on the extent of discovery that was warranted. *Id.* at 23–30.[33]

The court asked the parties to suggest candidates for the position of special discovery master. Dkt. 272 at 39. The plaintiffs proposed Jim Timmins, a Managing Director of Teknos Associates LLC. Dkt. 271. Timmins is an expert in both valuation and technology companies. Dkt. 284 ¶ 5; *see* JX 2419 at 25–26; Dkt. 271 Ex. A. Notably, Timmins is not a lawyer.

---

[33] The court also envisioned that as a result of addressing the scope of discovery, the special discovery master might acquire subject matter expertise so that it would make sense to transition the special discovery master into a valuation role. *Id.* As events transpired in the litigation, the plaintiffs objected to special discovery master transitioning into a valuation role. As a result, the special discovery master only made a recommendation regarding the appropriate scope of discovery.

74

On July 27, 2016, the court issued two orders. The first order granted the supplemental motion. Dkt. 283 (the "Supplemental Order"). The opening paragraph stated:

> The court has spent multiple days reviewing the history of this proceeding. As part of that process, the court has given detailed review to the motion to compel that the plaintiffs filed in November 2015, the briefing in connection with that motion, and the hearing during which the court ruled on certain issues and, as to others, gave the parties substantial guidance on how to proceed. The court also has reviewed the discovery that the plaintiffs served following the hearing, the defendants' responses to that discovery, and the briefing that ensued on the plaintiffs' motion to compel and supplemental motion to compel. The court has considered in particular the defendants' attempts to portray as excessive and unfounded the discovery that the plaintiffs served in response to the guidance the court provided, the numerous issues raised by the defendants in response to that discovery, and the defendants [sic] repeated efforts to argue the merits of the case in the context of discovery disputes. Having done so, the plaintiffs' supplemental motion to compel is GRANTED.

*Id.* ¶ 1.

The court overruled AT&T's objections. Among other things, the court reiterated a ruling it had made during the hearing on February 11, 2016, regarding the scope of discovery:

> Information about all revenue streams that potentially resulted from partnership assets is plainly relevant to the valuation issues presented in this case and therefore discoverable. In addition, many of the categories of Partnership Information appear likely to be held to be confidential partnership information. Discovery into their use by AT&T is also relevant to the plaintiffs' claims for breach of the partnership agreements that contained limitations on the use of confidential partnership information.

*Id.* ¶ 10.

In the Supplemental Order, the court directed AT&T to provide information about how it monetized Partnership information:

75

14. To the extent that Partnership Information was monetized as an unsegregated part of a larger sale, license, or agreement to provide the information, AT&T shall (i) identify the larger sale, license, or agreement and (ii) identify on a year-by-year basis the gross consideration received from monetizing the information through that channel.

15. AT&T shall identify on a year-by-year basis the gross consideration that AT&T received from monetizing Partnership Information to government entities. AT&T shall identify on a year-by-year basis the gross consideration that AT&T received from monetizing Partnership Information to commercial entities. AT&T shall provide this information regardless of whether some or all of the consideration was allocated or conveyed to the Partnership. The plaintiffs are entitled to the gross consideration to test the fairness of AT&T's allocations or conveyances.

16. The identification on a year-by-year basis of the gross consideration that AT&T received from monetizing Partnership Information to government entities shall include consideration derived from contracts or legal processes that may be subject to national security protections, but the information provided pursuant to this order shall neither (i) identify the amounts derived from contracts or legal processes that may be subject to national security protections, nor (ii) identify amounts derived from other sources that would enable the plaintiffs to determine or estimate the amounts derived from contracts or legal processes that may be subject to national security protections. . . .

17. Defendants' objection to "gross consideration" is overruled. Consideration means anything of value received from the monetization of a partnership asset. Gross consideration means the aggregation of the consideration received. Defendants shall provide discovery using the term "gross consideration" and not subject to their objections.

*Id.* ¶¶ 14–17.

The second order appointed Timmins as the special discovery master. Dkt. 284 (the "Discovery Master"). The court directed Timmins to conduct proceedings to develop a recommendation as to whether the plaintiffs should be permitted to conduct further discovery into the four categories of information. The court vested Timmins with the authority typically afforded to a special master, including the authority to schedule

proceedings, to conduct hearings, and to take testimony under oath. *Id.* ¶ 6. The court stayed all other proceedings in the case pending receipt of Timmins' recommendations. *Id.* ¶ 13.

### 2. The Discovery Master's Investigation

As Discovery Master, Timmins conducted a detailed investigation that spanned the better part of two years. He reviewed hundreds of documents. *See* JX 2419 at 26–27, 31–33. He interviewed eleven witnesses under oath, including Lurie, Wages, Teske, Hall, and other AT&T accounting executives. *Id.* at 33–34, 36–37. He also conducted an informal interview with Aaron Gilcreast, the leader of the PwC team AT&T retained to value the partnerships in connection with the freeze-outs. JX 2419 at 36. Timmins met frequently with counsel for the plaintiffs and AT&T to understand their positions. *Id.* at 27–28.

Timmins issued a draft report in October 2017. *See* Dkt. 352. Both sides took exceptions. Dkt. 354 Exs. 1–6; Dkt. 358. Timmins addressed those exceptions in his final report dated March 12, 2018. JX 2419 (the "Discovery Report").

### a. Discovery Into Revenue From Connected Devices

The Discovery Report first addressed the plaintiffs' efforts to conduct discovery in support of their theory that AT&T "created or anticipated a large business based on Connected Devices, that these Connected Devices generated substantial activity and revenue on AT&T's mobile network, and that this revenue was not presented to and/or appropriately considered by PwC in preparing its valuations of the Partnerships." *Id.* at 45. Based on concerns about proportionality, Timmins recommended that discovery into revenue from Connected Devices "be limited, or declined entirely." *Id.* at 137.

77

In seeking discovery related to Connected Devices, the plaintiffs cited publicly available materials which showed that AT&T's executives were optimistic about the future of the business. *Id.* at 45–46. Timmins confirmed that "the AT&T wireless business was doing well and its future prospects looked bright," but he also noted that revenue from Connected Devices during the relevant period remained "small relative to AT&T's overall revenue." *Id.* at 47–48. To support these observations, Timmins noted that AT&T's annual revenue from Connected Devices ranged from $110 million in 2008 to a run-rate of $332 million in 2013. *Id.* at 48–49. He observed that this revenue was

> small when compared to revenues for all of AT&T Mobility (*e.g.*, $66,627,051,447 in 2012) or even compared to allocated revenues from sources attributable to the Partnerships other than wireless service and equipment revenues (*e.g.*, $412,648,534 in 2012) or the fair value estimated for the Partnerships by PwC (*e.g.*, Bremerton was valued at $76,000,000), especially in light of the fact that the Plaintiffs owned only – at most – a few percent of each Partnership.

*Id.* at 49–50 (footnotes omitted). Timmins also observed that "[t]he number of Connected Devices did not reach the bullish goals of some industry executives . . . , although the [plaintiffs] are correct that the number of Connected Devices on AT&T's network has risen dramatically over time." *Id.* at 51–52 (footnote omitted). Timmins therefore recommended against additional discovery into Connected Devices and mobile data revenue, believing it was unlikely to be productive and would be unduly burdensome. *Id.* at 54.

As an additional reason for his recommendation against permitting further discovery into revenue from Connected Devices, Timmins noted that AT&T allocated Connected Device revenue to the partnerships using "processes, procedures, and an outside audit firm to ensure that revenues and expenses were allocated appropriately . . . in accordance with

78

good management practices and generally accepted accounting principles." *Id.* at 55–56 (footnote omitted). Timmins observed that "AT&T utilized appropriate accounting managers with the requisite knowledge, training, and experience to carry out these functions and that these managers were provided with a workforce, software, and systems to carry out these functions." *Id.* at 56. Timmins also noted that "other checks and balances were at work within the organization that would ensure revenues were allocated appropriately." *Id.* Timmins based these conclusions on interviews of AT&T personnel, "accounting walkthroughs" with AT&T executives, and his review of AT&T's audited financial statements. *Id.* at 58. He also examined a sample of revenue allocations to confirm that AT&T allocated revenue from Connected Devices to the partnerships. *Id.* at 57–59, 65. Timmins' investigation did not disclose "any deficiencies in AT&T's accounting practices." *Id.* at 134.

Timmins cited the complexity of AT&T's accounting system as an additional factor that made it less likely that further discovery into revenue from Connected Devices would be productive. He observed that due to the complexity of AT&T's general ledger and other aspects of AT&T's accounting system, "a number of systems would need to be examined by personnel with relevant expertise in order for such data to be properly collected, reviewed, and produced." *Id.* at 65–66. For example, after AT&T introduced a new "subledger accounting system" for manual allocations in 2009, it ran "nearly 70,000" manual revenue and expense allocations through the system in the following four-and-a-half years. *Id.* at 63–64. Before 2009, AT&T used an accounting system that was "no longer online." *Id.* at 64. Before that, AT&T used "a paper process." *Id.* Timmins recommended

79

that "it would be overly burdensome and of little benefit" to require AT&T to provide additional information about the allocations of revenue from Connected Devices. *Id.* at 66.

Timmins also believed that revenue from Connected Devices was "included in the financial results and financial forecasts provided to PwC for the purpose of preparing the valuations of the Partnerships." *Id.* at 73. Timmins believed that even if revenue from Connected Devices continued to grow quickly, then those revenues "would make up only a small part of total revenues during the period of the financial forecast" that PwC used in its valuations. *Id.* at 77. Timmins therefore recommended against additional discovery because "no proportionate benefit to the Plaintiffs would result." *Id.*

### b. Discovery Into Revenue From Commercial And Governmental Entities

The second category of information that Timmins investigated related to the plaintiffs' efforts to conduct discovery to support their claim that AT&T "gathered data from the use by Partnership customers of the wireless communications network and similar activities, that these data were monetized in sales to commercial and government entities," and that these revenues were not reflected in PwC's valuations. *Id.* at 78. Based on concerns about proportionality, Timmins recommended against additional discovery into this area.

Timmins reasoned that discovery into the sale of customer data to commercial entities would be unduly burdensome for AT&T and likely would produce no benefit for the plaintiffs. Timmins observed that "the first notable commercial use of Big Data by AT&T did not occur until after the Relevant Period." *Id.* at 85. As a result, Timmins "determined that Big Data activities did not generate any material revenues during the

80

Relevant Period." *Id.* He accordingly recommended "that broad discovery into AT&T's Big Data initiative during the Relevant Period should be denied." *Id.* at 88.

Timmins believed that AT&T generated "somewhat more revenues" by selling Partnership information to governmental entities, but he regarded those revenues as "not large or material to AT&T" and "not . . . material to the Partnerships." *Id.* at 89. He explained that AT&T monetized its data, including Partnership information, through two government revenue sources: AT&T's National Compliance Center, and the sale of analytics services.

The National Compliance Center responded to subpoenas from law enforcement agencies and other litigants. Timmins noted that his investigation was "constrained by the government's insistence, for national security purposes, that there be no denial or confirmation of whether AT&T supports or undertakes sales to national security agencies." *Id.* at 90 n.253. He nevertheless believed that revenue from the National Compliance Center was booked either as a "contra-expense directly on AT&T Mobility's general ledger, or netted with expense and billed to AT&T by a separate affiliate. The net expense thereafter was allocated to the market-level entities including the Partnerships." *Id.* at 92. Timmins recommended against any additional discovery in this area because AT&T appropriately allocated the revenue to the partnerships.

For the data analytics contracts, Timmins believed that AT&T did not allocate any of the revenue to the partnerships. AT&T instead booked the revenue to a separate subsidiary with an independent billing system. *Id.* at 105–06. Timmins nonetheless

recommended against additional discovery, citing the fact that the revenue would have been small from the perspective of the partnerships. *Id.* at 106.

### c. Discovery Into The Monetization Of Partnership Information Through Intellectual Property

The third category of information that Timmins investigated related to the plaintiffs' claim that AT&T "derived value from the sale or licensing of intellectual property created with the use of Partnership Assets or Partnership Information." *Id.* at 107. Based on concerns about proportionality, Timmins recommended against additional discovery in this area.

Timmins believed as a result of his investigation that AT&T had "a business team devoted to realizing value from the intellectual property it develops." *Id.* at 112. He also believed that the resulting revenue was "small from the perspectives of AT&T and the Partnerships," and that "AT&T's Intellectual Property division monetized little to no Partnership Information during the Relevant Period." *Id.* at 112, 115. For example, of the $342.5 million in revenue AT&T generated through patent licensing during the relevant period, the overwhelming majority was generated from patents for compressing audio files. *Id.* at 114–15. Timmins saw no reason to believe that AT&T's internal startup incubator or its R&D division had "monetized Partnership information, or utilized Partnership Assets, in their R&D efforts." *Id.* at 115. Individuals associated with the incubator did not have access to customer or network information, and the R&D division used customer data "solely for AT&T internal purposes." *Id.* at 116. Timmins believed that given AT&T's massive patent portfolio "and the very small amount of revenues that would flow to the

Partnerships" from a hypothetical patent, "it would be disproportionately burdensome" for AT&T to "locate, review, and produce all potentially relevant information about its intellectual property development during the Relevant Period." *Id.*

#### d. Discovery Into Non-Monetary Consideration

The last category of information that Timmins investigated related to the plaintiffs' claim that AT&T "derived non-monetary consideration from barter or peering or similar arrangements" that involved the transfer of information that included Partnership Information. *Id.* at 117. Timmins "found nothing to support these concerns." *Id.* at 118. Timmins therefore recommended against permitting any discovery into this area. *Id.* at 122.

### 3. The Court Adopts The Discovery Report's Recommendations.

The Discovery Master's bottom-line conclusion, conveyed in the Discovery Report, was that AT&T's internal accounting records depicted how AT&T allocated revenue to the partnerships with a sufficiently high degree of accuracy that discovery into the areas that the plaintiffs wanted to explore would be overly burdensome and disproportionate to the needs of the case. The Discovery Master discussed factual matters when making these recommendations, but he did not make factual findings that would be binding through trial. Nor did he not make rulings about whether AT&T complied with its contractual obligations. And he did not make rulings about whether AT&T complied with its fiduciary duties in connection with the freeze-outs.

As Delaware law requires, the court undertook a *de novo* review of the Discovery Report. Dkt. 381 ¶ 5; *see DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999). The court accepted the Discovery Master's recommendations regarding discovery, denied the

83

plaintiffs' motion to compel, and entered a protective order barring further discovery into the four categories of information addressed in the Discovery Report. Dkt. 381 ¶ 5. In making this ruling, the court addressed a motion to compel production of documents. The court did not make factual findings that would be binding through trial. The court did not make rulings about whether AT&T complied with its contractual obligations. And the court did not make rulings about whether AT&T complied with its fiduciary duties in connection with the Freeze-Out.

### 4. AT&T Finally Provides Limited Discovery.

As part of his work, the Discovery Master noted that AT&T had not produced certain information that the Supplemental Order had directed AT&T to provide. AT&T previously had sought to evade the Supplemental Order by asking the court to refer the subject matter of the order to the Discovery Master. The court issued a letter ruling that rejected AT&T's request and directed AT&T to comply. Dkt. 292. The letter ruling stated: "Paragraphs 14 through 16 [of the Supplemental Order] addressed specific requests for discoverable information. AT&T has been ordered to provide that information. It should already have done so." *Id.* at 1.

During a teleconference on December 22, 2016, the court reiterated that AT&T needed to produce the information. Dkt. 301 at 23, 27–28. The court also ordered that AT&T produce a witness pursuant to Court of Chancery Rule 30(b)(6) to confirm or deny whether AT&T disclosed Partnership Information to third parties and to produce a witness from PwC to testify about its valuation process. Dkt. 381 ¶ 5; *see* Dkt. 383 at 67–75.

84

On June 9, 2017, AT&T finally served an interrogatory response addressing the information covered by the Supplemental Order. In that response, AT&T identified on a year-by-year basis the aggregate revenue, expense, and operating margin associated with providing services to the government that involved the monetization of Partnership Information:

| Year | Revenue | Expense | Operating Margin |
|---|---|---|---|
| 2005 | $340,020,899 | $321,609,683 | $18,411,216 |
| 2006 | $301,758,469 | $276,247,643 | $25,510,826 |
| 2007 | $323,337,184 | $292,099,912 | $31,237,272 |
| 2008 | $385,271,417 | $341,553,542 | $43,717,875 |
| 2009 | $445,138,157 | $372,038,648 | $73,099,509 |
| 2010 | $476,930,483 | $388,390,003 | $88,540,480 |
| 2011 | $489,950,426 | $405,676,189 | $84,274,237 |
| 2012 | $418,666,959 | $337,391,719 | $81,275,239 |
| YTD 6/30/2013 | $207,522,260 | $174,155,903 | $33,366,358 |

JX 2416 at 2. AT&T admitted that none of these amounts were allocated to the partnerships. *Id.* In an objection, AT&T asserted that the figures included revenue that the partnerships were not entitled to receive. *Id.* AT&T admitted that "[f]urther isolation and presentation of revenues and operating margins is not practical, however, in light of the risk of disclosure of information the Company is not free to disclose." *Id.* At trial, the court overruled AT&T's objection. Tr. 477–81. The data provides persuasive and reliable evidence of the existence of revenue associated with government contracts that falls within the Shared Revenues Definition.

## Q.    The Summary Judgment Motion

In May 2019, AT&T moved for summary judgment on the plaintiffs' claims that AT&T had failed to manage the partnerships in compliance with their partnership

agreements. AT&T argued that the plaintiffs were bound by the releases in settlements reached in 1997 and 2007 between some of the minority partners and AT&T's predecessor.[34] AT&T also contended that the plaintiffs' claims were time-barred. Dkt. 467 at 26–31.

The court denied AT&T's motion. Dkt. 551. The court rejected the argument that by entering into the settlements, the plaintiffs had conceded that AT&T had the necessary authority as majority partner to engage in the challenged business practices. The court explained that the settlements were just that—settlements—and "the plaintiffs did not give up their right to litigate the same issues later if the majority partner decided to engage in the same conduct that the plaintiffs regarded as problematic." *Id.* ¶¶ 9–10. The court also held that because the "plaintiffs have represented that they are suing only based on conduct that took place from 2008 forward," the doctrine of laches did not bar their claims. *Id.* ¶ 8.

## R.     AT&T Removes The Case To Federal Court.

In August 2019, the plaintiffs moved to compel AT&T to produce witnesses to confirm or deny (i) whether AT&T had disclosed confidential information about Partnership subscribers "to one or more Unaffiliated Third Parties," (ii) whether AT&T received any payment for the disclosures, and (iii) whether AT&T had allocated any of the resulting revenue to the partnerships. Dkt. 525 ¶ 2. The plaintiffs sought this information

---

[34] Dkt. 467 at 25–26; *see Linney v. Cellular Alaska P'ship*, 1997 WL 450064 (N.D. Cal. July 18, 1997) (approving settlement of 1997 action); JX 145 (notice of pendency of settlement of 1997 action); JX 144 (stipulation of settlement of 1997 action); Dkt. 467 Ex. 10 (petition in 2007 action); JX 317 (settlement agreement in 2007 action).

because they continued to believe that AT&T had generated revenue by providing confidential information, including subscriber information, to government entities. *See id.*

The United States Department of Justice (the "DOJ") opposed the motion, asserting that "[a]ny confirmation of whether or not particular telecommunications service providers, including the AT&T Defendants, have assisted the United States in national security and intelligence matters . . . reasonably could be expected to cause exceptionally grave harm to the national security of the United States." Dkt. 542 at 2. After hearing argument, the court granted the plaintiffs' motion. Dkt. 547; *see* Dkt. 571.

On October 7, 2019, the DOJ intervened for the purpose of removing the case to federal court. Dkt. 567. Later that day, AT&T removed the litigation to the United States District Court for the District of Delaware. Dkt. 569.

The case remained in federal court for the next nine months. As the price of returning the case to this court and moving forward with the litigation, the plaintiffs agreed to "forever disclaim and relinquish" any claim based on AT&T's use of any Partnership Information to provide assistance to any element of the intelligence community. Dkt. 573, Ex. A ¶ 1. The plaintiffs also agreed that no evidence or argument about AT&T providing Partnership information to the intelligence community would be advanced in this case. *Id.* ¶ 3. Based on the stipulation, the district court entered orders remanding the cases. PTO at 10; *see* Dkt. 573, Ex. A ¶ 5.

S.     **Trial**

After the remand, the case proceeded to trial. The initial coordination order had provided for coordination only for purposes of pre-trial discovery. In the pre-trial order,

87

the parties agreed to a coordinated trial. As noted, trial took place over five days, the parties introduced 3,187 exhibits, and seven witnesses testified live.

## II.    THE CLAIMS FOR BREACH OF THE PARTNERSHIP AGREEMENT

The plaintiffs sought to prove that AT&T breached the Partnership Agreement. In their post-trial briefs and during post-trial argument, the plaintiffs advanced three principal theories.

In their broadest claim, the plaintiffs sought to prove that AT&T breached the Governance Provision. According to the plaintiffs, AT&T managed the Partnership however it wished, without obtaining approval from the Executive Committee for any of the business-related actions it took. To defend its conduct, AT&T asserted that the Executive Committee delegated broad managerial authority to AT&T, including through the Management Agreement. To defeat AT&T's defense, the plaintiffs sought to prove that AT&T exceeded the scope of its authority in the Management Agreement.

The plaintiffs proved that AT&T pervasively disregarded the Management Agreement, but judgment nevertheless will be entered in favor of AT&T on this claim. The record shows that the Executive Committee delegated expansive authority to AT&T to manage the Partnership's business. That grant of authority pre-dated the Management Agreement, then later was confirmed in the Management Agreement. The provisions in the Management Agreement that AT&T disregarded are not restrictions on the scope of AT&T's authority, but rather contractual commitments regarding how AT&T would exercise its delegated authority. AT&T's failure to comply with the Management Agreement therefore does not give rise to a breach of the Governance Provision. AT&T's

88

failure to comply with the Management Agreement would have supported a derivative claim against AT&T for breach of the Management Agreement, but the plaintiffs did not assert that theory. They also did not take steps that might have been necessary to pursue that theory, such as reviving the Partnership.

Next, the plaintiffs sought to prove that AT&T breached the Title Provision, which generally required that AT&T hold title to Partnership assets in the name of the Partnership. The Title Provision permitted Partnership assets to be titled jointly with another entity or in the name of another entity if (i) the Executive Committee determined that titling the asset in that manner was in the best interests of the Partnership and (ii) the other entity held the asset for the benefit of the Partnership.

The plaintiffs proved that AT&T used an AT&T affiliate to hold title to (i) the contract rights with the Partnership's subscribers and (ii) information about the Partnership's subscribers, including data generated when the Partnership's subscribers used AT&T's network. The plaintiffs proved that the Executive Committee never formally made a determination that holding title to the asset in that manner was in the best interest of the Partnership, but the record shows that the Executive Committee delegated sufficiently broad authority to AT&T so that AT&T could make that determination. Nevertheless, the plaintiffs proved that with respect to two businesses, AT&T did not hold title to those assets for the benefit of the Partnership. AT&T used the Partnership's contracts with its subscribers, as well as information about those subscribers, to sell handset insurance, without allocating any of the benefits of the program to the Partnership. AT&T also sold information about Partnership subscribers to government agencies without

89

allocating any of the benefits to the Partnership. AT&T's actions in connection with those businesses breached the Title Provision.

Finally, the plaintiffs sought to prove that AT&T breached the Protected Information Provision, which prevented AT&T from disclosing Protected Information without the prior consent of the Executive Committee. The plaintiffs proved that AT&T disclosed Protected Information when monetizing geolocation data relating to the Partnership's subscribers, but the plaintiffs failed to prove their claim for breach of the Protected Information Provision because the Executive Committee delegated sufficiently broad authority to AT&T that AT&T could use the information as part of its management of the Partnership's business.

## A.    Threshold Legal Issues

Before addressing the merits of the plaintiffs' claims for breach of Partnership Agreement, it is helpful to address two threshold issues. The first involves the principles of law that apply to the plaintiffs' claims. The second involves the extent to which a ruling that the court made during discovery continued to govern for purposes of trial and post-trial proceedings.

### 1.    Principles Of Law Governing The Plaintiffs' Claims

This decision addresses the plaintiffs' claims for breach of the Partnership Agreement. Delaware law governs the Partnership Agreement. PTO ¶ 7. "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiffs." *WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at

*13 (Del. Ch. Sept. 17, 2010). The plaintiffs bore the burden of proving each element of the claim by a preponderance of the evidence. *First State Constr., Inc. v. Thoro-Good's Concrete Co.*, 2010 WL 1782410, at *3 (Del. Super. Ct. May 3, 2010).

When determining the scope of a contractual obligation, and when measuring the parties' conduct against that obligation to determine breach, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotations omitted). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). By contrast, a contract is unambiguous "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc*, 616 A.2d at 1196.

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). A reading of an agreement must be reasonable when the contract is "read in full and situated in the commercial context between the parties." *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–

91

27 (Del. 2017). "[T]he basic business relationship between the parties must be understood to give sensible life to any contract." *Id.* at 927. But this principle cannot be used to override the plain language of the agreement: While our courts "have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement." *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (footnote omitted) (quoting *Chi. Bridge*, 166 A.3d at 926–27). "[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not." *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

This decision also refers frequently to the Management Agreement. That agreement selects the law of the State of Washington to govern its terms. MNSA § X(F). That difference is not significant, however, because when interpreting a contract, Washington law tracks Delaware law in looking to the plain meaning of the words of the agreement. *See Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005). Moreover, no one has argued that applying Washington law when interpreting the Management Agreement would lead to a different result. Consequently, there is no need for a choice-of-law analysis, and the court will interpret the contract in accordance with its plain meaning as if Delaware law governed.[35]

---

[35] *See Deuley v. DynCorp. Intern.*, Inc., 8 A.3d 1156, 1161 (Del. 2010) (when "the result would be the same under both Delaware and [another jurisdiction's] law[,] . . .

## 2. Law Of The Case

The second overarching issue is the extent to which the court's adoption of the Discovery Report resulted in findings of fact that govern for purposes of trial and post-trial proceedings. In its pre- and post-trial briefs, AT&T relied extensively on the Discovery Report, to the point where AT&T often cited it as the only factual support for its contentions. By relying on the Discovery Report, AT&T attempted to treat the assessments that the Discovery Master made for purposes of evaluating the proportionality of potential discovery as factual findings that would govern for the rest of the case. The Discovery Report did not have that effect.

AT&T correctly observes that the court adopted the recommendations in the Discovery Report as a ruling of the court. Dkt. 614 at 9; Dkt. 622 at 27; *see* Dkt. 381. But the court's adoption of the Discovery Master's recommendations merely resulted in those recommendations and his observations in the Discovery Report functioning like any other discovery ruling. A court's factual assessments in a discovery ruling do not constitute

---

according to conflicts of law principles . . . there is a 'false conflict,' and the Court should avoid the choice-of-law analysis altogether." (second omission in original) (alteration omitted)); *Lagrone v. Am. Mortell Corp.*, 2008 WL 4152677, at *5 (Del. Super. Sept. 4, 2008) ("The Court has reviewed the applicable law from each of the competing jurisdictions and has concluded that the end result is the same regardless of which State's law the Court applies here. In such instances of 'false conflicts' of laws, the Court may resolve the dispute without a choice between the laws of the competing jurisdictions."); 15A C.J.S. Conflict of Laws § 31 ("If the laws and interests of the concerned states are not in conflict, the result is deemed a 'false conflict' or no conflict at all, and no choice-of-law analysis need be made."); 16 Am. Jur. 2d Conflicts of Laws § 4 ("An apparent conflict of laws may be treated as false when the laws of the two states are the same or would produce the same result; or do not conflict . . . ." (footnote omitted)).

factual findings that remain dispositive at later stages of the case. A court's factual assessments in a discovery ruling rather reflect how the evidence appears at that earlier stage of the case for purposes of informing the court's rulings on discovery.[36] The court does not bring those findings forward for purposes of trial. The parties instead introduce evidence at trial, and the court makes factual findings based on the evidence presented at trial.

In addition to being contrary to law, AT&T's approach runs contrary to express language in the Discovery Report. The Discovery Master pointed out that because he was making recommendations about the scope of discovery, his work "might not touch upon the 'concept of the breach of contract claim.'" JX 2419 at 66–67 n.185 (quoting Dkt. 336 at 73). The Discovery Master properly did not make any factual findings about whether the revenue streams he investigated were "'material' in the context of the dissociation or disgorgement remedies the [plaintiffs] seek." *Id.*

---

[36] *See Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *1 (Del. Ch. Dec. 4, 2018) ("Because this is a discovery ruling, the description of events provided in this section does not constitute formal findings of fact. It only represents how the record appears at this preliminary stage."); *In re Info. Mgmt. Servs., Inc. Deriv. Litig.*, 81 A.3d 278, 282 (Del. Ch. 2013) (noting that "for purposes of a discovery ruling," the court does not make "formal factual findings" and "cannot resolve conflicting factual contentions"); *accord In re Activision Blizzard, Inc.*, 86 A.3d 531, 533 (Del. Ch. 2014) (same); *see also* 18B Edward H. Cooper, *Federal Practice and Procedure (Wright & Miller)* § 4478.1 (2d ed. 1990 & Supp. 2020) [hereinafter Wright & Miller] ("The pretrial rulings that may be reconsidered in continuing pretrial proceedings span the range of pretrial activity. Discovery orders are an example."); *see also id.* (explaining that a court may amend its findings of fact "whether or not labeled as tentative").

AT&T has never explained why a discovery ruling that took the form of the court's adoption of recommendations from the Discovery Master would result in dispositive factual findings for purposes of trial. The closest potential source of authority would be the law of the case doctrine.

"The law of the case is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation." *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000) (internal quotation marks omitted). The doctrine

> requires that issues already decided by the same court should be adopted without relitigation, and once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.

*May v. Bigmar, Inc.*, 838 A.2d 285, 288 n.8 (Del. Ch. 2003) (internal quotation marks omitted), *aff'd*, 858 A.2d 1158 (Del. 2004) (TABLE).

"The law of the case doctrine is a self-imposed restriction that prohibits courts from revisiting issues previously decided, with the intent to promote 'efficiency, finality, stability and respect for the judicial system.'" *State v. Wright*, 131 A.3d 310, 321 (Del. 2016) (quoting *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 39 (Del. 2005)). The doctrine "presumes a hearing on the merits and only applies to issues the court actually decided." *Wright*, 131 A.3d at 321 (footnote and internal quotation marks omitted) (quoting *United States v. Hatter*, 532 U.S. 557, 566 (2001)); *accord* Wright & Miller, *supra*, § 4478 ("Actual decision of an issue is required to establish the law of the case."). The law of the case most often applies to a trial court's "legal ruling at an earlier stage of the proceedings,"

95

which continues to control during later stages of those proceedings, "provided the facts underlying the ruling do not change." *Wright*, 131 A.3d at 322.

In the Discovery Report, the Discovery Master considered whether the plaintiffs should be permitted to seek further discovery into the subjects of their motion to compel. *See* Dkt. 288 ¶ 5 (appointing Discovery Master to "assess the requests that are the subject of [the plaintiffs' motion to compel discovery], evaluate AT&T's responses, and determine what information AT&T should produce"). The central issues that the Discovery Master assessed were the burden of producing the information and its proportionality to the needs of the case. In the course of developing his recommendations, the Discovery Master considered documentary evidence and testimony from AT&T witnesses. He also conducted witness interviews. Based on his assessment of the record at that stage, the Discovery Master recommended against further discovery into the topics that he considered.

The court's adoption of the Discovery Master's recommendations resulted in the denial of the plaintiffs' motion to compel. Dkt. 381 ¶ 5; *see* Dkt. 383 at 67–75. By adopting the Discovery Master's recommendations, the court made a discretionary decision on the scope of discovery, informed by the Discovery Report. The court did not elevate the assessments in the Discovery Report to the status of factual findings. The preliminary factual assessments in the Discovery Report have no greater weight or significance than would the court's factual recitation in a ruling on a motion to compel.

The Discovery Report is not a nullity, and the court considered it. A court may extend "some measure of deference" to a discovery ruling. *See* Wright & Miller, *supra*, §

96

4478.5. The court also has considered the evidence that the Discovery Master generated in connection with the Discovery Report. But the court has considered that evidence as part of the overall trial record. The court has not treated the Discovery Report as a set of factual findings that control for purposes of the trial on the merits.

## B. The Claim That AT&T Breached The Governance Provision

In their headline claim, the plaintiffs asserted in their post-trial briefs and during post-trial argument that AT&T breached the Governance Provision by managing the Partnership however it wished rather than by acting through the Executive Committee. As its defense to that claim, AT&T argued that the Executive Committee delegated broad managerial authority to AT&T, predominantly through the Management Agreement. In response, the plaintiffs sought to negate AT&T's reliance on the Management Agreement by showing that AT&T pervasively disregarded its terms, thereby exceeding its delegated authority.

### 1. The Competing Views Of The Claim

The Governance Provision states that "[e]xcept as otherwise provided in this Partnership Agreement, complete and exclusive power to conduct the business affairs of the Partnership is delegated to the Executive Committee." PA § 4.3. As a baseline matter, therefore, the Executive Committee had "complete and exclusive power" to manage the Partnership.

The record shows, and it is essentially undisputed, that AT&T always managed the day-to-day business of the Partnership. As discussed in the Factual Background, the Executive Committee met periodically, and representatives of AT&T—including the

representatives who served on the Executive Committee—provided information about how AT&T was conducting the business of the Partnership. The Executive Committee did not, however, manage the business of the Partnership. The Executive Committee only took action on formal matters, such as authorizing a distribution to the partners. AT&T managed the assets of the Partnership as part of its larger cellular telephone business. AT&T did not seek or obtain approval from the Executive Committee for the actions it took.

By demonstrating these facts, the plaintiffs proved a *prima facie* case of breach. If that were the whole story, then the plaintiffs would have established a breach of the Governance Provision. But that is not the whole story.

From the outset, it was understood that the Executive Committee had delegated authority to AT&T to manage the business of the Partnership. The structure of the Partnership Agreement as a whole made clear that the majority partner controlled the Partnership. The manner in which AT&T, the Executive Committee, and the minority partners conducted themselves evidenced that relationship. Deposition testimony from a minority partner who served on the Executive Committee confirms that a settled understanding existed from the outset that the majority partner had the authority operate the day-to-day business of the Partnership. *See* Stone Dep. 39–41. To that end, the Affiliate Provision authorized the Partnership to "enter into agreements from time to time with Partners and/or Partner Affiliates for management services in connection with design, development, construction, and operation of the Partnership's nonwireline cellular systems." PA § 4.8. The Affiliate Provision also authorized the Executive Committee to authorize its delegee—here, AT&T—to approve Affiliate Agreements. *Id.* That delegation

98

of authority comports with the Delaware Revised Uniform Partnership Act ("DRUPA"), which provides that "[a] partner has the power and authority to delegate to 1 or more other persons any or all of the partner's rights, powers and duties to manage and control the business and affairs of the partnership." 6 *Del. C.* § 15-401(l).

Originally, the delegation to AT&T was unwritten. Then, in the 1995 Resolution, the Executive Committee formally delegated managerial authority to AT&T. The form of the resolution was expansive: "[T]he Majority General Partner is hereby delegated full, complete and exclusive authority to manage and control the business of the Partnership." JX 91 at '469. In conjunction with that grant of authority, the Partnership and AT&T entered into the Switch Agreement and the Cellular Agreement, in which AT&T committed to exercise its delegated authority in particular ways.

The Switch Agreement and the Cellular Agreement remained in place until 2005, when AT&T replaced them with the Management Agreement. When authorizing the Partnership to enter into the Management Agreement with AT&T, the Executive Committee did not change the general delegation to AT&T of "full, complete and exclusive authority to manage and control the business of the Partnership." *Id.* The Management Agreement reinforced that delegation of authority through the Services Provision and the Authority Provision, which gave AT&T expansive authority to manage the Partnership.

The Services Provision in the Management Agreement charged AT&T-as-Manager with the "management and operation of the [Partnership's] Business." MNSA § I. It further charged AT&T with providing "all services as are necessary to assure the commercially reasonable development and operation of the [Partnership's] Business." *Id.* Those services

included construction and procurement, general and administrative services, technical operating services, sales and marketing services, and maintenance of the Partnership's licenses. The Authority Provision then gave AT&T the authority "to undertake . . . any and all other commercially reasonable actions necessary or advisable to develop, manage, and operate the [Partnership's] Business, which are not prohibited by law." *Id.* § II. Against the backdrop of the 1995 Resolution, it is difficult to imagine an aspect of the Partnership's business that the delegation of authority did not encompass.

The plaintiffs contend that the Management Agreement imposed limitations on AT&T's delegated authority such that if AT&T failed to comply with the Management Agreement, then AT&T exceeded its authority and breached the Governance Provision. AT&T views matters differently. AT&T believes it possessed broad delegated authority to manage the Partnership and that the Management Agreement simply represented a contract between AT&T and the Partnership. AT&T concludes that any claim that AT&T failed to comply with its obligations under the Management Agreement is a breach of contract claim that belongs to the Partnership, which a minority partner must assert derivatively.[37]

---

[37] A simplistic example illustrates the difference between the theories. Assume a couple hires a painter to paint their house forest green. The painter paints the house ruby red. The plaintiffs would argue that the couple only gave the painter authority to paint their house forest green and that the painter exceeded that grant of authority by painting the house ruby red. AT&T would argue that the couple gave the painter authority to paint the house, and that the painter merely breached a contractual obligation to paint it the right color. In the simplistic example, the couple can assert both theories in the alternative and litigate both claims, subject only to the limitation that the couple can receive only one recovery. Only in the metaphysical world of entity law does the proper characterization of the claim become dispositive.

100

The plaintiffs' approach finds support in the provision of DRUPA which provides that "[a] partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to . . . [e]nforce the partner's rights under the partnership agreement." 6 *Del. C.* § 15-405(b)(1). For purposes of the plaintiffs' claim, the Governance Provision intersects with the black-letter principle that "[a]n agent has a duty to take action only within the scope of the agent's actual authority." *Restatement (Third) Of Agency* § 8.09(l) (2006 & Supp. 2021) Consequently, "[i]n the context of the agent's relationship with the principal, the boundary of an agent's rightful action is the scope of the agent's actual authority." *Id.* cmt. b. Thus, if the Management Agreement imposed requirements on how AT&T could exercise the authority that the Executive Committee delegated to it, and if AT&T failed to comply with those requirements, then AT&T exceeded its delegated authority. Under the plaintiffs' approach, demonstrating that AT&T failed to comply with the Management Agreement equates to proof that AT&T breached the Governance Provision.

AT&T's approach finds support in similarly well-settled principles. Under DRUPA, a general partnership "is a separate legal entity which is an entity distinct from its partners unless otherwise provided in a statement of partnership existence or a statement of qualification and in a partnership agreement." 6 *Del. C.* § 15-201(a). Neither the Partnership Agreement nor either a statement of partnership existence or a statement of qualification otherwise provide. Property acquired by a partnership, such as rights under a contract, "is property of the partnership and not of the partners individually." *Id.* § 15-203. Under DRUPA, "[a] partner may bring a derivative action in the Court of Chancery in the

101

right of a partnership to recover a judgment in the partnership's favor." *Id.* § 15-405(d).

Although derivative actions typically involve internal claims for breach of fiduciary duty or mismanagement, "[a]ny claim belonging to the corporation may, in appropriate circumstances, be asserted in a derivative action," including a claim for breach of contract.[38]

It does not seem necessary to stake out a bright line view on which theory is correct. The answer will depend on the facts of the case.

AT&T's view better fits the facts of this case. The record establishes that from the outset, the Partnership gave AT&T expansive authority to operate its business. The provisions in the Management Agreement regarding the assignment and allocation of revenue and expense reflect AT&T's commitments as to how it would exercise its delegated authority, rather than limitations on its authority. AT&T's failure to comply with

---

[38] 3 Stephen A. Radin, *The Business Judgment Rule* 3612 (6th ed. 2009) (internal quotation marks omitted) (quoting *Midland Food Servs., LLC v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 931 (Del. Ch. 1999)). Examples of derivative actions involving the assertion of an entity's claim for breach of contract include *First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1293 (Fed. Cir. 1999) (permitting "contract actions brought derivatively by shareholders on behalf of the contracting corporation"); *Slattery v. United States*, 35 Fed. Cl. 180, 183 (1996) (same); *Suess v. United States*, 33 Fed. Cl. 89, 93 (Fed. Cl. 1995) (denying motion to dismiss a derivative claim for breach of contract against the United States). *See also Ross v. Bernhard*, 396 U.S. 531, 542-43 (1970) (holding right to jury trial existed for breach of contract claim asserted by stockholder derivatively because "[t]he corporation, had it sued on its own behalf, would have been entitled to a jury's determination").

those provisions thus would give rise to a breach of the Management Agreement, but it would not result in AT&T exceeding the scope of its delegated authority.[39]

From this perspective, the plaintiffs' contentions regarding the Governance Provision really are a derivative claim for breach of the Management Agreement. The plaintiffs recognize that they never asserted a derivative claim for breach of the Management Agreement. The court accordingly will enter judgment in favor of AT&T on the claim for breach of the Governance Provision because, in substance, it is a derivative claim for breach of the Management Agreement that the plaintiffs never pursued.

Although this holding is sufficient to dispose of the claim for breach of the Governance Provision, the parties each advanced a legitimate perspective. Given how vigorously the parties have litigated this dispute, it seems certain that appeals and cross-appeals will follow. This decision therefore will analyze the claim for breach of the Governance Provision based on the assumption, solely for purposes of analysis, that the Management Agreement imposes limitations on AT&T's authority.

For purposes of analyzing this claim, the court has viewed the evidence with the burden placed on the plaintiffs to prove that AT&T caused the Partnership to act without

---

[39] A different outcome might be warranted on different facts. Envision a partnership with a similar governance structure, including a provision comparable to the Governance Provision, that lacked any history of the Executive Committee delegating its managerial authority. Further envision that the Executive Committee decides to delegate authority to a partner and that the sole documentation for the delegation is an agreement that specifies how the partner will allocate revenue and expense. On those facts, the argument that the agreement defined the scope of the partner's delegated authority would be more persuasive.

obtaining Executive Committee approval. Once the plaintiffs carried that burden and established a *prima facie* case of breach, the burden shifted to AT&T to establish as its defense that it acted within its delegated authority. "As a general rule, the party asserting the agency relationship has the burden of proving both the existence of the relationship and the authority of the agent." 12 Williston on Contracts § 35:2 (4th ed. 1993 & Supp. 2021); *accord Restatement*, *supra*, § 1.02 cmt. d ("The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence."); *see Zeeb v. Atlas Powder Co.*, 87 A.2d 123, 128 (Del. 1952) (explaining that "when the authority of an agent is in issue the burden rests on him who asserts the existence of the agency"). The burden of proving the existence of an agency relationship "extends to proof of agency as a defense." 3 C.J.S. Agency § 541.[40]

### 2. AT&T Failed To Follow The Shared Revenues Formula.

The plaintiffs proved that AT&T failed to follow the Shared Revenues Formula in the Management Agreement. The plaintiffs also proved that AT&T did not and could not have relied on the Modification Right to adopt different allocation methodologies.

---

[40] The allocation of the burden of proof ultimately would not affect the outcome. The Delaware Supreme Court has explained that the real-world effect of the burden of proof is "modest" and only outcome-determinative in the "very few cases" where the "evidence is in equipoise." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1242 (Del. 2012) (internal quotation marks omitted). In this case, the evidence was not in equipoise. Even if the burden of proof were placed on the plaintiffs as to all issues, the record establishes that AT&T failed to allocate revenue as the Management Agreement required.

### a. The Requirements Of The Shared Revenues Formula

Under the plain language of the Shared Revenues Formula, AT&T committed to aggregate all of the revenue generated from the utilization of AT&T's Entire Network. AT&T committed that when aggregating revenue, AT&T would not distinguish between the Partnership's subscribers and other subscribers. AT&T further committed that when allocating a share of revenue to the Partnership, AT&T would use the ratio of the traffic carried by the Partnership's portion of the Entire Network compared to the traffic carried by the Entire Network as a whole. AT&T committed that it would not itemize the Partnership's share of revenue as if the Partnership were a separate, independent business with its own wireless network. Finally, AT&T committed to add a premium to the Partnership's share of revenue.

The plain language of the Shared Revenues Definition establishes these commitments. It defines Shared Revenues to mean "[1] the aggregate revenue generated by Subscribers of Owner's Business and Manager's Business utilizing Owner's System and Manager's System, and [2] any other applicable revenues generated by utilization of the Entire Network." MNSA at '751. (enumeration added). The first part of this definition encompasses revenue generated "by Subscribers of Owner's Business and Manager's Business utilizing Owner's System and Manager's System." It does not look only to revenue generated by Owner's Subscribers or from the use of Owner's System. The second part of this definition goes further and entitles the Partnership to a share of "any other applicable revenues generated by utilization of the Entire Network."

105

Other components of the Shared Revenues Definition confirm that it encompasses all revenue generated by AT&T's wireless business. The stack of component definitions that aggregate as the Entire Network leads to that conclusion.

- The Management Agreement defines "Entire Network" as "collectively, the Owner's System, the Manager's System, and the Shared Network." *Id.* at '748.

- The Management Agreement defines "Owner's System" as all of the equipment, facilities, hardware, and software "which Owner uses, owns or leases in order to operate a wireless communications system in Owner's Area, to deliver Traffic between and among cell sites and any points of interconnection in Owner's Area directly or indirectly to the [landline telephone network], and to deliver Traffic to and from cell sites in Owner's Area to the Shared Network." *Id.* at '750.

- The Management Agreement defines "Manager's System" as all of the equipment, facilities, hardware, and software "which Manager and its Affiliates use, own or lease in order to operate a wireless communications system in Manager's Area, to deliver Traffic between and among cell sites and points of interconnection directly or indirectly . . . in Manager's Area, and to deliver Traffic to and from cell sites in Manager's Area to the Shared Network; but shall exclude Owner's System." *Id.*

- The Management Agreement defines "Shared Network" as "all wireless communications system equipment that is owned, leased or used by Manager and its Affiliates and that allows the cell sites of Manager and its Affiliates (including Owner) to operate as a single nationwide network, including, without limitation, switches, base station controllers, data centers, certain circuits, SS7 network, and all related hardware and software required for such equipment to operate in accordance with its specifications." *Id.* at '751.

The Management Agreement calls for the Partnership to share in all revenue "generated by utilization of the Entire Network." *Id.* The concept of the Entire Network thus encompasses every aspect of AT&T's wireless system.

The plain language of the Shared Revenues Formula required that AT&T aggregate all revenue generated by any user of wireless communications services under an ongoing agreement or from the utilization of the Entire Network, then allocate to the Partnership a

106

share of the resulting revenue based on the proportion of "Traffic" carried by the Partnership's system. The Management Agreement defines "Traffic" broadly as "electronic signals, including voice data, and other associated electronic signals." *Id.* at '752. The Management Agreement calls for each "Unit of Traffic" to be allocated based on "the cell site that carries such Traffic, with the convention that the Unit of Traffic from any one call or transmission shall be assigned to the cell site upon which such call or transmission is first carried." *Id.* § V(G)(1). If AT&T owned a cell site as part of its system that served an Owner's Area, then AT&T committed to attribute Units of Traffic to the Partnership according to the percentage of site incursions in the Owner's Area, or otherwise in proportion to the relative benefits that AT&T and the Owner received from the cell site. *Id.* § V(G)(2).

Finally, to ensure fairness to the Partnership, AT&T committed to the Premium Provision. *Id.* Ex. A. Although AT&T reserved the right to apply a different premium, AT&T committed to the No-Less-Favorable Requirement, under which any revised method would be "no less favorable to the Owner than the allocation method used in prior periods." *Id.* AT&T thus committed to provide the Partnership with *at least* a 25% premium on its allocated share of revenue.

Extrinsic evidence explains why AT&T made these commitments. AT&T adopted the Management Agreement at a critical time in the development of the cellular telephone industry when carriers were shifting to nationwide plans and number portability had arrived. The Management Agreement was executed in October 2005, immediately after the arrival of number portability and AT&T's introduction of unlimited nationwide roaming

as a component of its basic subscriber packages. The Management Agreement was made effective as of January 1, 2003, to reflect the fact that AT&T already had started managing the Partnership as an integral part of its nationwide wireless network. The Management Agreement confirms that AT&T replaced the Cellular Agreement and Switch Agreement "to adapt to changing market and technological conditions." *Id.* at '748; *see* JX 191. Two of the changing "market and technological conditions" were the arrival of number portability and nationwide plans.

The Management Agreement also arrived during a period of industry consolidation. When AT&T adopted it, the company was in the final stages of its M&A activity. The immediate predecessor to AT&T—SBC—was preparing to close on its acquisition of what was then AT&T, creating a combined company with the largest market share in wireless customers and data revenue in the United States. And Cingular, which SBC controlled, recently had completed its acquisition of the former AT&T's wireless business. *See* JX 188; JX 263 at 3. The FCC anticipated that large nationwide carriers would dominate the industry. *See* JX 300 at 70. The Management Agreement reflected AT&T's shift toward a nationwide business model.

Perhaps most notably for industry insiders, the Management Agreement made no explicit refence to NPA-NXX, the system that AT&T and its predecessors had used to identify subscribers since the 1980s. Wages Tr. 375; *See* JX 2681 at '361 (document dated November 18, 1988 detailing McCaw's allocation methodologies that used NPA-NXX). The Switch Agreement contained explicit references to NPA-NXX, stating that "[f]eatures revenue . . . shall be assigned according to the subscriber's NXX . . . , which is specific to

[Owner's] or [Manager's] System," and noted that the Partnership would be liable for roaming charges generated by its subscribers with telephone numbers assigned to its NPA-NXX ranges. JX 112 §§ 4.1–4.2. By omitting any reference to NPA-NXX and substituting the Shared Revenues Definition, the Management Agreement demonstrated that AT&T had moved to a nationwide sharing model for revenue.

### b. AT&T's Departed From The Shared Revenues Formula By Assigning Revenue By Subscriber And Using A Different Definition Of The Partnership's Business.

AT&T failed to follow the Shared Revenues Formula. AT&T instead identified revenue generated by the subscribers with NPA-NXX numbers assigned to the Partnership. AT&T also used a different and narrower definition of the Partnership's business than what the Management Agreement contemplated. On cross-examination during trial, the plaintiffs elicited admissions to that effect from AT&T's principal witness.

At trial, Wages conceded that AT&T did not use the definition of "subscriber" that appeared in the Management Agreement. Wages Tr. 384 ("Q: Isn't it true that you did not identify subscribers in the partnerships on the basis of the management and network sharing agreement? A: Yes."); *id*. at 386 ("Q: . . . . You just didn't use the definition of subscriber that's in the [Management Agreement], did you? A: Not the one that's in that document, no."). Rather than using the Shared Revenues Formula, AT&T used a subscriber-based model that relied on NPA-NXX. *Id.* at 384. AT&T treated subscribers with an NPA-NXX associated with the Partnership's geographic area as subscribers of the Partnership. AT&T then identified revenue generate by those subscribers and assigned it to the Partnership. *Id.* at 176, 358–59, 383–87, 501–02; *see* PTO ¶¶ 196–200.

109

The Shared Revenues Formula did not permit AT&T to identify and assign revenue based on a specific group of Partnership subscribers. The Shared Revenues Formula called for aggregating all revenue generated by all of the Partnership's subscribers and AT&T's subscribers, plus all other revenue derived from the utilization of the Entire Network. The Shared Revenues Formula then called for allocating the resulting pool of revenue based on traffic. Finally, the Premium Provision called for adding a 25% premium to the Partnership's share of revenue.

The Management Agreement did use subscriber-based concepts for other purposes. For example, the Shared Expenses Formula used subscriber-based concepts as the sharing statistic for certain categories of Shared Expenses. And in two sections addressing AT&T's administrative obligations, the Management Agreement used the phrase "Owner's Subscribers" in isolation.[41] Those provisions show that the Management Agreement could have used a subscriber-based metric in the Shared Revenues Formula, but did not.

AT&T also departed from the Shared Revenues Formula by using a different and more limited definition of the Partnership's business than what the Management Agreement specified. Wages Tr. 391–92 ("Q: You didn't define our business this way, did

---

[41] In the first provision, the Management Agreement stated that "Manager shall provide to Owner, to the extent necessary, direct electronic access to certain information technology systems, for purposes of activating or deactivating Owner's Subscribers." MNSA § V(C). In the second provision, the Management Agreement stated that "Owner's Subscribers, if any, shall be entitled to Roam" in areas in which AT&T maintained reciprocal roaming agreements with third-party carriers. *Id.* § V(E). Neither suggests that AT&T could identify assign revenue to the Partnership based on a limited universe of subscribers identified by NPA-NXX.

110

you? A: From my perspective, no."). Wages and the Partnership Accounting Group viewed the business of the Partnership as limited to "wireless activity," meaning activity involving "cellular phones, voice, data, SMS text, those things . . . we do with our phones." *Id.* at 395–97. As a result, they believed that the Partnership was "not entitled to participate in the profits of every AT&T business venture that used partnership assets." *Id.* at 406. For activities not involving this narrow definition of wireless activity, Wages believed that the Partnership only was entitled to be "made whole" for AT&T's use of its assets. *Id.*

The Shared Revenues Formula called for the Partnership to receive (i) a share of any revenue generated by any subscriber, whether that subscriber was assigned to the Partnership or to AT&T and its other affiliates and (ii) a share of any revenue otherwise generated from the utilization of the Entire Network. The Shared Revenues Formula did not differentiate between the Partnership's business and AT&T's business. The Management Agreement defined "Owner's Business" and "Manager's Business" in parallel terms. *See* MNSA at '749, '750. Those parallel definitions make clear that the Partnership (the Owner) and AT&T (the Manager and its affiliates) were in precisely the same business: the business of operating and benefitting from the Entire Network. But AT&T never established the pool of Shared Revenues as contemplated by the Management Agreement. AT&T also never allocated Shared Revenues to the Partnership based on traffic. And AT&T never applied a premium to the Partnership's allocations, as contemplated by the Premium Provision. *See* JX 2558.

Wages admitted that AT&T never told the Partnership or its Executive Committee that AT&T was not using the definition of "subscriber" that appeared in the Management

111

Agreement. Wages Tr. 384. Wages also admitted that the different approach that AT&T used was not written down anywhere. *Id.* at 397. When the Partnership Accounting Group assigned or allocated revenue and expense and prepared the Partnership's financial statements, they used AT&T's unwritten definition, not the Management Agreement. *Id.*

Wages admitted that AT&T never determined how many people would have qualified as subscribers using the definition in the Management Agreement. *Id.* at 384. Wages admitted that AT&T never determined how much revenue the Partnership would have received if AT&T had followed the Shared Revenues Definition, then applied the Shared Revenues Formula and allocated revenue based on traffic. *Id.* at 385, 406–07. Wages admitted that it is impossible to know how much more the Partnership would have been worth if AT&T had followed the methodologies specified in the Management Agreement. *Id.* at 398.

### c. AT&T Did Not And Could Not Have Invoked The Modification Right To Depart From The Shared Revenues Formula.

To defend its alternative methodologies for allocating revenue, AT&T relied on the Modification Right. That argument fails because AT&T could not meet the requirements for invoking the Modification Right.

At the outset, the record establishes that AT&T never invoked the Modification Right in real time. To the contrary, there is ample evidence that AT&T's Partnership Accounting Group never thought AT&T had to invoke the Modification Right. Wages and the Partnership Accounting Group thought that AT&T had the discretion to make

112

judgments about how AT&T identified and assigned or allocated revenue and expense to the Partnership. They did not know about the Modification Right or its requirements.

The record also establishes that AT&T could not have met the conditions necessary to invoke the Modification Right. Under the New Conditions Requirement, a new allocation methodology had to address "changing market and technological conditions." MNSA § VI(A). Any decision to depart from the Shared Revenues Formula and revert to NPA-NXX could not have satisfied the New Conditions Requirement. AT&T began disregarding the Shared Revenues Formula promptly after implementing the Management Agreement. There was no change in market or technological conditions between the adoption of the Management Agreement and AT&T's failure to follow the Shared Revenues Formula. Instead, it was the Management Agreement's adoption of the Shared Revenues Formula that responded to changing market and technological conditions, including the arrival of number portability and nationwide roaming. The Management Agreement was progressive. AT&T's failure to follow it was regressive.

To properly invoke the Modification Right, AT&T also had to satisfy the Fair Accounting Requirement. That condition required that the new allocation methodology "fairly account" for the revenue and expense associated with Owner's Business. *Id.* AT&T could not have met that standard for purposes of an itemization scheme based on NPA-NXX.

During the early years of the wireless industry, NPA-NXX was a reasonable approximation for a subscriber's primary place of use, albeit an imperfect one. But after the arrival of number portability, a customer could move across the country and even

switch wireless carriers, yet her usage still would remain associated with her phone number's original rate center. Wages Tr. 361–62. At the same time, the advent of nationwide roaming eliminated any incentive for the subscriber to obtain a new NPA-NXX number associated with her new location. Without the underpinnings that historically made NPA-NXX a reasonable proxy for primary place of use, that system became less reliable over time. By the time of the events giving rise to this litigation, the NPA-NXX system had become so unreliable that AT&T could not provide basic information about the number of subscribers for the Partnership, such as:

- The percentage of AT&T subscribers nationwide who resided in AT&T service areas different from the one that issued their NPA-NXX;

- The number of AT&T subscribers who resided in the Partnership's service area and used a non-partnership NPA-NXX;

- The number of AT&T subscribers who moved to the Partnership's service area, changed their billing address and primary place of use to an address in the Partnership's area, yet continued to use a non-Partnership NPA-NXX; or

- The number of AT&T subscribers who resided in a non-Partnership service area and use an NPA-NXX assigned to the Partnership.

*See id.* at 364–70; Wages 2019 Dep. 260. Wages admitted that he could not say whether the number of AT&T subscribers in the Partnership's services was twice as many, three times as many, or even five times as many as the number of NPA-NXX numbers issued to the Partnership. Wages Tr. 386.

The plaintiffs proved that after the introduction of nationwide rate plans and number portability, NPA-NXX became an increasingly unreliable means of allocating revenue to the Partnership. Having committed to using the Shared Revenues Formula, AT&T could

114

not have reverted to the NPA-NXX methodology and satisfied the Fair Accounting Requirement.[42]

AT&T's system of identifying revenue and assigning it to the Partnership based on NPA-NXX also could not meet the No-Less-Favorable Requirement. That condition required that any new allocation methodology be "no less favorable to the Owner than the allocation method used in prior periods." MNSA Ex. A. In the Management Agreement, AT&T committed to the Premium Provision, which obligated AT&T to add a 25% premium to the share of revenue that AT&T allocated to the Partnership. When using the NPA-NXX methodology, AT&T never added a premium to the items of revenue that

_____

[42] In an attempt to show that there remained some linkage between the customer's assigned NPA-NXX number and the customer's primary place of use, Wages testified that if a subscriber affirmatively told AT&T that her primary place of use had changed, then the customer could have her number ported to the new area, where it then would be identified with the market-level entity covering that area. Wages 2019 Dep. 211–12. Otherwise, her use and monthly recurring access charges would continue to be attributed to her original home market. *Id.* at 212. Wages' testimony overlooked the fact that ported numbers remained associated with their original rate center, meaning that even after porting, the customer's use and access charges would remain associated with her original home market. *See* JX 2122 at 6 n.20; JX 2160 at 3. Wages could not state the basis for his belief that ported numbers would be associated with their new geographic market in AT&T's accounting system. Wages described Location Routing Numbers as "ghost numbers," and he stated that once a customer was assigned a "ghost number," then "something happens in the system . . . that links it to" the new geographic market. Wages 2019 Dep. 189–93. When asked how he knew that "ghost numbers" could point to a specific geography, Wages testified only that he had "been told that that's the way it works." *Id.* at 208. AT&T's valuation expert credibly contradicted Wages' testimony, stating that both "intracarrier and intercarrier roaming charges . . . [were] settled by rate centers determined by NPA-NXX." Taylor Report at 68. Later in the same deposition, Wages contradicted himself, admitting that the Location Routing Number would remain associated with the NPA-NXX number's original geography. Wages 2019 Dep. 268–71.

115

AT&T assigned to the Partnership. AT&T's reversion to a subscriber-based, NPA-NXX methodology therefore could not meet the No-Less-Favorable Requirement.

As a general matter, therefore, AT&T failed to adhere to the Management Agreement by failing to follow the Shared Revenues Formula. Assuming for the sake of analysis that the Management Agreement defined the scope of AT&T's delegated authority, then AT&T exceeded its delegated authority by departing from the Shared Revenues Formula.

### 3. AT&T Failed To Abide By The Intra-Company Roaming Provision For Purposes Of Voice Roaming.

AT&T also failed to abide by the Intra-Company Roaming Provision when allocating revenue and expense associated with voice roaming. The Intra-Company Roaming Provision established that AT&T would not identify and assign any direct charges associated with intra-company roaming.[43] The Shared Revenues Definition mandated that any revenue that AT&T collected as a result of intra-company roaming become part of the aggregate pool and allocated using the Shared Revenues Formula. AT&T did not do either of these things.

Instead, AT&T implemented a system for intra-company roaming that used the concepts of "outcollect revenue" and "incollect expense." The concept of "outcollect

---

[43] Reinforcing the Intra-Company Roaming Provision, the Management Agreement called for AT&T to allocate assign identifiable Outcollect Roaming Revenues to the Partnership when generated by third-party carriers. The specific reference to the latter reinforces the prohibition on the former.

revenue" referred to revenue generated from non-Partnership subscribers roaming in the Partnership's area and using its network. *See* JX 546 at '543–44. The concept of "incollect expense" referred to revenue generated Partnership subscribers roaming outside of the Partnership's area and using the rest of the AT&T network. *See id.* That was the same method that AT&T used to track third-party roaming revenue and expense with other carriers, such as Verizon or Sprint. *Id.*

To defend its methodology, AT&T again relied on the Modification Right, but AT&T could not have invoked the Modification Right because the Intra-Company Roaming Provision did not describe an allocation methodology. It barred charges for intra-company roaming. To modify the Intra-Company Roaming Provision, AT&T would have needed to amend the Management Agreement, which it never did.

Assuming for the sake of analysis that AT&T could have invoked the Modification Right—and there is no evidence that AT&T ever did—then AT&T could not have met the New Conditions Requirement. AT&T's methodology for identifying and assigning revenue and expense for intra-company roaming did not respond "to changing market and technological conditions." MNSA § VI(B). The Switch Agreement had provided for assigning intra-company roaming revenue and expense based on subscribers. JX 112 § 4.2(b). The Management Agreement responded to changing market and technological conditions by banning any direct charges for intra-company roaming.

To properly invoke the Modification Right, AT&T also would have had to satisfy the Fair Accounting Requirement, including the No-Less-Favorable Requirement. AT&T claimed at trial that some of the partnerships were net winners under AT&T's intra-

117

company methodology, while others were net losers. By its own admission, AT&T could not satisfy the No-Less-Favorable Requirement if the Partnership was a net loser. AT&T did not prove that the Partnership was a net winner.

Instead, the record shows that the outcollect-incollect system did not fairly account for the revenue and expense of the Partnership. Under AT&T's system, a subscriber who moved out of the Partnership's area continued to generate incollect expense for the Partnership, but the subscriber no longer generated any offsetting network usage revenue for the Partnership. AT&T's methodology thus generated expense that had nothing to do with the operation of the Partnership's business.

AT&T contended in response that its system could have benefited the Partnership because a subscriber who moved out of the Partnership's area continued to generate monthly recurring access fees for the Partnership. Dkt. 614 at 12–13; *see* Wages Tr. 344–45; Hall Tr. 1040–41. AT&T also asserted that because the Partnership incurred the expense of up-front customer acquisition costs,[44] the Partnership was entitled to recoup

---

[44] Framed broadly, customer acquisition costs included the costs of maintaining physical store locations and employing a sales staff. More significantly, customer acquisition costs included handset subsidies that AT&T offered as a promotion to new customers. Equipment subsidies caused the cost of equipment sales to exceed equipment sales revenue at the partnerships. *See* JX 647 at '528; Musey Tr. 1262; JX 627 at 22. In the years before the Freeze-Out, higher handset subsidies for the iPhone further increased the cost of equipment sales. *See* JX 499 at '558 (describing higher customer acquisition costs "driven by iPhone"); JX 874 at '006 ("We have seen sharp increases in the subsidy per unit since the launch of the iPhone."); *see also* JX 627 at 22 ("The importance of equipment subsidies to industry success can be seen in AT&T's exclusive agreement with Apple."). And as the wireless industry matured and carriers' competition for subscribers intensified, equipment subsidies and other acquisition costs increased. *See* JX 627 at 50 ("[C]arriers

those costs, and AT&T's method enabled the Partnership to do that. Although that argument has some intuitive appeal, the evidence does not establish that the monthly recurring access fees exceeded the incollect expense, and there is no evidence that anyone at AT&T ever conducted the cost-benefit calculation in real time. Instead, the record evidence makes it unlikely that the Partnership came out ahead. AT&T's valuation expert recognized that the opposite likely was true, meaning that many relocated subscribers generated *net losses* for the Partnership. Taylor Tr. 711–12. Making matters worse, the Partnership would continue to be billed for each customer's subsequent equipment upgrade, even though the subscriber no longer lived in the Partnership's geographic area or used the Partnership's wireless system. *See* MNSA Ex. A.

The Management Agreement also contemplated that AT&T would allocate three categories of General and Administrative expense to the Partnership based on the number of subscribers assigned to the Partnership. *Id.* Under the NPA-NXX system, the Partnership gained a subscriber and associated G&A expense whenever it activated a number in one of its NPA-NXX blocks. Wages 2019 Dep. 175. When that subscriber relocated, AT&T's accounting system did not remove the subscriber from the Partnership's count, meaning that the Partnership continued to incur G&A expense, but without offsetting revenue.

---

will focus more heavily on increasing customer value and handset subsidies to win subscriber share. Over the past five years, carriers [sic] value-boosting initiatives knocked about six percentage points off their gross margins.").

119

AT&T could not have complied with the Modification Right when disregarding the Intra-Company Roaming Provision, departing from the Shared Revenues Formula, and using the incollect/outcollect methodology. AT&T could not have concluded that its system met the New Conditions Requirement, the No-Less-Favorable Requirement, or the Fair Accounting Requirement. Assuming for the sake of analysis that the Management Agreement defined the scope of AT&T's delegated authority, then AT&T exceeded its delegated authority by failing to comply with the Intra-Company Roaming Provision .

### 4. AT&Ts Approach To Data Usage And Data Roaming

AT&T did not follow the Management Agreement when addressing data usage and data roaming. AT&T was obligated to allocate all revenue from data usage under the Shared Revenues Formula, with an additional 25% premium as contemplated by the Premium Provision. Under the Intra-Company Roaming Provision, AT&T was not permitted to charge the Partnership for data roaming. Instead, AT&T used its subscriber-based framework for data usage, never applied a revenue premium, and developed methodologies for assigning revenue from intra-company data roaming based on NPA-NXX. In departing from the Management Agreement, AT&T did not and could not have met the requirements to exercise the Modification Right.

Subscribers generate data-usage revenue by using their cellular phones for various activities such as browsing the internet, sending photos and videos via text message, and downloading games and ringtones. Subscribers also generate data-usage revenue when they access the internet via Connected Devices, such as the Amazon Kindle.

Data-usage revenue met both aspects of the definition of Shared Revenues. It was both (i) part of the aggregate revenue generated by subscribers of Owner's Business and Manager's Business utilizing Owner's System and Manager's System and (ii) part of the revenue generated by utilization of the Entire Network. *See* MNSA at '751. AT&T therefore was obligated to allocate data-usage revenue using the Shared Revenues Formula, including the premium contemplated by the Premium Provision.

Instead of following the Shared Revenues Formula, AT&T applied its subscriber-based model to data usage. Just as with voice, if a subscriber assigned to the Partnership paid for data usage, then the Partnership received that revenue. AT&T did not aggregate the revenue and allocate it based on traffic, and AT&T did not apply the 25% revenue premium contemplated by the Premium Provision.

Just as with voice, AT&T came up with approaches to assign data roaming revenue. AT&T used two different methodologies during two different periods. AT&T did not and could not have relied on the Modification Right to adopt either method.

### a. AT&T's Use Of The Bill-And-Keep Method To Allocate Intra-Company Data-Roaming Revenue Before July 2010

The plaintiffs proved that AT&T failed to follow the Shared Revenues Formula to allocate intra-company data roaming revenue before July 2010. Until July 2010, AT&T permitted all of its subscribers to engage in data roaming in all AT&T markets without paying any roaming fees. *See, e.g.*, JX 647 at '533; JX 2591 at 6–7. This approach utilized the same bill-and-keep method for intra-company data roaming that AT&T traditionally used for inter-carrier voice roaming. *See* JX 647 at '533.

121

AT&T's use of the bill-and-keep method for intra-carrier data roaming failed to comply with the Shared Revenues Formula. As noted, data-usage revenue fell within the definition of Shared Revenues. AT&T was obligated to include the data-usage revenue in the overall pool, allocate the data-usage revenue using a traffic-based measure, and add a 25% premium to the Partnership's share of revenue.

AT&T did not do any of these things. AT&T instead only allocated to the Partnership the data-usage revenue generated by subscribers with NPA-NXX numbers assigned to the Partnership.

AT&T did not and could not invoke the Modification Right to adopt the bill-and-keep method. There is no evidence that AT&T ever invoked the Modification Right. AT&T simply used the bill-and-keep approach. AT&T also could not have met the New Conditions Requirement or the Fair Allocation Requirement.

AT&T argued that it used the bill-and-keep method because it was not technologically possible to track data roaming based on the device's geographic location. Dkt. 622 at 46. AT&T thus tried to invert the New Conditions Requirement: Rather than arguing that new technological conditions necessitated the change, AT&T argued that old technological conditions necessitated the change.

AT&T's argument is an exercise in misdirection. The Shared Revenues Formula did not call for allocating revenue based on the device's location. The Shared Revenues Formula called for allocating revenue based on the proportion of overall traffic carried on the Partnership's network relative to the Entire Network. AT&T had the ability to track those levels of data usage. In fact, as discussed below, AT&T contends that it used that

122

method to allocate data-usage revenue from the Commercial Network Agreements that AT&T entered into with companies like Amazon, General Motors, and Garmin. *Id.* at 21 (citing JX 2419 at 58). AT&T thus could have allocated data-usage revenue using the Shared Revenues Formula.

Regardless, the record does not support AT&T's claim of technical impossibility. The record establishes that AT&T did not track intra-company data usage by device until July 2010, but that is a different question than whether AT&T could have done so earlier. Before trial, AT&T's witnesses simply claimed it was impossible; they could not explain why.[45] At trial, Wages asserted that many Connected Devices did not have an NPA-NXX number. Wages Tr. 402. So be it, but AT&T could have tracked revenue for devices that had NPA-NXX numbers. And AT&T could have assigned NPA-NXX numbers to the Connected Devices that lacked them, as it did when it began tracking data-roaming revenue

---

[45] *See, e.g.*, Hall Dep. 82 ("I think as the business [e]volved, we were able to track it; but, you know, some of it in the beginning, it was, you know, we couldn't."); Wages 2019 Dep. 84 ("I believe there was a time period in the relevant time period . . . where we could not if we're talking intra-company, and then we changed our methodology once we could track it."). AT&T also cited internal documents which identified the "[i]nability to track data roaming" as one of the motivations for the freeze-outs. JX 344 at 4; JX 547 at '319; *see* JX 310 at '765 (presentation recommending squeeze-out of other market-level AT&T entities to "[p]revent[] reconciling the inability to capture data roaming"). Those documents do not explain why either, and the references seem more geared to the accounting department's inability to track the information using AT&T's existing financial reporting systems, rather than commenting on whether or not AT&T had the technical chops.

in July 2010.[46] Other carriers assigned NPA-NXX numbers to Connected Devices as early as 2005. *See* JX 2122 at 10 (FCC report stating that since 2005, "the wireless [Number Resource Utilization Form] data has reflected the number of individual subscribers plus a share of the mobile wireless connections or connected devices").

AT&T thus had the capability to track data usage. AT&T simply chose not to do so. AT&T maintained bill-and-keep agreements with third-party carriers, meaning that modifying its systems to track data usage by location only would have affected the allocation among intra-company markets.[47] AT&T was indifferent to the revenue allocation among markets where AT&T owned the system, because AT&T received the value regardless. Tracking data roaming thus only had the potential to benefit entities like the Partnership. Even then, AT&T ultimately would receive the vast majority of the revenue, because it owned nearly all of the equity interests in those entities. AT&T thus did not have an economic incentive to expend resources on complying with the Shared Revenues Formula for data usage. Perhaps failing to comply with the Shared Revenues

---

[46] *See* JX 2419 at 55 ("Mr. Lurie confirmed that each Connected Device that attaches to AT&T's network has a ten-digit number associated with it that is tracked and allocated like any other ten-digit device."); Lurie Dep. 94–98 (AT&T "was able to track data roaming . . . in other networks, absolutely"); *see also* JX 2503 at 9 (FCC report stating that consumers often "use more than one mobile device that have been assigned telephone numbers – particularly non-voice devices, such as Internet access devices . . . , e-readers, tablets, and telematics systems").

[47] *See* Taylor Tr. 963 (before 2010 "it was all bill and keep, including . . . third parties"); Taylor Report at 80 ("[I]ntercarrier data roaming was not a revenue source during this period.").

124

Formula for data usage represented a case of efficient breach for AT&T, but it was a breach nonetheless.

AT&T only took steps to track data roaming in 2010 because of an FCC mandate that became effective in 2011.[48] To track data roaming, AT&T assigned each Connected Device an NPA-NXX number and tracked data usage like other network usage. *See* JX 2419 at 55. AT&T could have done that earlier and fulfilled its commitment under the Management Agreement to follow the Shared Revenues Formula.

AT&T thus could not meet the New Conditions Requirement. AT&T also could not meet the Fair Accounting Requirement. The plaintiffs proved that the bill-and-keep method did not fairly account for the data-usage revenue associated with the Partnership's portions of the Entire Network.

As noted, when applied to the Partnership, the bill-and-keep method meant that the Partnership received all of the service revenue that subscribers with NPA-NXX numbers assigned to the Partnership generated from data usage, regardless of where those subscribers were located when they generated the revenue. By contrast, the Partnership did not receive any share of the service revenue that other AT&T subscribers generated when they used the Partnership's system to carry data. In order for the bill-and-keep method to

---

[48] *See In re Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, WT Dkt. No. 05-265, Order on Reconsideration and Second Further Notice of Proposed Rulemaking, 25 FCC Rcd. 4181 (2010) [JX 1012]; *Id.*, Second Report and Order, 26 FCC Rcd. 5411 (2011) [JX 1924]; Taylor Tr. 754.

"fairly account[] for the revenues and expenses of Owner's Business," the level of data usage by those subscribers would have had to be equal.

The record does not suggest that the usage was equal. Instead, AT&T's use of NPA-NXX to implement the bill-and-keep method means that the usage was unlikely to be equal. Because AT&T identified the subscribers assigned to market-level entities based on often outdated NPA-NXX designations, the Partnership received nothing when subscribers with NPA-NXX numbers assigned to a different market-level entity used its system. AT&T's principal witness could not testify with any confidence about the correspondence between an NPA-NXX number and primary place of use. *See* Wages Tr. 367–69.

Even if, by a remarkable coincidence, the usage balanced out, AT&T never applied the 25% premium to the revenue assigned to the Partnership. AT&T's use of the bill-and-keep method could not have not satisfied the Fair Accounting Requirement.[49]

---

[49] AT&T points out that for those partnerships that received audited financial statements, the notes to the financial statements for the year ended December 31, 2008, disclosed the bill-and-keep method. For example, the audited financial statements for Bradenton for the year ended December 31, 2008, stated that "[d]ata usage revenue is not allocated between affiliates." JX 539 at '926, '935. For those partnerships with audited financial statements, the fact that AT&T disclosed a methodology that ran contrary to the Management Agreement does not mean that AT&T validly exercised the Modification Right. It rather provides additional evidence that AT&T ignored its obligations under the Management Agreement. It also would affect the timelines of any claim for breach of the Governance Provision based on the use of the bill-and-keep method in connection with a partnership where the disclosure was made. The Partnership did not have audited financial statements, so the issue is irrelevant.

### b. AT&T's Use Of The Kilobyte-Fee Method To Address Data Roaming Revenue After July 2010

The plaintiffs proved that AT&T failed to follow the Shared Revenues Formula after July 2010 when allocating intra-company data-roaming revenue. During this brief period before the Freeze-Out, AT&T continued to use NPA-NXX to assign to the Partnership any data revenue generated by the Partnership's subscribers. That approach ran contrary to the Management Agreement for the reasons explained in the prior section.

What changed was how AT&T priced a subscriber's use of data. Having assigned NPA-NXX numbers to track data usage, AT&T adopted an incollect/outcollect methodology similar to what it used for intra-company voice roaming. To charge for intra-company data roaming, AT&T's accounting department estimated a fee per kilobyte of data use (the "Kilobyte-Fee Method"). *See* Taylor Tr. 964; JX 2166 at 16, 18; JX 1335; JX 1336; JX 1338; JX 1347; JX 1761; JX 1872. If a Partnership subscriber used AT&T's network outside of the Partnership's area, then the Partnership was charged the fee in a manner comparable to incollect expense. If a non-Partnership subscriber used AT&T's network inside the Partnership's area, then the Partnership was credited with the fee in a manner comparable to outcollect revenue.

The use of the Kilobyte-Fee Method for intra-company data roaming contravened the Management Agreement for all the same reasons that the incollect/outcollect method did for intra-company voice roaming. For starters, it ignored the Intra-Company Roaming Provision, in which AT&T committed not to charge for intra-company roaming. Next, it ignored the principles of revenue aggregation and allocation by traffic prescribed by the

127

Shared Revenues Formula. Finally, it ignored AT&T's commitment to add a 25% premium to the Partnership's share of revenue. The Kilobyte-Fee Method assigned revenue using the same method that AT&T would use if a subscriber of a competing carrier, such as T-Mobile, had used AT&T's network. Wages Tr. 408–09. AT&T thus treated the Partnership not as a partner, but as an arm's-length counterparty.

The record again shows that AT&T did not invoke the Modification Right to adopt the new methodology and could not have done so. The plaintiffs proved that AT&T could not have satisfied the New Conditions Requirement. AT&T used the Kilobyte-Fee Method at a time when it had the ability to use the Shared Revenues Formula. AT&T did not need to adopt the Kilobyte-Fee Method to respond to changing market and technological conditions.

The Kilobyte-Fee Method also could not have satisfied the Fair Accounting Requirement because the Partnership was a net loser under the system. Before implementing the Kilobyte-Fee Method, AT&T's accountants calculated that the Partnership would go from having no revenue or expense from data roaming under the bill-and-keep method to net-negative data roaming revenue of $145,851.23 per quarter under the Kilobyte-Fee-Method, equating to net negative revenue of nearly $600,000 per year. *See* JX 1335, "Data GL 2Q2010-Subtotal %" tab, at Cell S130. More broadly, when using the Kilobyte-Fee Method, AT&T systematically charged the Partnership and its sister partnerships a rate for intra-company incollect data roaming expense that was 4.87% greater than what AT&T used when allocating intra-company outcollect data roaming

revenue. JX 1872b; *see* JX 2166 at 16. And AT&T never applied the 25% revenue premium.

Neither the bill-and-keep method nor the Kilobyte-Fee Method complied with the Management Agreement.

### 5. AT&T's Allocation Of Revenue From Commercial Network Agreements

AT&T also failed to follow the Management Agreement when allocating revenue from the Commercial Network Agreements. The revenue from the Commercial Network Agreements qualified as Shared Revenues, but AT&T did not allocate the revenue using the Shared Revenues Formula.[50]

As discussed in the Factual Background, AT&T entered into the Commercial Network Agreements with commercial counterparties like Amazon, General Motors, and Garmin. Generally speaking, the Commercial Network Agreements involved the commercial counterparties contracting to enable their Connected Devices, like the Amazon Kindle, to use AT&T's network. The Commercial Network Agreements covered an array of services derived from the utilization of AT&T's network, and AT&T received various types of revenue under the Commercial Network Agreements, including revenue based on the amount of data carried by the AT&T's network, which AT&T called data-service

---

[50] The same analysis applies to AT&T's contracts with geolocation aggregators. It is undisputed that AT&T did not allocate any revenue from these contracts to the Partnership. Wages Tr. 445. Wages did not know about those agreements until November 2020. *Id.*

129

revenue. The data-service revenue categories consisted of "(1) a fee per kilobyte or megabyte; (2) a monthly access fee plus a reduced rate per kilobyte or megabyte; or (3) a monthly fee for a specified amount of data plus a fee for kilobyte or megabyte of data used in excess of that amount." JX 2166 at 33–34; *see* JX 252 at '002–06 (tiered pricing plan for contract with KORE Telematics Inc., a reseller of wireless data services); JX 2090 at 39–40 (tiered pricing plan with monthly recurring charges for contract with Spacenet Inc.).

Wages and the Partnership Accounting Group decided that AT&T would compensate the Partnership for the use of its network by allocating to the Partnership a proportionate share of the data-service revenue generated by each Commercial Network Agreement subscriber each month. *See* JX 2407; Wages Tr. 189; *see also* JX 2419 at 54–59. AT&T did not allocate to the Partnership any other categories of revenue that AT&T received under the Commercial Network Agreements.

Wages and the Partnership Accounting Group decided to allocate the monthly data-service revenue from each Commercial Network Agreement subscriber "based upon a weighted average of kilobytes" for each geographical market. JX 2412 at 13–14, 18. For each contract, AT&T maintained detailed usage statistics for each market and calculated allocation factors every month. *See* JX 2409; JX 2412 at 18; *see also* Hall Tr. 1023 (commercial Connected Device revenue was allocated based on usage). AT&T then applied the allocation factor to the data-service revenue that that the Commercial Network Agreement generated and allocated the resulting share to the Partnership.

There is no evidence that AT&T sought to mimic aspects of the Shared Revenues Formula when deciding to use this allocation methodology. The outcome that AT&T

130

independently reached nevertheless deployed some of the concepts that the Shared Revenues Formula required AT&T to use. Despite those similarities, the plaintiffs proved that AT&T's approach failed to comply with the Management Agreement.

First, the Shared Revenues Formula did not contemplate a contract-by-contract allocation of revenue. The Shared Revenues Formula contemplated a single, aggregated pot of revenue associated with the Entire Network. It then required AT&T-as-Manager to allocate the total pot of revenue using a traffic-based statistic for the Entire Network. That approach recognized that in a digital world, there was no distinction between or among voice calls, video calls, or data services. The network carried packets of data. That approach also recognized that the signature feature that AT&T sold to its customers was the ubiquity and reliability of the Entire Network, not pieces of the network.

It is theoretically possible that a contract-by-contract allocation would generate the same amount of revenue for the Partnership as a single-pot allocation. But there are infinitely more cases in which a contract-by-contract allocation would generate different results. Assume, for example, that a subset of commercial counterparties paid lower rates for data services, while a different subset of commercial counterparties paid higher rates for data services. A partnership that carried lots of data at the lower rates would lose under a contract-by-contract allocation relative to the single-pot allocation.

During cross-examination, Wages conceded this point. After counsel had elicited an explanation of the Kilobyte-Fee Method, the following exchange took place:

> Q.     And we'll never know how much more money the
>         partnerships were entitled to receive from the operation
>         of Emerging and Connected Devices if AT&T had

131

> accounted for them in accordance with the plain language of the Management and Network Sharing Agreements, will we?
>
> A:     No, we won't, if we looked at it specifically that way.

Wages Tr. 406–07. Wages subsequently agreed that the Kilobyte-Fee Method did not track the Shared Revenues Formula. *Id.* at 410. He also agreed that AT&T only allocated data-usage revenue to the Partnership, not a share of any revenue from the "overall contract." *Id.* at 409. And he agreed that AT&T never wrote down the Kilobyte-Fee Method anywhere and that the Executive Committee never approved the methodology. *Id.* at 410.

AT&T's lawyers sought to argue that its allocation method was justified because a market that carried more data bore more of the burden and should receive more money. Absent the Management Agreement and the Shared Revenues Formula, that would be a reasonable approach. The Shared Revenues Formula, however, required AT&T to aggregate all revenue into a single pot. To deviate from it, AT&T had to invoke the Modification Right or amend the Management Agreement.

AT&T's actions failed to comply with the Shared Revenues Formula in two other ways. The Premium Provision required that AT&T add a premium to the Partnership's revenue allocation. AT&T did not apply a 25% revenue premium when allocating data-service revenue to the Partnership.

AT&T also failed to allocate other forms of revenue that it received under the Commercial Network Agreements beyond data-service revenue. *See, e.g.*, JX 439 at '011–12. The definition of Shared Revenues encompassed "[1] the aggregate revenue generated by subscribers of Owner's Business and Manager's Business utilizing Owner's System and

132

Manager's System, and [2] any other applicable revenues generated by utilization of the Entire Network." MNSA at '751 (enumeration added). The counterparties to the Commercial Network Agreements were subscribers of Owner's Business and Manager's Business who were utilizing Owner's System and Manager's System. *See* Wages Tr. 380–81 (agreeing that counterparties to Commercial Network Agreements qualified as subscribers under definition in Management Agreement). The revenue generated by the Commercial Network Agreements encompassed contained other fees and revenue streams generated by the utilization of the Entire Network. AT&T thus should have included all of the revenue from the Commercial Network Agreements in the Shared Revenues Formula, not just the data-services revenue.

AT&T also argued that the Partnership was not entitled to share in the benefits of other streams of revenue from the Commercial Network Agreements because the Partnership did not bear an equitable share of the expenses. AT&T asserted that it incurred a wide range of expenses on an enterprise level that it did not allocate to the Partnership.[51] The short answer is that the Management Agreement addressed this issue through its allocation methodologies for expenses, including the Shared Expenses Formula. The longer answer is that AT&T had the power to invoke the Modification Right, if it could

---

[51] For example, by subpoenaing OnStar, LLC, the plaintiffs obtained the Commercial Network Agreement with that entity, which AT&T failed to produce. AT&T then pointed to the agreement to argue that it was obligated to remediate technical issues encountered by OnStar's end users, and AT&T bore the risk if it failed to fulfill those commitments. JX 2106 § 4.1(A).

133

satisfy the conditions for its use, and AT&T had the ability to amend the Management Agreement. What AT&T could not do was simply disregard the Shared Revenues Formula.

AT&T's methods for allocating revenue from Commercial Network Agreements did not comply with the Management Agreement.

### 6. The Defense That The Allocation Issues Were Not Fairly Raised

Faced with its witnesses' concessions about failing to comply with the Management Agreement, AT&T argued during post-trial briefing that the plaintiffs' claim for breach of the Governance Provision was never pled. To the extent that the plaintiffs were obligated to pursue their theory as a derivative claim for breach of the Management Agreement—as this decision has held—then that is a valid objection. The plaintiffs, however, maintain that they pled a claim for breach of the Governance Provision, then elicited proof at trial regarding AT&T's allocation practices to respond to the *defense* that AT&T had advanced as its principal reason why it did not breach the Governance Provision. Whether fairness would the prevent the court from considering that claim presents a difficult issue, but one where the court ultimately sides with the plaintiffs.

AT&T argues that the plaintiffs did not make clear in their pleadings that they were asserting a claim for breach of the Governance Provision based on AT&T's failure to comply with the Management Agreement. The failure to plead a particular legal theory is not inherently fatal. "Delaware has adopted the system of notice pleading that the Federal Rules of Civil Procedure ushered in, which rejected the antiquated doctrine of the 'theory of the pleadings'—*i.e.*, the requirement that a plaintiff must plead a particular legal theory." *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *26 (Del. Ch. May 19, 2020).

134

Through a combination of provisions, the Federal Rules of Civil Procedure "effectively abolish[ed] the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." 5 Arthur R. Miller et al., *Federal Practice and Procedure (Wright & Miller)* § 1219 (3d ed. 2004 & Supp. 2020). Under the Federal Rules of Civil Procedure, "particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not." *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir. 1945) (Clark, J.).

> The federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits.

Miller, *supra*, § 1219 (footnote omitted). *See generally Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (per curiam) (reversing dismissal of complaint for failure to articulate a claim under 42 U.S.C. § 1983; explaining that the Federal Rules of Civil Procedure rejected the "theory of the pleadings" and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"). The real question is whether the plaintiffs gave the defendant adequate notice that they were litigating a particular theory such that the defendant had "a fair opportunity to respond." *See Backer v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 103 (Del. 2021).

The record is mixed on whether the plaintiffs met this standard. AT&T is correct that the plaintiffs did not formally plead a count titled, in substance, "Breach of the Governance Provision Based On AT&T's Allocation Methodologies." Instead, Count I of

the plaintiffs' pleading was called "Breach of Partnership Agreement." C.A. No. 6886-VCL, Dkt. 27 at 42. The contentions in that count included the following:

- "The Partnership Agreement does not permit the majority partner to deprive the Executive Committee of its complete and exclusive authority to conduct the Partnership's business affairs, and thereby also deprive the minority partners of their indirect voice in the management of the Partnership." *Id.* ¶ 131.

- "The Partnership Agreement does not allow the majority partner to deprive the minority partners of the right to participate in management of the Partnership through the Executive Committee." *Id*. ¶ 132.

- "The Partnership Agreement does not allow a partner to conduct or control the Partnership's business and does not permit a partner to act for or on behalf of the Partnership, except as authorized by the Partnership's Executive Committee." *Id*. ¶ 133.

- "Under the Partnership Agreement, any partner who commits a material default or wrongfully causes a dissolution . . . is required to forfeit its interest in the Partnership. The Salem Partners gave [AT&T] notice of material default. [AT&T] made no attempt to cure. As a result, [AT&T] has forfeited its interest in the Partnership and vested in the non-defaulting partners the right to purchase its interest for an aggregate amount equal to the balance of [AT&T's] capital account." *Id.* ¶ 144.

- "The Salem Partners are entitled to the contractual remedy of forfeiture as a result of [AT&T's] uncured material breaches of Partnership Agreement and to damages as provided by law." *Id.* ¶ 145.

Viewed in isolation, those allegations point to a claim for breach of the Governance Provision. Earlier allegations in the pleading also suggested a breach of the Governance Provision.[52] Those allegations included specific contentions that AT&T "asserted its status

---

[52] *See id.* ¶ 61 (alleging that AT&T "effectively took control of the Partnership"); *id.* ¶ 78(c) (citing Governance Provision); *id.* ¶ 84 (alleging that AT&T "acquired the majority general partner interest in the Partnership" and "entered into management and operations agreements with the Partnership" pursuant to which AT&T "provided, *inter*

136

as the majority general partner to by-pass the Executive Committee and to act unilaterally on behalf of the partnerships" and that AT&T's "attempt to act as a de facto Managing Partner is a knowing and intentional breach of the Partnership Agreement." *Id.* ¶ 92.

AT&T filed a motion to dismiss that construed the plaintiffs' allegations as only challenging the Freeze-Out. The plaintiffs opposed the motion to dismiss. They also filed a cross-motion for summary judgment asserting that the Freeze-Out breached the Partnership Agreement, including because it required Executive Committee approval. The court interpreted AT&T's motion as seeking dismissal of the plaintiffs' claims "only to the extent they contend that a sale of assets by [the Partnership] breached the terms of the [Partnership Agreement]." C.A. No. 6886-VCL, Dkt. 60 at 2. The court rejected the argument that the Governance Provision required that the Executive Committee approve the Freeze-Out and dismissed that claim. *Id.* ¶ 8. The plaintiffs moved for reargument, which the court granted as to a potential breach of the Protected Information Provision. C.A. No. 6886-VCL, Dkt. 68.

After these rulings, the parties conducted discovery. AT&T's interrogatories suggested that AT&T believed that the plaintiffs were pursuing claims for breach of the

---

*alia*, accounting services to the Partnership"); *id.* ¶ 86 (alleging that AT&T "has taken an active role in managing the Partnership's assets and running the Partnership's business"); *id.* ¶ 87 (alleging that AT&T "consistently used their majority position to oppress the minority partners and commit breaches of the partnership agreements"); *id.* ¶ 88 (alleging that "AT&T never fully disclosed to the Executive Committees or the minority partners in the partnerships (including the Partnership) that AT&T committed the above material breaches of the partnership agreements").

Partnership Agreement, because AT&T asked each plaintiff to identify every "material breach or material default of the . . . Partnership Agreement . . . and state the complete factual basis for each such allegation." JX 2175 at 53–54. But the plaintiffs' responses did not clarify matters. The plaintiffs simply referred to their pleadings and objected that discovery still was ongoing. *Id.*; *see also id.* at 64–65. In responses to other interrogatories, the plaintiffs referred obliquely to allocation issues. *See id.* at 14–15, 40, 75 (asserting that "Defendants and/or ATTM improperly allocated their/its costs to the Salem Partnership."); *id.* at 63 (asserting that there were "other monetary benefits not shared proportionately" with the minority partners); *id.* at 64 (referring to improper allocations of expense).

Viewing these responses as inadequate, AT&T moved to compel. The court ordered the plaintiffs to provide supplemental responses that included providing "a description— in the sense of a summary—of" any material breach or material default of the Partnership Agreements. Dkt. 217, Ex. A at 20. The court also ruled that if the plaintiffs intended to challenge conduct that had not been disclosed previously in the pleadings or in discovery responses, then they must disclose it because "the defendants are entitled to know what claims they have to defend against by receiving a reasonable summary of the facts in the plaintiffs' possession." Dkt. 218, Ex. A at 26–27. The plaintiffs served supplemental responses, but they did not meaningfully elaborate on the plaintiffs' earlier efforts. *See* JX 2264.

Meanwhile, the plaintiffs served discovery requests which indicated that they were litigating how AT&T generated revenue and expense from its network and whether AT&T properly allocated the resulting revenue and expense to the Partnership. Those document

138

requests and interrogatories also sought to explore how AT&T monetized Partnership information and allocated the resulting revenue and expense to the Partnership. AT&T vigorously resisted this discovery, and after one of the hearings on the plaintiffs' motions to compel, AT&T served a second set of interrogatories directed to those issues. The plaintiffs' responses identified the sources of revenue that the plaintiffs claimed had been misallocated. *See* JX 2281.

The battle over whether the plaintiffs could obtain discovery into these issues eventually resulted in the appointment of the Discovery Master. The process that the Discovery Master conducted and the report that he generated focused on sources of revenue that the plaintiffs claimed had been misallocated. The Discovery Master recommended against further discovery into these areas, and the court adopted that ruling. The substance of the Discovery Report, however, showed that these matters were at issue.

After the court adopted the Discovery Report, the plaintiffs continued to seek discovery into how AT&T monetized Partnership information. Using AT&T's public filings, the plaintiffs identified third parties with whom AT&T appeared to have Commercial Network Agreements, then served subpoenas on those parties. *See* Dkt. 478; Dkt. 493. The plaintiffs also sought additional discovery into the extent to which AT&T monetized Partnership information by providing services to the United States government. These efforts demonstrated that the plaintiffs were continuing to litigate allocation issues.

During the same period, the plaintiffs noticed a Rule 30(b)(6) deposition. As it had previously, AT&T designated Wages. During that deposition, plaintiffs' counsel questioned Wages about concepts in the Management Agreement including "Owner's

Business," "Manager's Business," and "Shared Revenues." The plaintiffs also laid the groundwork to impeach Wages at trial regarding AT&T's approach to the term "subscriber." *See* Wages 2019 Dep. 41–42, 97, 116–53. The plaintiffs explored similar topics with Hall. *See* Hall Dep. 54–55, 62–64, 70–71.

The plaintiffs' efforts during discovery made clear that they were seeking to litigate allocation issues and pursuing a claim for breach of the Governance Provision. With discovery finally coming to a close, AT&T filed a motion for summary judgment which suggested that AT&T believed the plaintiffs were litigating those points. Dkt. 467. In its motion, AT&T asserted that the plaintiffs were relitigating what AT&T labeled "Historical Mismanagement Claims." *Id.* at 3. AT&T described the first of those theories as a claim that AT&T "breached the Partnership Agreements" by "[u]nilaterally managing the Partnerships' business and affairs without input or authorization from the Partnerships' Executive Committees." *Id.* In support of this assertion, AT&T quoted allegations from the plaintiffs' pleading, including the allegation that AT&T had "taken an active role in managing the Partnership's assets and running the Partnership's business" even though "[t]he Partnership Agreement does not permit the majority partner to deprive the Executive Committee of its complete and exclusive authority to conduct the Partnership's business affairs." *Id.* at 21. During argument on AT&T's motion, plaintiffs' counsel listed four claims that they were pursuing, including a claim for breach of the Governance Provision. *See* Dkt. 571 at 100 (referring to "operating the partnership except through the executive committee"). The court denied the motion, allowing the plaintiffs to proceed with their claims. Dkt. 551.

After the summary judgment motion, AT&T was on notice that a claim for breach of the Governance Provision was one of the plaintiffs' theories. Consistent with that reality, when the plaintiffs listed their claims in the pretrial order, they identified one of their theories as whether the defendants breached the Partnership Agreement by "not operating the Partnership[] through the Executive Committee." PTO ¶ 76(c).

In the lead-up to trial, AT&T confused matters by filing a motion *in limine* to exclude evidence that only was relevant to claims that the plaintiffs had not pled or which previously had been dismissed. Dkt. 550. The court granted the motion in part. Dkt. 585. The court held that any breach of contract theories relating to the Freeze-Out had been addressed earlier in the case. *Id.* ¶¶ 11–12. The court held that evidence regarding AT&T's alleged commingling of assets was admissible to the extent the parties had engaged in discovery on that topic. *Id.* ¶ 24. It is now clear that they had.

Against the backdrop of these rulings, the parties went to trial. During trial, AT&T presented extensive testimony and evidence from multiple witnesses regarding how it allocated revenue and expense to the Partnership. AT&T also was the party that first raised the Management Agreement. Using leading questions to conduct a direct examination, AT&T's counsel elicited testimony from Wages about the authority that the Management Agreement conferred on AT&T.[53] On cross-examination, Wages regularly returned to the Management Agreement when asked about AT&T's authority to manage the Partnership

---

[53] *See* Wages Tr. 126–29, 142–43, 145, 147.

or when confronted with provisions in the Partnership Agreement, like the Governance Provision, which limited AT&T's ability to manage the Partnership.[54] On redirect, AT&T's counsel again used leading questions to walk Wages through provisions in the Management Agreement to demonstrate the authority that they conferred on AT&T.

Given this history, it is clear that the parties engaged on how AT&T generated revenue from its network and how AT&T allocated the resulting revenue and expense to the Partnership. Those issues were the subject of discovery, and AT&T largely prevailed in its efforts to constrain the scope of discovery on those points on the basis of burden and proportionality. AT&T also substantially prevailed on its motion *in limine*. AT&T thus knew the issues that were being litigated, and AT&T succeeded in shaping the litigation environment to its advantage. AT&T confronted difficulties at trial not because the plaintiffs surprised AT&T with a new issue, but rather because the record showed—and AT&T's key witness admitted—that AT&T had not complied with the Management Agreement.

This also is not a situation in which the plaintiffs possessed the relevant evidence and sprung it belatedly on AT&T. All of the evidence about how AT&T monetized its network and allocated the resulting revenue and expense was in AT&T's possession. Indeed, the theory that the plaintiffs have advanced for breach of the Governance Provision

---

[54] *See id.* at 221–23, 233, 274, 276, 278, 280–81, 285.

rests primarily on a combination of what AT&T's accounting records show and admissions by AT&T's witnesses at trial.

Under the circumstances, therefore, the court will not bar the plaintiffs from asserting their theory for breach of the Governance Provision. AT&T understood that the theory was being litigated and had a fair opportunity to respond.

### 7.     The Laches Defense

AT&T finally argues that the plaintiffs' claim for breach of the Governance Provision is barred by laches. As noted, AT&T previously moved for partial summary judgment on the basis of laches. The court denied the motion as to "the so-called mismanagement claims," noting that the claims generated many factual permutations and that it made little sense for the court to attempt to determine in the abstract which claims could be pursued. Dkt. 551 ¶ 16. The court noted, that "[a]fter trial, it will be clear what claims the plaintiffs have pursued," and that "[i]n post trial briefing, the defendants can advance their arguments and explain on a fact-specific and claim-specific basis why laches should bar the litigation of particular issues." *Id.* AT&T failed to prove that the laches defense would bar the claim for breach of the Governance Provision.

The equitable doctrine of laches is "rooted in the maxim that equity aids the vigilant, not those who slumber on their rights." *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982). Laches protects a defendant from the "unfair prejudice[]" of a plaintiff waiting "an unreasonable length of time before bringing [a] suit." *Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002). "[L]aches generally requires the establishment of three things: first,

143

knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, prejudice to the defendant." *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005).

"A statute of limitations period at law does not automatically bar an action in equity because actions in equity are time-barred only by the equitable doctrine of laches." *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005). Nevertheless, a court of equity presumptively applies the statute of limitations by analogy when determining whether laches renders a claim untimely. *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009). Otherwise, a plaintiff could "be placed in a potentially better position to seek to avoid a statute of limitations than if she had filed in a Delaware court of law by invoking the more flexible doctrine of laches." *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 976 (Del. Ch. 2016); *see Kim v. Coupang, LLC*, 2021 WL 3671136, at *3 (Del. Ch. Aug. 19, 2021). "Absent a tolling of the limitations period, a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches." *Whittington*, 991 A.2d at 9. For purposes of a breach of contract claim, the time period for suit begins to run at the time of breach, when the claim accrues. *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *11 (Del. Ch. Feb. 18, 2015).

"[E]quitable tolling will toll the limitations period 'while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary.'" *Forman v. CentrifyHealth, Inc.*, 2019 WL 1810947, at *8 (Del. Ch. Apr. 25, 2019) (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007)). "The obvious purpose of the equitable tolling doctrine is to ensure that fiduciaries cannot use their own success at concealing their misconduct as a

144

method of immunizing themselves from accountability for their wrongdoing." *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 813 (Del. Ch. 2009). In line with this purpose, equitable tolling "usually [becomes] unavailable after the injured party is on inquiry notice of the claim." *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *8 (Del. Ch. July 24, 2014). "Inquiry notice exists when the plaintiff is 'objectively aware of the facts giving rise to the wrong,' and in the context of inherently unknowable injuries, when 'persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury.'" *Whittington v. Dragon Gp. L.L.C.*, 2008 WL 4419075, at *7 (Del. Ch. June 6, 2008) (quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6–7 (Del. Ch. July 17, 1998)).

AT&T shared the Management Agreement with the minority partners before causing the Partnership to execute it. The minority partners were entitled to rely on the good faith of their fellow partner and assume that AT&T was complying with the Management Agreement, absent evidence to the contrary. Equitable tolling therefore applies until the point when AT&T provided information to the minority partners sufficient to put them on inquiry notice.

AT&T has not identified evidence in the record which establishes that the minority partners in the Partnership were on notice of AT&T's departures from the Management Agreement. The Partnership did not have audited financial statements, and its unaudited financial statements did not have notes that provided detail about significant accounting policies. For other partnerships with audited financial statements, the description of how

145

revenue was recognized likely was sufficient to put the minority partners on inquiry notice as to particular aspects of AT&T's departures from the Management Agreement.

The record instead reflects that AT&T did not inform the Partnership or its minority partners about how AT&T approached allocation issues. For example, Wages admitted that AT&T never told the Partnership or its Executive Committee that AT&T was not using the definition of "subscriber" that appeared in the Management Agreement. Wages Tr. 384. AT&T also has not pointed to evidence in the record to which establishes that the minority partners in the Partnership were on notice that AT&T was not complying with the Premium Provision.

AT&T also has argued that the plaintiffs should be treated as if they had asserted their claims for the first time in post-trial briefing such that the disclosure of information in discovery put the plaintiffs on inquiry notice and caused the statute of limitations to run. This decision has held that the parties were litigating actively over how AT&T generated revenue from its network and allocated the resulting revenue and expense to the Partnership. The plaintiffs' theories therefore were validly in the litigation, and the time for analyzing their claims for purposes of laches is the filing of the lawsuits in 2011.

AT&T failed to prove the affirmative defense of laches as to the minority partners in the Partnership. That doctrine does not provide an independent basis for entering judgment in favor of AT&T on the claim for breach of the Governance Provision.

## C.    The Claim That AT&T Breached The Title Provision

The plaintiffs next sought to prove that AT&T breached the Title Provision. They advanced three different theories. First, they sought to prove that AT&T used an affiliate

146

to enter into subscriber agreements with Partnership subscribers, rather than titling the agreements in the names of the Partnership. Second, they sought to prove that AT&T used Partnership employees, stores, and other assets to sell handset insurance for AT&T. Third, they sought to prove that AT&T sold Partnership information to government entities. The plaintiffs failed to prove that AT&T's actions breached the Title Provision under the first theory. The plaintiffs proved that AT&T's actions breached the Title Provision under the second and third theory.

The plain language of the Title Provision establishes that as a general rule, "[t]he Partnership shall hold title to the capital of the Partnership and to all applications, authorizations, equipment and other property and assets, whether real, personal or intangible, acquired by the Partnership." PA § 3.1 (the "Exclusive Title Clause"). The Title Provision then creates an exception to the Exclusive Title Clause, but that exception has two requirements. First, the Partnership may "acquire, own and utilize assets jointly with other entities, including entities affiliated with a Partner, and may commingle assets," but only "to the extent the Executive Committee reasonably considers, in its sole discretion, such activities appropriate and in the best interests of the Partnership." *Id.* (the "Best Interests Condition"). Second, "title may be held in the name of persons designated by the Executive Committee so long as the Partnership's interest in such title is held for the benefit of the Partnership." *Id.* (the "Beneficial Ownership Condition").

### 1.    The Claim Based On Subscriber Contracts

The plaintiffs sought to prove that AT&T breached the Title Provision by failing to hold title to subscribers and subscriber contracts in the name of the Partnership. Dkt. 590

147

at 39–43; Dkt. 615 at 40. The plaintiffs proved that AT&T failed to comply with the general obligation established in the Exclusive Title Clause. It is now undisputed that Partnership subscribers were Partnership assets. It also is now undisputed that the contracts with Partnership subscribers were Partnership assets. And it is now undisputed that when AT&T entered into contracts with Partnership subscribers, the counterparty was an AT&T affiliate, not the Partnership. AT&T thus took title to Partnership assets in the name of the AT&T affiliate.

The operative question, therefore, is whether AT&T complied with the exception to the Exclusive Title Clause. There is no evidence that the Executive Committee satisfied the Best Interests Condition by determining that allowing AT&T to enter into agreements with the Partnership's subscribers was in the best interests of the Partnership. Nevertheless, the delegation of authority that the Executive Committee gave to AT&T, first by unwritten agreement, later through the 1995 Resolution, and finally through the Management Agreement, was broad enough to empower AT&T to make that decision. For example, the Services Provision in the Management Agreement stated that AT&T would provide the Partnership with "Sales and Marketing Services," which the Management Agreement defined to include "subscriber acquisition." MNSA § I(D); *id.* at '751. AT&T was running a nationwide cellular business, and there were obvious efficiencies associated with using the same customer contract with all of its subscribers. AT&T therefore satisfied the Best Interests Condition.

The bigger problem for AT&T is whether it complied with the Beneficial Ownership Condition. If AT&T properly assigned and allocated the value of the

148

Partnership's subscriber contracts to the Partnership, then AT&T appropriately held title to the contracts for the benefit of the Partnership, satisfying the Beneficial Ownership Condition. The question of whether AT&T complied with the Beneficial Ownership Condition thus devolves into a question of whether AT&T properly assigned and allocated revenue from those contracts to the Partnership.

This decision has found that AT&T did not comply with the Management Agreement, but it also has held that the plaintiffs cannot pursue that claim. Without the constraints imposed by the Management Agreement, the record shows that AT&T sought to identify items of revenue by subscriber and assign those revenues to the Partnership. The exceptions are handset insurance revenue and government services revenue, which this decision addresses separately.

Except for handset insurance revenue and government services revenue, the plaintiffs failed to show that AT&T did not allocate revenue from the Partnership's subscriber contracts to the Partnership. The plaintiffs therefore failed to prove that AT&T breached the Title Provision by holding all of the subscriber contracts with Partnership subscribers in the name of an AT&T affiliate. Except for the issues of handset insurance and government services, AT&T held those contracts for the benefit of the Partnership.

## 2.    The Claim Based On The Handset Insurance Program

The plaintiffs next sought to prove that AT&T breached the Title Provision when selling handset insurance. The plaintiffs framed this claim as involving the misuse of the Partnership's retail stores, employees, customer lists, and subscribers to sell handset insurance for an AT&T affiliate. To establish a breach of the Title Provision, however, the

149

plaintiffs must show a mis-titling of assets. The plaintiffs did not carry their burden for the Partnership's retail stores and employees, because they failed to prove how those assets were titled. The plaintiffs succeeded for the Partnership's subscribers, which collectively constituted the Partnership's customer list.

There is no dispute that the Partnership's subscribers were assets of the Partnership.[55] As discussed in the preceding section, there also is no dispute that AT&T entered into contracts with Partnership subscribers through an AT&T affiliate, thus taking title to the subscriber relationship in the name of the AT&T affiliate. As the preceding section explained, those practices are not inherently problematic, as long as AT&T complied with the Beneficial Ownership Condition. That exception required that AT&T hold the asset—here, the contract with the Partnership subscriber—for the benefit of the Partnership.

When selling handset insurance, AT&T did not comply with the Beneficial Ownership Condition. Instead, AT&T used its access to the Partnership's subscribers to sell handset insurance for its own benefit. *See* Wages Tr. 416–18. From the beginning of the program until 2005, AT&T did not provide any compensation to the Partnership for its use of the Partnership's assets. JX 2403 at 11. In 2005, after prompting by its outside

---

[55] *See* Hall Dep. 54 ("The partnership owned the subscriber."); Wages 2019 Dep. 377–81 (stating that the "partnerships own the . . . customers"); JX 3866 at '315 (AT&T "does not compensate the Partnerships for use of the Partnerships' customers"); *see also* JX 2591 at 5 (AT&T's auditors stating that "a subscriber who chooses to participate in the handset insurance program is a partnership's subscriber").

150

auditor, AT&T began reimbursing the Partnership for certain costs by paying a commission for each sale of handset insurance, but AT&T did not compensate the Partnership for the use of the Partnership's subscribers. *See* JX 3866 at '315. AT&T never allocated revenue and expense to the Partnership so that it received a share of the profits associated with the handset insurance business. *See* Wages Tr. 415, 419.

AT&T's justifications for its conduct are not persuasive. AT&T asserted that the Partnership was not an insurance company and "did not bear the risk of profit and loss for the programs." JX 2415 at 5; *accord* Dkt. 622 at 20; Wages Tr. 423–24; JX 2403 at 9. AT&T also was not an insurance company, and there is no reason why AT&T could receive the benefits of the program but the Partnership could not. *See* Wages Tr. 423–24. AT&T easily could have ensured that the Partnership bore a share of the risk of loss. AT&T could have allocated a share of the net profits from the program to the Partnership, after accounting for risk, or AT&T could have allocated a share of any losses to the Partnership. The Management Agreement identified methods for doing just that. AT&T should have followed those methodologies rather than excluding the Partnership entirely from the handset insurance business, then later reimbursing the Partnership for employee commissions. Even without the Management Agreement, AT&T could have allocated a share of both revenue and expense to the Partnership.

To defend its conduct, AT&T also relied on a provision in the Partnership Agreement which states that "[n]othing contained in this Partnership Agreement shall restrict any Partner or Partner's Affiliate from engaging in any business outside of the Partnership[,] including business which may be deemed to be in competition with the

151

business of the Partnership." PA § 10.3. That provision is irrelevant. The plaintiffs have not argued that AT&T could not engage in the handset insurance business; obviously AT&T could. AT&T breached the Partnership Agreement by conducting a business in which AT&T used assets that AT&T was obligated to hold for the benefit of the Partnership, but without sharing the benefits with the Partnership.

AT&T also observed that the amounts were immaterial. The following table shows the amount of income that AT&T generated from the handset insurance program, the percentage of AT&T subscribers that were assigned to the Partnership, the resulting proportionate share of income that the Partnership would have received, and the percentage to which the plaintiffs would have been entitled.

| Year | Income (in millions) | Salem % | Salem $ | Plaintiff % | Plaintiff $ |
|------|----------------------|---------|---------|-------------|-------------|
| 2008 | $126.3 | 0.122% | $716,342 | 1.881% | $13,484 |
| 2009 | $139.8 | 0.116% | $674,113 | 1.881% | $12,680 |
| 2010 | $136.3 | 0.107% | $577,982 | 1.881% | $10,872 |

JX 2567, "Handset Ins Funnel" tab, row 24. Although it is true that the amounts were small, there is no *de minimis* exception to the Title Provision. AT&T held Partnership assets in its own name and used the assets to generate profit for itself. Under this arrangement, AT&T treated the Partnership worse than it would treat a third-party vendor, who would have earned some amount of return on its assets. AT&T failed to hold the Partnership's assets for the benefit of the Partnership.

152

### 3. The Claim Based On Selling Partnership Information To Government Entities

The plaintiffs finally assert that AT&T breached the Title Provision by selling information belonging to the Partnership to government entities. The analysis of this claim resembles the analysis of the claim based on handset insurance.

AT&T admitted that it collected data generated by its subscribers, including by subscribers assigned to the Partnership. The Partnership's subscriber data belonged to the Partnership, yet AT&T did not hold that data in the name of the Partnership. As with the subscriber contracts, therefore, AT&T failed to comply with the general obligation established in the Exclusive Title Clause.

The operative question therefore becomes whether AT&T complied with the exception to the Exclusive Title Clause. AT&T had sufficient authority to determine that holding title to the Partnership's information in its own name was in the best interest of the Partnership. AT&T was running a nationwide cellular business that generated data about all of the subscribers to the network. It would have made no sense for AT&T to partition that data in an effort to title data generated by the Partnership's subscribers in the name of the Partnership. Holding the data in the aggregate was in the best interest of the Partnership and satisfied the Best Interests Condition.

The problem for AT&T again lies in its failure to comply with the Beneficial Ownership Condition. AT&T admitted that it booked the revenue earned from these contracts at the corporate level and that the resulting revenue was "not allocated to AT&T Mobility companies, including [the] Partnerships." JX 2416 at 2. The Partnership thus did

not receive any benefit from AT&T's sales of Partnership information to government entities. Put differently, AT&T did not hold title to the information generated by Partnership subscribers for the benefit of the Partnership. AT&T held it for its own benefit.

The following table shows the amount of income that AT&T generated from selling information about its wireless and wireline subscribers to government agencies, the percentage of those subscribers that were assigned to the Partnership, the resulting proportionate share of income that the Partnership would have received, and the percentage to which the plaintiffs would have been entitled.

| Year | Income (in millions) | Salem % | Salem $ | Plaintiff % | Plaintiff $ |
|------|----------------------|---------|---------|-------------|-------------|
| 2008 | $43.7 | 0.071% | $31,033 | 1.881% | $584 |
| 2009 | $73.1 | 0.073% | $53,629 | 1.881% | $1,009 |
| 2010 | $85.5 | 0.073% | $64,807 | 1.881% | $1,219 |

JX 2567, "Para 16 Funnel" tab, row 23. The amounts were negligible, but there remains no *de minimis* exception to the Title Provision.

AT&T thus breached the Title Provision. AT&T (i) collected data about the subscribers assigned to the Partnership and held that data in its own name, (ii) sold information about Partnership subscribers to government entities, and (iii) failed to allocate any amounts to the Partnership. AT&T thus did not hold title to the Partnership's asset for the benefit of the Partnership.

## D. The Claim That AT&T Breached The Protected Information Provision

Finally, the plaintiffs sought to prove that AT&T breached the Protected Information Provision by monetizing geolocation data relating to the Partnership's subscribers. The plaintiffs failed to prove their claim of breach because AT&T had

154

authority to disclose the information. AT&T also acted appropriately by assigning the resulting revenue to the Partnership to the extent it was generated by subscribers assigned to the Partnership.

The Protected Information Provision applies only if geolocation data qualifies as Protected Information. To qualify as Protected Information, the information must be "information of the Partnership." There are multiple parties with legitimate claims of ownership over geolocation data, including the Partnership, AT&T, and the individual subscriber.

As between the Partnership and AT&T, any geolocation information generated by the subscribers that AT&T had assigned to the Partnership belonged to that Partnership. AT&T has conceded that the Partnership owned the customer geolocation data associated with its subscribers.[56] The information also was proprietary and confidential; AT&T did not share it openly. All of the agreements AT&T entered into with individual wireless

---

[56] Wages Tr. 319, 442–43. In its post-trial brief, AT&T argued that geolocation data was generated from GPS satellites and therefore was not subscriber use data. Dkt. 622 at 60–61. The record shows that during the relevant period, geolocation data was created by triangulating a subscriber's location from cellular phone towers. Wages Tr. 155; *see also* JX 3872 (LOC-AID executive describing how LOC-AID's technology "uses all three sides of the [cellular phone tower] to 'talk' to the mobile device," enabling the tower to "triangulate" an estimate of the device's location); JX 359 at 39 (AT&T used "a network-based location solution to estimate the location" of 911 callers). The document AT&T cited to support its claim about GPS data is from 2020, long after the relevant period. *See* JX 3867. When the plaintiffs sought to rely on a Notice of Apparent Liability that the FCC issued against AT&T in 2020, AT&T argued vociferously that the document post-dated the relevant period and was therefore irrelevant. *See* Dkt. 622 at 63. The same is true for AT&T's document.

subscribers, all of which were executed in the name of an AT&T affiliate, defined subscriber geolocation data as confidential information. Wages Tr. 319–20, 464; *see* JX 530 at 10–12 (AT&T customer privacy policy for location information).

Under the Protected Information Provision, AT&T only could provide Protected Information to third parties with the written consent of the Executive Committee. The plaintiffs proved that AT&T sold geolocation data for Partnership subscribers to geolocation aggregators. *See* Wages Tr. 323. The plaintiffs also proved that AT&T never obtained approval from the Executive Committee. *Id.* at 324. Those facts establish a *prima facie* claim of breach.

The claim fails, however, because AT&T proved that the Executive Committee had delegated authority to AT&T to share information on behalf of the Partnership. Under the original unwritten delegation of authority, under the 1995 Resolution, and in the Management Agreement, AT&T had broad authority to manage the Partnership's business. That grant of authority necessarily included the authority to provide Protected Information to third parties if necessary for AT&T to operate its business. *See id.* at 320, 325.

As part of operating the Partnership's business, AT&T had the concomitant obligation to allocate revenue and expense fairly to the Partnership. Under the Management Agreement, the revenue from the geolocation contracts constituted Shared Revenues, generated from the utilization of the Entire Network, that AT&T was obligated to allocate to the Partnership based on its relative share of traffic. The plaintiffs proved that AT&T did not allocate revenue from the geolocation agreements to the Partnership at the contract level. Instead, AT&T treated a geolocation application as a "bolt-on" service, so that if the

156

Partnership subscriber paid for it, then AT&T assigned the revenue from that subscriber's subscription to the Partnership. *Id.* at 439–40, 448, 494–95. AT&T did not treat the overall contract revenue as Shared Revenues for purposes of the Shared Revenues Formula, nor did AT&T apply the premium contemplated by the Premium Provision.

This decision has found, however, that the plaintiffs cannot pursue a claim for breach of the Management Agreement because that cause of action is a derivative claim that belongs to the Partnership. Without the ability to rely on the allocation methodologies in the Management Agreement, the plaintiffs failed to prove that it was unreasonable for AT&T to allocate revenue among its market-level entities based on the subscribers assigned to those units. The plaintiffs therefore failed to prove a breach of the Protected Information Provision.

### E.    Causally Related Harm

The final element of a claim for breach of contract is causally related harm. That framing combines two concepts: (i) harm to the plaintiff that is (ii) causally related to the breach.

All that a plaintiff must prove is the fact of harm. A party's inability to prove precise harm is not fatal.

> When a party breaches a contract, that party often creates a course of events that is different from those that would have transpired absent the breach. The breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer. Rather, when a contract is breached, expectation damages can be established as long as the plaintiff can prove the fact of damages with reasonable certainty.

157

*Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015).

The plaintiffs proved that AT&T harmed the Partnership by using the Partnership's assets while failing to allocate to the Partnership a share of the resulting benefits. The plaintiffs thus proved all of the elements of a breach of contract claim.

## III.     THE REMEDY

The plaintiffs proved a single breach of the Partnership Agreement: AT&T breached the Title Provision when it held Partnership assets in its own name without holding those assets for the benefit of the Partnership. The final question is what remedy should result.

The plaintiffs argue that the court should craft a damages remedy based on a contractual dissociation provision in the Partnership Agreement. That provision states that if a partner breaches a material term of the Partnership Agreement, then the partner must transfer its interest to the non-breaching partners in exchange for a payment from the Partnership equal to the value of the partner's capital account. Recognizing that it is impractical to enforce the remedy as written at this stage in the life of the Partnership—eleven years after the Freeze-Out—the plaintiffs ask the court to award the monetary equivalent of the dissociation remedy. They correctly calculate that an equivalent award of dissociation damages could be crafted by determining the fair value of the Partnership and subtracting the value of AT&T's capital account.

The court declines to award this remedy, because to the extent it yields any remedy at all, the result would be unconscionably disproportionate. Instead, AT&T will pay to the plaintiffs their proportionate share of the net income that AT&T should have allocated to

158

the Partnership. When allocated to the Partnership based on its proportional number of subscribers, the resulting amount is trivial.

## A. Applicable Principles Of Law

As a general matter, a remedy for breach of contract should seek to give the non-breaching party the benefit of its bargain. *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000). "Delaware is a pro-contractarian state." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 2012 WL 3201139, at *26 n.211 (Del. Ch. Aug. 7, 2012). "In Delaware, the traditional method of computing damages for a breach of contract claim is to determine the reasonable expectations of the parties." *Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *29 (Del. Ch. July 20, 2007).

Where parties have expressed their expectations through a specific contractual remedy, Delaware law favors enforcing that remedy. Requiring parties to live with "the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length." *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002). The parties' contractual agreement to that remedy is sufficient, standing alone, to support awarding it.[57] That said, a contractual remedy does not bind the court, and the court has discretion to award a different remedy. "[E]ven if a contract specifies a remedy for breach of that

---

[57] *See Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) (specific performance); *Kan. City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003) (injunctive relief); *Dover Assocs. Joint Venture v. Ingram*, 768 A.2d 971, 974 (Del. Ch. 2000) (receiver).

contract, 'a contractual remedy cannot be read as exclusive of all other remedies [if] it lacks the requisite expression of exclusivity.'" *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 176 (Del. 2002) (alteration in original) (quoting *Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.*, 336 A.2d 211, 214 (Del. 1975)).

Delaware's contractarian approach applies all the more strongly to general partnerships governed by DRUPA, which articulates a policy of giving "maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." 6 *Del. C.* § 15-103(d). Enforcing the plain language of partnership agreements fulfills the public policy that the General Assembly has articulated. *Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A. 3d 1097, 1109 (Del. Ch. 2014).

DRUPA expressly authorizes a partnership agreement to specify the remedy that will apply in the event of breach. It states:

> A partnership agreement may provide that (i) a partner who fails to perform in accordance with, or to comply with the terms and conditions of, the partnership agreement shall be subject to specified penalties or specified consequences, and (ii) at the time or upon the happening of events specified in the partnership agreement, a partner shall be subject to specified penalties or specified consequences. Such specified penalties or specified consequences may include and take the form of any penalty or consequence set forth in § 15-207(b) of this title.

6 *Del. C.* § 15-408.

The statutory language expressly permits the contractually designated remedies to include "specified penalties or specified consequences," including "any penalty or consequence set forth in § 15-207(b)." That section provides that if a partner fails to make a capital contribution, then the contractual penalty or consequence

160

may take the form of reducing or eliminating the defaulting partner's interest in the partnership, subordinating the partner's partnership interest to that of nondefaulting partners, a forced sale of the partner's partnership interest, forfeiture of the partner's partnership interest, the lending by other partners of the amount necessary to meet the partner's commitment, a fixing of the value of the partner's partnership interest by appraisal or by formula and redemption or sale of the partner's partnership interest at such value, or other penalty or consequence.

6 *Del. C.* § 15-207(b).

The authorization of penalties and forfeitures that appears in Sections 15-408 and 15-207 reflects a significant departure from standard contractarian principles. Under the common law, a court generally will not enforce a contractual provision aimed at punishing or penalizing the breaching party, rather than compensating the non-breaching party.[58] The common law also resists outcomes that result in a forfeiture.[59] DRUPA authorizes both.

---

[58] *See Restatement (Second) of Contracts* § 355 (1981 & Supp. 2021) (barring recovery of punitive damages as remedy for breach of contract); *id.* § 356(1) ("A [contract] term fixing unreasonably large liquidated damages is unenforceable . . . as a penalty."); *see also Del. Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006) (analyzing whether a liquidated damages provision constituted "a 'penalty' . . . inserted into a contract that serves as a punishment for default, rather than a measure of compensation for its breach" and explaining that "if a [contract] provision is considered a penalty, it is void as against public policy and recovery is limited to actual damages"); *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 48 (Del. 1997) (determining whether termination fee cast as a liquidated damages provision represented an unjustified penalty). Comparable provisions appear in the Delaware Limited Liability Company Act. *See* 6 *Del. C.* §§ 18-306, 18-502; *CML V, LLC v. Bax*, 6 A.3d 238, 251 (Del. Ch. 2010), *aff'd*, 28 A.3d 1037 (Del. 2011). A leading scholar has cited the express authorization of penalties and forfeitures as one of a coven of reasons why LLCs are not truly creatures of contract; at best they are primarily contractual. *See generally* Mohsen Manesh, *Creatures of Contract: A Half-Truth About LLCs*, 42 Del. J. Corp. L. 391 (2018).

[59] *Jefferson Chem. Co. v. Mobay Chem. Co.*, 267 A.2d 635, 637 (Del. Ch. 1970) ("Equity . . . abhors a forfeiture."); *see Garrett v. Brown*, 1986 WL 6708, at *8 (Del. Ch.

While it authorizes contractual remedies, DRUPA also recognizes the broad scope of the court's discretion. The statute notes that "[i]n any case not provided for in this chapter, the rules of law and equity, including the law merchant, shall govern." 6 *Del. C.* § 15-104(a). Commentary to the analogous provision of the Revised Uniform Partnership Act ("RUPA"), on which DRUPA was based, states:

> The principles of law and equity supplement RUPA unless displaced by a particular provision of the Act. This broad statement combines the separate rules contained in UPA Sections 4(2), 4(3), and 5. These supplementary principles encompass not only the law of agency and estoppel and the law merchant mentioned in the UPA, but all of the other principles listed in UCC Section 1-103: the law relative to capacity to contract, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other common law validating or invalidating causes, such as unconscionability.

Uniform Partnership Act § 104 cmt. (2020-2021 ed.). *See generally* Robert S. Summers, *General Equitable Principles Under Section 1-103 of the Uniform Commercial Code*, 72 Nw. U. L. Rev. 906 (1978). Consequently, "even where a partnership agreement specifies a remedy for breach of that contract, the Court of Chancery is not prohibited from awarding other equitable or legal remedies, at least unless the partnership agreement explicitly states that the specified remedy is the exclusive remedy." *Gotham P'rs*, 817 A.2d at 176.

Consistent with these principles, in jurisdictions outside of Delaware, "[t]he approach of the cases has been to give effect to expulsion provisions as written." 2 Christine Hurt et al., *Bromberg and Ribstein on Partnership*, § 7.02(f) at 7:50 (1988 & Supp. 2014).

---

June 13, 1986) ("Forfeitures are not favored and contracts will be construed to avoid such a result."); *Clements v. Castle Mortg. Serv. Co.*, 382 A.2d 1367, 1370 (Del. Ch. 1977) ("Forfeiture as such is highly disfavored by the courts, including those of Delaware.").

But there also is authority "against enforcing an expulsion that results in substantial forfeiture of the expelled partner's interest." *Id.* at 7:51–52 (citing *Jones v. Chester*, 363 S.W.2d 150 (Tex. Civ. App. 1962) (refusing to enforce liquidated damages provision that would punish involuntarily terminated partner out of proportion to any damage caused to partnership)).

## B. The Dissociation Remedy

As authorized by DRUPA, the Partnership Agreement establishes a contractual remedy that applies if a partner commits a "Material Default," defined as the breach of a material covenant, representation, or warranty in the Partnership Agreement. The language of the provision notably does not deploy the common law concept of a "material breach."

The baseline provision establishes the concept of a "Material Default" by stating as follows:

> Material Default. If a Partner for any reason breaches any material covenant, representation or warranty of this Partnership Agreement, and the breach is not cured within thirty (30) days after written notice of the breach is provided to the defaulting Partner by the Executive Committee, then the Partner shall be considered to be in material default.

PA § 8.1 (the "Material Default Provision").

A separate provision prescribes dissociation as the contractual remedy for a Material Default. The operative language states:

> Sale on Material Default. Each Partner who commits an uncured material default or voluntarily causes a dissolution . . . shall be required to sell its Ownership Interest, and subject to any required FCC consent, to transfer to the other Partners pro rata its Ownership Interest, if any, for an aggregate amount equal to the balance of its capital account. The provisions of this Section 8.2 may be waived on a case by case basis by the Executive Committee in its sole discretion.

163

*Id.* § 8.2 (the "Dissociation Provision"). The Dissociation Provision thus calls for a forced sale of the defaulting partner's interest in return for the balance of the defaulting partner's capital account (the "Dissociation Remedy"). By its terms, the Dissociation Remedy is mandatory ("shall be required to sell"), but the Executive Committee can waive its application "on a case by case basis . . . in its sole discretion." The combination of these provisions empowers the Executive Committee to determine whether the Dissociation Remedy applies, subject to fiduciary constraints and the strictures of the implied covenant of good faith and fair dealing.

The Partnership Agreement likewise makes clear that the Dissociation Remedy is not an exclusive remedy:

> Any Partner who commits such a material default, or who causes the dissolution of the Partnership . . . shall be liable to the Partnership for, and shall indemnify the Partnership against, all resulting damages, losses, expenses and claims, including reasonable attorneys' fees and litigation expenses, suffered or incurred by the Partnership.
>
> The exercise of rights provided in Section[] 8.2 [the Dissociation Remedy] . . . shall not relieve the Partner of such liability or indemnification and shall not constitute a waiver, by any Partner or the Partnership, of any right or remedy against the defaulting Partner under this Partnership Agreement, including the right to set off damages, losses and expenses against any amount owed to the defaulting Partner.

*Id.* § 8.1 (the "Non-Exclusive Remedy Provision") (formatting added).

In broad strokes, the Dissociation Remedy resembles the statutory dissociation remedy that appears in the DRUPA. Section 15-601 of DRUPA identifies events that will cause a partner's dissociation from a partnership. One such event occurs if the Court of Chancery enters an order directing the partner's expulsion for having "wilfully or

164

persistently committed a material breach of either the partnership agreement or of a duty owned to the partnership or the other partners." 6 *Del. C.* § 15-601(5)(ii); *see* RUPA § 601(5)(B).

Despite strong conceptual similarities, the Partnership Agreement creates a more readily available dissociation remedy than the statute. For starters, the Dissociation Remedy uses a different and more easily satisfied trigger. The statute contemplates a material breach, which is a recognized term under the common law. *See generally Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *28 (Del. Ch. June 26, 2017). The Material Default Provision, by contrast, requires only a breach of a "material covenant, representation or warranty." The United States Court of Appeals for the Second Circuit has distinguished the two standards explicitly, holding that it was error for a trial court to require a showing of "material breach" when the dissociation provision in a partnership agreement required only that the defaulting partner have breached a material provision. *See NCAS Realty Mgmt. Corp. v. Nat'l Corp. for Housing P'ships*, 143 F.3d 38, 46 (2d Cir. 1998) (applying New York law). The Court of Appeals concluded that the district court had erred because "[i]t required the breach itself to be material, instead of enquiring whether the breach was of a material provision." *Id.* The Court of Appeals also held that the district court had erred by relying "upon cases involving contracts negotiated at arm's-length, not partnership agreements." *Id.* This court has distinguished between the two concepts implicitly, holding that the majority partner in a general partnership breached a provision in the partnership agreement that prohibited the sharing of confidential information without formal partner-level approval—a material covenant—but awarded

165

only nominal damages because the plaintiff had failed to show proof of actual injury. *See B & L Cellular v. USCOC of Greater Iowa, LLC*, 2014 WL 6882207, at *2 (Del. Ch. Dec. 8, 2014).

The Dissociation Remedy's trigger for dissociation also is lower than the statutory trigger in two other respects. The statute requires that the breaching party have acted "wilfully" or that the material breach have occurred "persistently." The Dissociation Provision requires only a single breach ("the breach"), and it envisions that the breach could occur "for any reason."

The statute and the Partnership Agreement also differ over who controls the remedy. The statute specifies that the Court of Chancery may enter such an order "[o]n application by or for the partnership or another partner." 6 *Del. C.* § 15-601(5). The statute thus makes plain that "another partner" can make the application. But the Dissociation Provision gives the Executive Committee the ability to waive the remedy in its sole discretion. That language ensures that the Executive Committee controls whether the Dissociation Remedy is available.[60]

---

[60] When determining whether to exercise the Dissociation Remedy, however, the members of the Executive Committee would be obligated to comply with their fiduciary duties. If AT&T's representatives on the Executive Committee declined to enforce the Dissociation Remedy against AT&T, then such a decision would be subject to fiduciary review. The Executive Committee also would have to exercise its discretion in conformity with the implied convent of good faith and fair dealing. *See Miller v. HCP Trumpet Invs., LLC*, 2018 WL 4600818, at *1, 194 A.3d 908 (Del. 2018) (ORDER) ("[T]he mere vesting of 'sole discretion' did not relieve the Board of its obligation to use that discretion consistently with the implied covenant of good faith and fair dealing."). A provision granting a general partner "sole discretion" without "further flesh[ing] out what that term

The statute and the Partnership Agreement also differ in what the dissociated partner receives. Under the statute, a partner whose dissociation does not cause the partnership to dissolve is entitled to receive "an amount equal to the fair value of such partner's economic interest as of the date of dissociation based upon such partner's right to share in distributions from the partnership." 6 *Del. C.* § 15-701(b); *see Hillman v. Hillman*, 910 A.2d 262, 277 (Del. Ch. 2006) (interpreting statute). Under the Dissociation Remedy, the partner receives an amount equal to the balance of its capital account. That amount typically will be less than fair value, because the balance in the capital account reflects the partner's allocation of net income through the date of dissociation. It does not credit the partner with a share of the value of the business as a going concern.

Finally, both the statute and the Partnership Agreement make the dissociated partner liable for any damages to the partnership or the other parties. By statute, if a court orders the expulsion of a partner under the statutory provision, then the dissociation is wrongful. *See* 6 *Del. C.* § 15-602(b)(3). "A partner who wrongfully dissociates is liable to the partnership and to the other partners for damages caused by the dissociation. Such liability is in addition to any other obligation of the partner to the partnership or to the other partners." *Id.* § 15-602(c). The Non-Exclusive Remedy Provision establishes the same rule.

means" does not insulate the general partner's actions from review; it "simply says that [the general partner] has the singular (i.e., sole) authority (i.e., discretion) to consider and decide this matter." *Paige Cap. Mgmt., LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355, at *32 (Del. Ch. Aug. 8, 2011). Given those strictures, AT&T's representatives on the Executive Committee could not freely waive the Dissociation Remedy if it otherwise applied to AT&T.

The parties have not addressed whether the contractual Dissociation Remedy can co-exist with the statutory alternative. Although DRUPA generally is an enabling statute, some of its provisions are mandatory. *Id.* § 15-103(a). Section 15-103(b) identifies the provisions a partnership agreement cannot modify. *United States v. Sanofi-Aventis U.S. LLC*, 226 A.3d 1117, 1128 (Del. 2020). One of them is the statutory dissociation remedy: "The partnership agreement may not . . . [v]ary the right of a court to expel a partner in the events specified in § 15-601(5) of this title." 6 *Del. C.* § 15-103(b)(5). Commentary to Section 601(5) of the Uniform Act reinforces this point, stating that "[t]he partnership agreement cannot vary the stated grounds for expulsion . . . , but can choose an alternative forum – *e.g.*, arbitration." RUPA § 601(5) cmt. The Dissociation Remedy and the statute can be harmonized by recognizing that the statute does not prevent a partnership agreement from providing an additional contractual remedy, such as the Dissociation Remedy, but that a partner and the partnership always have resort to the statutory dissociation remedy.

## C.    The Plaintiffs' Request For The Monetary Equivalent Of Dissociation

The plaintiffs recognize that on the facts of this case, it is not possible to enforce the Dissociation Remedy as written. The Partnership has dissolved, and AT&T claims to have wound up its affairs some eleven years ago. In October 2010, the Partnership made what AT&T contends is a liquidating distribution, and AT&T maintains that the Partnership's existence terminated once the distribution was complete. The record does not reveal what has happened to the assets of the Partnership since then. Once its affiliate became the sole owner of the Partnership's assets, it seems likely that AT&T would have taken steps to integrate the Partnership's business more deeply into its operations. It would be a stretch

168

to revive the Partnership at this point and attempt to enforce a buyout of AT&T's interests.[61]

Instead, the minority partners ask the court to award damages that will achieve the monetary equivalent of dissociation. The concept of rescissory damages provides an apt analogy for this request: When rescission is impractical, a court can award damages designed to achieve "the monetary equivalent of rescission." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014). The plaintiffs seek the same result, but with dissociation as the baseline.

Nothing in the Partnership Agreement would prevent the court from crafting a remedy based on dissociation damages if the facts warranted it. The Non-Exclusive Remedy Provision makes clear that the Dissociation Remedy is non-exclusive. That rule comports with the common law principle that a court "will not construe a contract as taking

---

[61] The plaintiffs never sought to have the court revive the Partnership, whether for purposes of enforcing the Dissociation Remedy or to pursue derivative claims against AT&T. Presumably the court could do so, but only if the equities warranted it. *Cf. In re Krafft-Murphy Co., Inc.*, 82 A.3d 686 (Del. 2013) (contemplating revival of dissolved corporation and appointment of receiver to defend claims and pursue coverage under unexhausted insurance policies).

AT&T also argues that there are other impediments to enforcing the Dissociation Remedy as written. The Material Default Provision contemplates that the Executive Committee will provide notice to the defaulting partner and give the defaulting partner thirty days in which to cure the breach. In this case, the Executive Committee (controlled by AT&T) never gave notice to AT&T of a material breach, and the cure period never took place. The plaintiffs argue with some force that under the facts of the case, compliance with the notice requirement would be futile and would be excluded on that basis. They also argue with equal force that they only discovered the full nature of AT&T's actions by conducting discovery in this litigation.

away a common law remedy unless that result is imperatively required." *Gotham Pr's*, 817 A.2d at 176 (internal quotation marks omitted). When the contract does not specify that a particular remedy is exclusive, "the Court of Chancery has the discretion to award any form of legal and/or equitable relief and is not limited to awarding contract damages for breach of the agreement." *Id.* Relying on that principle, this court has ordered the dissociation of a member as a remedy when an LLC agreement did not provide for it, although in that case the court allowed the dissociated member to retain its economic interest in the entity as an assignee. *See Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 107, 115 (Del. Ch. 2006).

The plaintiffs ask the court to award the monetary equivalent of the Dissociation Remedy by placing them in the same position that they would have occupied if they had acquired AT&T's interest in the Partnership under the Dissociation Remedy, just before the Freeze-Out took place. It is relatively easy to calculate the monetary equivalent of the Dissociation Remedy. The core concept underlying the Dissociation Remedy is that the non-breaching partners receive the breaching partner's interest in the Partnership in return for the value of the breaching partner's capital account. The non-breaching partners thus benefit from the difference between the value of the interest and the value of the capital account.

In this case, the balance of each partner's capital account is known. It is that partner's proportionate share of the cash payment of $219 million that AT&T paid for all of the Partnership's assets and liabilities. At the time that transaction took place, the minority partners held a 1.881% interest in the Partnership, and AT&T held the remaining

170

98.119% interest. *See* PTO ¶ 10. Given these figures, in a hypothetical world where the minority partners could have enforced the Dissociation Remedy against AT&T, the minority partners would have received a pro rata allocation of AT&T's interest in the Partnership, and AT&T would have received $214,880,610. After the transaction, AT&T no longer would have an interest in the Partnership. Instead, the no-longer-minority partners would own 100% of the post-payout value of the Partnership.

The critical step in the analysis therefore is to determine the post-payout value of the Partnership. The starting point is to determine the fair value of the Partnership before the payout. In this litigation, AT&T's expert has opined that the pre-payout value of the Partnership ranged from $169,354,000 to $222,119,000. Taylor Report at 123. The plaintiffs' expert made adjustments to that valuation and opined that the Partnership had a pre-payout value of $478,978,000. Barrick Rebuttal Report at 8.

The high end of the range provided by AT&T's expert implies that if the plaintiffs could have enforced the Dissociation Remedy against AT&T, then they would have held interests in an entity worth $7,238,390 ($222,119,000 minus $214,880,610). The plaintiffs already received $4,119,390 from AT&T as their share of the proceeds from dissolution, so they would be entitled to an additional $3,119,000 in damages from AT&T.

The valuation provided by the plaintiffs' expert implies that if the plaintiffs could have enforced the Dissociation Remedy against AT&T, then they would have held interests in an entity worth $264,097,390 ($478,978,000 minus $214,880,610). The plaintiffs already received $4,119,390 from AT&T as their share of the proceeds from dissolution, so they would be entitled to an additional $259,978,000 in damages from AT&T.

171

Under this approach, the minority partners receive 100% of the court-determined value of the Partnership that is in excess of the price that AT&T set in the buyout. If the court determines that AT&T paid a fair price, then dissociation damages do not result in any recovery for the plaintiffs. But if the court determines that AT&T paid a price that was unfairly low, then the dissociation damages rapidly become disproportionate and punitive.

The plaintiffs advance several arguments as to why this result is warranted.

• They observe that in other litigation involving similar partnerships, AT&T has sought to impose the Dissociation Remedy on minority partners, making dissociation damages a fitting sauce for the gander.

• They note that as the holder of more 98% of the general partner interest in the Partnership, AT&T could have acted at any time to change or eliminate the Dissociation Remedy.

• They emphasize out that AT&T only will be required to pay damages if it set the price too low in the Freeze-Out. AT&T thus will keep its pro rata share of the value that it unilaterally placed on the Partnership and forced the plaintiffs to accept.

The facts of this case, however, convince me that an award of dissociation damages would be too untethered from the nature of the proven breach. The plaintiffs only succeeded on their claim for breach of the Title Provision. The essence of that breach lay in AT&T's failure to allocate to the Partnership its share of the value that AT&T generated from monetizing information about the Partnership's subscribers. The amount of the misallocation was negligible.

Dissociation damages would have been warranted if the plaintiffs had proven their claim for breach of the Governance Provision. To recap, the Shared Revenues Formula called for allocating to the Partnership a proportionate share of a single, inclusive pot of revenue based on the relative share of network traffic that the Partnership carried. The

172

Shared Revenues Formula also called for the Partnership to receive a 25% premium over and above its share of revenue. The evidence shows that AT&T either assigned or allocated to the Partnership at least some share of the vast majority of the revenue to which the Partnership could have been entitled. But the evidence also show that AT&T did not use a traffic-based allocation and did not comply with the Premium Provision.

It seems more likely than not that the Partnership would have benefitted materially from a traffic-based allocation. The evidence demonstrates that the NPA-NXX system for assigning subscribers to the Partnership became less accurate over time. The evidence also demonstrates that AT&T's system of assigning incollect roaming expense and Outcollect Roaming Revenues was disadvantageous to the Partnership. If one believed that there were more subscribers using the Partnership's network than the amount of NPA-NXX numbers assigned to the Partnership, then a traffic-based allocation could have benefitted the Partnership significantly. Wages could not say whether the subscriber accounts were off by 25%, 50%, or even 75%. Assuming the subscriber count was 75% lower than it should have been, then a traffic-based allocation might have resulted in four times as much revenue going to the Partnership. And on top of that, AT&T would have needed to add a 25% premium to the Partnership's allocation of revenue.

The plaintiffs, however, did not pursue a derivative claim for breach of the Management Agreement. They also did not obtain traffic-based metrics that would enable the court to assess, if only approximately, how the Partnership's revenue allocation would have changed under the allocation principles that AT&T committed to use in the Management Agreement.

173

The plaintiffs thus are in a position where their only proven breach of the Partnership Agreement does not support a meaningful damages award. Linking the Dissociation Remedy to that breach risks a disproportionate and punitive outcome. The court therefore will not enforce the Dissociation Remedy.

## D. The Compensatory Award

The plaintiffs are entitled to damages equal to their pro rata share of the value that AT&T generated by using Partnership information to sell handset insurance and by selling Partnership information to government entities. The following table shows the breakdown of the amounts by year:

| Year | Handset Insurance | Government Information |
|------|-------------------|-----------------------|
| 2008 | $13,484 | $584 |
| 2009 | $12,680 | $1,009 |
| 2010 | $10,872 | $1,219 |

The plaintiffs are entitled to pre- and post-judgment interest on these amounts through the date of payment. Interest shall accrue at the legal rate, compounded quarterly, with the legal rate changing with changes in the reference rate. The parties shall confer regarding the calculation of interest.

## IV. CONCLUSION

Judgment will be entered for the plaintiffs on their claim that AT&T breached the Title Provision. Otherwise, judgment will be entered for AT&T on the plaintiffs' claims for breach of the Partnership Agreement.

174